# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## DEL RIO DIVSION

| | |
|---|---|
| **J.P.,** a minor by and through his parents and next friends, **CRYSTAL P.** and **DANIEL P.**, et al.,<br><br>*Plaintiffs,*<br><br>vs.<br><br>**THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT ("UCISD")**, et al.,<br><br>*Defendants.* | **Civil Action No.: 2:23-cv-00015-AM** |

## PLAINTIFFS' EX PARTE MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

**TO HONORABLE JUDGE ALIA MOSES**

COMES NOW, PLAINTIFFS' J.P., a Minor, et al., pursuant to FRCP 15(a) to file their MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT, and in support thereof, provides this Court with the following:

### SUMMARY

Plaintiffs herein move this Court for leave to amend their Complaint by adding two indispensable parties who are currently named in a related case currently before this Court, *Jasmine C., et al v. Daniel Defense, et al* **2:23-cv-00014**. Upon considerations of judicial economy, joinder, and consolidation, Plaintiffs respectfully request leave to amend in order to add these two indispensable parties to the action at bar, thereby consolidating two separate actions into one.

### BACKGROUND

On or about November 29, 2023, Plaintiffs filed a class/mass action before Judge Lee Yaekel in the Western District, Austin Division pertaining to the horrific events of a mass shooting at Robb Elementary School in Uvalde Texas seeking redress against Defendants' municipality,

school district and law enforcement agencies on account of their role in exacerbating Plaintiffs' harms. No.: I:22-CV-1252-LY. (Dkt. 1). Given that other related cases had been filed in the geographically more proximate Del Rio Division, Judge Yaekel transferred Plaintiffs' case to this Court in the Del Rio Division on or about March 1, 2023. (Dkt. 20).

Also, on or about November 29, 2023, Plaintiffs' Jasmine C., et al filed suit before Judge Yaekel in the Austin Division against Defendants' Daniel Defense ("Daniel") and Oasis Outback ("Oasis") for their separate and associated conduct in negligently outfitting the mass shooter, Salvador Ramos, with the armaments he relied upon in carrying out the May 24, 2022, massacre. No.: 1:22-CV-1251-LY (Dtk. 1). Judge Yaekel similarly transferred Plaintiffs' case against Daniel Defense to this Court on March 1, 2023. (Dkt. 19).

As such, there currently exists two separate and distinct lawsuits before this Court brought by the same set of Plaintiffs who are seeking redress as a class/mass action against (1) the City and School District of Uvalde and various local, City, State and Federal law enforcement agencies (No,: 2:23-cv-00015-AM)("Uvalde action") and (2) gun manufacturer Defendant Daniel Defense and gun retailer, Oasis Outback (2:23-cv-00014-AM)("Daniel action"). The instant motion seeks to consolidate the two actions into one.

Given that there has been neither service of process nor have the Defendants currently at bar formally appeared, Plaintiffs bring the instant Motion on an ex-parte basis.

With respect to the Daniel action, despite having failed to formally appear nor having been served, Defendant Daniel Defense sought out Plaintiffs' complaint from the court's docket and on February 17, 2023, moved this Court to dismiss for lack of subject matter jurisdiction pursuant to Section 12(b)(1). (Dkt. 11). Daniel's motion highlighted the lack of complete diversity where,

unlike itself as a foreign corporation, Daniel's co-defendant, Oasis is an LLC domiciled in Texas, as are the plurality of the Plaintiffs' class. (Dkt. 11).

In response, Plaintiffs filed an amended complaint that relied upon § 1332(d) diversity jurisdiction as otherwise provided by the Class Action Fairness Act's ("CAFA") exception to complete diversity. 28 U.S.C. § 1332(d). (Dkt. 14). Thereafter, Daniel renewed its Section 12(b)(1) motion by seizing upon CAFA's jurisdictional exception withholding jurisdiction when more than two-thirds of the putative class are from the forum state. 28 U.S.C. § 1332(d)(4). (Dkt. 20).

Said motion is now pending before this Court under the Daniel action, 2:23-cv-00014(Dkt. 20).[1]

Thus, were this court to grant Plaintiffs' motion for leave to amend, in addition to this Court having jurisdiction over Plaintiffs' state claims against Defendants' Daniel Defense and Oasis Outback based upon supplemental jurisdiction (42 U.S.C. § 1367)[2], this Court would benefit from having to preside over one case involving Plaintiffs' putative class, and as such, its judicial economy would be significantly simplified, particularly in light of the sizeable number of related actions currently filed or soon to be filed that will be added to its docket.

//

//

---

[1] Were this Court to grant Plaintiffs' instant Motion for Leave to Amend, Daniel Defense's outstanding Motion to Dismiss would thereby be rendered moot. See, Comb v. Benji's Special Educ. Acad., Inc., 745 F. Supp. 2d 755, 773 (S.D. Tex. 2010) (denying as moot motion to dismiss "without prejudice to refiling in light of Plaintiffs' second amended complaint").

[2] The Court will also have supplemental jurisdiction over Plaintiff's state law claims as they form part of the "same case or controversy" under Article III of the United States Constitution as the federal claims currently lodged against the municipal and law law enforcement agencies. 28 U.S.C. § 1367(a). Claims form part of the same case or controversy when they derive from "a common nucleus of operative fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-66(1997); *State Nat'l Ins. Co. Inc. v. Yates*, 391 F.3d 577, 579 (5th Cir. 2004).

**ARGUMENT**

I.     **Given Rule 15(a) bias in favor of granting amendment and the lack of substantial reasons at bar for diverting from such, Plaintiffs motion to amend is most considerably applicable.**

Federal Rule of Civil Procedure 15(a)(2) provides that a court should freely give leave to a party to amend its pleadings "when justice so requires."[3] Fed. R. Civ. P. 15(a)(2). A court reviewing a Rule 15(a) motion to amend pleadings may consider factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003. The Rule "evinces a bias in favor of granting leave to amend." *Id.*

Here, the balance reasonably tips in favor of Rule 15(a)'s bias favoring amendment. *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). Given the procedural posture at bar, i.e., pre-service and pre-notice of appearance, there is absolutely no "undue delay" nor is there any scintilla of bad faith or dilatory motive.[4]

---

[3] Determining when "justice so requires" rests within the sound discretion of a district court. *See Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1162 (5th Cir. 1982). A court's discretion to grant leave is severely limited by the bias of Rule 15(a) favoring amendment. *Dussouy*, 660 F.2d at 598. Leave to amend should not be denied unless there is a substantial reason to do so. *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998). There is a substantial reason to deny leave if the proposed amendment would cause undue delay or prejudice to the non-movant, if it is motivated by bad faith or dilatory motives, if there have been repeated failures to cure deficiencies with prior amendment, or if the amendment is futile. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); *see also, Martin's Herend Imports, Inc. v. Diamond & Gem Trading*, 195 F.3d 765, 770 (5th Cir. 1999).

[4] Bad faith exists if the amendment indicates that the plaintiff asserts baseless claims in an effort to prolong litigation. *Griggs v. Pace American Corp, Inc.*, 170 F.3d 877, 881 (9th Cir. 1999). Bad faith exists when a party attempts to amend its pleading for an improper purpose. *Foman v. Davis*, 371 U.S. 178, 182(1962); *Wizards of the Coast LLC v. Cryptozoic Entm't LLC*, 309 F.R.D. 645, 651 (W.D. Wash. 2015)(bad faith exists under Rule 15 when a party intends "to deceive, harass, mislead, delay, or disrupt).

Similarly, with respect to the factor of "repeated failures to cure deficiencies with prior amendment," here Plaintiffs are only seeking to amend a second time and fully acknowledge that their amendment has been catalyzed by Defendants' casting attention on the sufficiency of their grounds for invoking subject matter jurisdiction. *See, Thompson v. New York Life Ins. Co.*, 644 F.2d 439, 444 (5th Cir. 1981) (permission to amend may be granted even though the original pleading is defective in its statement of a claim for relief or defense). This however is a reasonable, 'non-futile' attempt to cure a deficiency that will prove successful on account that jurisdiction will attach upon supplemental jurisdiction based upon federal question jurisdiction 28 U.S.C. § 1331. See *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998(Rule 15(a) evinces a liberal amendment policy and a motion to amend should not be denied absent a substantial reason to do so.). Furthermore, "this 'policy' is strongest when the motion challenged is the first motion to amend." *Thompson*, 644 F.2d at 444.

Lastly, with respect to the existence of "prejudice to the non-movant" and futility[5] of amendment, here, while the Defendants' at bar, i.e., the City of Uvalde, Uvalde's school district and law enforcement would by no means be prejudiced by adding the gun manufacturer and the gun seller as co-defendants, Defendant Daniel Defense however could conceivably argue the existence of prejudice in having to defend against claims in federal court where subject matter jurisdiction could conceivably be unbecoming were leave to amend be denied. Such prejudice

---

[5] Given that neither of the named defendants at bar have been served nor have they entered a notice of appearance, no such argument exists that amendment is futile where substantive argument has yet to proceed. The same holds true for Defendant Daniel Defense who, as of yet, has only challenged the federal court's jurisdiction which, as argued, jurisdiction would soundly attach pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1367 were amendment granted. An amendment is considered futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Mason v. Fremont Inv. & Loan*, 671 Fed. Appx. 880, 883 (5th Cir. 2016) (in determining futility, the court applies "the same standard of legal sufficiency as applied under Rule 12(b)(6)").

however is unavailing where said prejudice can only defeat Rule 15(a)'s liberal amendment policy where amendment "will significantly hinder a defendant's ability to defend against the plaintiff's claims." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir. 1989). Here, no such standard can be reasonably met, particularly when considered against the well-established admonition that leave to amend should not be denied unless there is a substantial reason to do so. *Jacobsen,* 133 F.3d at 318.

Thus, the fact that amendment affords Plaintiffs with a sound foundation for subject matter jurisdiction does not provide the kind and degree of prejudice required to preclude Rule 15(a)'s bias in favoring amendment. *Dussouy*, 660 F.2d at 598. The Supreme Court underscores such bias and squarely addresses the argument that Daniel could conceivably raise with respect to prejudice by amendment where such would provide plaintiff a 'safe haven' in establishing subject matter jurisdiction, Thus the Court reaffirmed that Rule 15 "reject[s] the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept[s] the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48(1957).

As the above makes plain, the exceptions that otherwise defeat Rule 15's liberal amendment policy fall short where such reasons, if such exist at all, fail to constitute *substantial* reasons. *Jacobsen*, 133 F.3d at 318; *Foman*, 371 U.S. at 182) ("there is a *substantial* reason to deny leave if the proposed amendment would cause undue delay or prejudice to the non-movant, if it is motivated by bad faith or dilatory motives, if there have been repeated failures to cure deficiencies with prior amendment, or if the amendment is futile.") (*emphasis added*).

//

//

## II.     Judicial economy is reasonably served upon Amendment's resulting consolidation

In addition to the above analysis that sufficiently illustrates that Rule 15(a)'s bias favoring amendment is not substantially inapplicable, *Dussouy*, 660 F.2d at 598, amendment is further warranted when considering this Court's judicial economy. *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985)("even if substantial reason to deny leave exists, the court should consider prejudice to the movant, as well as judicial economy, in determining whether justice requires granting leave."); *Chitimacha Tribe of La. v. Harry L. Laws Co.,* 690 F.2d 1157, 1163 (5th Cir. 1982)(the court should consider judicial economy and whether the amendments would lead to expeditious disposition of the merits of the litigation); *Lumpkins v. Office of Cmty. Dev.*, 621 F. App'x 264, 271 (5th Cir. 2015) (courts consider "judicial economy and effective case management" in deciding whether to grant leave to amend).

Here, when considering that the two actions, the Uvalde action, (2:23-cv-00015) and the Daniel action (2:23-cv-00014) most certainly derive from the same nucleus of operative facts, i.e., mass shooting at Robb Elementary, and that plaintiffs bring both their actions as a putative class, it is most compelling that judicial economy requires consolidation of the two actions. *State Nat'l Ins. Co. Inc. v. Yates*, 391 F.3d 577, 579 (5th Cir. 2004) (separate claims form part of the same case or controversy when they derive from "a common nucleus of operative fact").

Fed. R. Civ. Rule 42 affirms such reasoning where "if actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). Some of the factors that inform consolidation under Rule 42(a) include (1) whether the actions are pending before the same court; (2) whether there are common questions of law and/or fact; and (3) whether consolidation will conserve judicial

resources. *Harris v. Bexar County*, 2009 U.S. Dist. LEXIS 108984, 2009 WL 4059092, at *1 (W.D. Tex. Nov. 23, 2009). \

Thus, judiciary economy is most certainly a compelling consideration that firmly supports Plaintiffs' instant motion seeking leave to amend.

### III.    Amendment will alleviate procedural hurdles were joinder issues to arise

Lastly, amendment is most appropriately granted where, given the facts and circumstances at bar, there is a reasonable likelihood that Defendants' Daniel Defense and Oasis Outback, as the gun manufacturer and gun seller respectively, might seek to join and counterclaim the law enforcement defendants under a superseding causation theory. See, First Amended Complaint, (Dkt. 1). As such, given that there currently exists two separate complaints where the law enforcement Defendants and Daniel and Oasis are named in separate actions, were Daniel and Oasis to crossclaim law enforcement, they would be required to evoke Fed. R. Civ. P. 13(h) which requires that a crossclaim be first brought against an "existing party" and then thereafter, a non-existing party as a third-party defendant pursuant to Rule 19 and 20[6].

In order to alleviate the procedural hurdles related to a potential joinder with respect to the above rules, Plaintiffs' amendment would relieve such hurdles where all the Defendants will thereafter be named in the same action.

//

---

[6] The Fifth Circuit Court of Appeals has described Rule 20 as creating a two-prong test that allows joinder when (1) claims arise out of the same transaction, occurrence, or series of transactions and (2) there is at least one common question of law or fact linking all of the claims. *Acevedo v. Allsup's Convenience Stores, Inc.,* 600 F.3d 516, 521 (5th Cir.2010). When this test is satisfied, a district court may still refuse joinder in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness. *Applewhite v. Reichhold Chems., Inc.*, 67 F.3d 571, 574 (5th Cir.1995(finding that district courts have considerable discretion to deny joinder).

## CONCLUSION

On account of the foregoing analysis, Plaintiffs respectfully request that this Court grant Plaintiffs' Ex Parte Motion for Leave to File Second Amended Complaint as justified under Rule 15's liberal amendment policy. Thus, pursuant to the Western District's Local Rule CV-7(b) requiring an "executed copy" of an amended complaint to accompany any motion for leave to amend, Plaintiffs comply with such by attaching their Second Amended Complaint as **Exhibit 1**[7].

Dated:  March 31, 2023                    Respectfully Submitted,

                                          /s/Charles A. Bonner
                                          **CHARLES BONNER**
                                          **LAW OFFICES OF BONNER & BONNER**
                                          A.  CABRAL BONNER, ESQ.
                                          475 Gate Five Rd., Suite 211
                                          Sausalito, Ca 94965
                                          Tel: (415) 331-3070

**RYDER LAW FIRM**                        **EVANS LAW OFFICE P.P.L.C.**
JESSE RYDER                               JERRY EVANS
6739 Myers Road                           127 N. West Street
E. Syracuse, NY 13057                     Uvalde, Texas 78801
Tel: (515) 382-3617                       Tel: (830) 900-5021
e-mail: ryderlawfirm@gmail.com            e-mail: devanslawoffice@gmail.com

**THE BONNER LAW FIRM, P.C**.             **JOSE ANGEL GUTIERREZ, P.C.**
VICTOR BONNER                             JOSE ANGEL GUTIERREZ, JUDGE RET.
4820 Old Spanish Trail                    429 W. 12th Street,
Houston, Texas 77021                      Dallas, Texas 75208
Tel: (832) 433-6565                       Tel: (214)941-1900
e-mail: vicbonneresq@gmail.com            e-mail: joseangelgutierrez@yahoo.com

                                          **ATTORNEYS FOR PLAINTIFFS**

---

[7] In addition to adding Defendants' Daniel Defense and Oasis Outback and their respective state claims, Plaintiffs additionally add Defendants, United States, Dept of Homeland Security Secretary Ajejandro Mayorkas, and Dept of Customs and Border Protection BORTAC Commander Paul Guerrero, as well as their respective Federal Tort Claims actions and individual Bivens claims.

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### DEL RIO DIVSION

| | |
|---|---|
| **J.P.,** a minor by and through his parents and next friends, **CRYSTAL P.** and **DANIEL P.,** individually and on behalf of a class of all similarly situated students; **ANDREA V.,** individually and on behalf of a class of all similarly situated parents; **ESTHER V.,** individually and on behalf of a class of all similarly situated teachers; **SYLVIA U.,** individually and on behalf of a class of all similarly situated school support staff; **M.C.,** a minor by and through her parent and next friend, **JASMINE C**, individually; **Z.R.,** a minor by and through her parent and next friend, **CORINA R.,** individually**; J.S.,** a minor by and through his parent and next friend, **JENNIFER C**., individually; **I.R.,** a minor by and through his parents and next friends**, ALMA R.** and **GEORGE R.,** individually; **L.R.,** a minor by and through her parents and next friends**, LUCIENE A.** and **FRANK R.,** individually**; Z.A.,** a minor by and through his parents and next friends**, ESTHER V.** and **LUIS A.,** individually**; M.T.,** a minor by and through her parent and next friend**, LOUANNA R.; B.G.** and **F.G.,** minors by and through their parent and next friend, **BEATRICE T.,** individually**; J.L.,** a minor by and through his parent and next friend**, ASHLEY L.,** individually**; J.D.,** a minor by and through his parent and next friend, **SANDRA V.,** individually**; F.L.,** a minor by and through her parent and next friend, **VIRGINIA G.,** individually**; A.P.,** a minor by and through his parents and next friends, **ARACELY P. and ROMAN P.,** individually**; A.L.,** a minor by and through her parent and next friend, **CRYSTAL G.,** individually**; D.J.Q.,** a minor by and through his parents and next friends**, MANUEL Q. and YVETTE Q.,** individually**; J.P.,** a minor by and through her parent and next friend, **JASMIN P.,** individually**; T.G.,** a minor by and through her parent and next friend, **JACKIE G.,** individually**; R.F.,** a minor by and through her parent and next friend**, MONICA O.,** individually**; A.V. and G.E.,** minors by and through their parents and next friends**, ANDREA V., individually; N.S.,** a minor | **Civil Action No.: 2:23-cv-00015-AM**<br><br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br>────────────────<br><br>**CLASS/ MASS ACTION**<br><br>**Jury Demand** |

by and through her parent and next friend,
**ALIETA P.,** individually and grandmother**,
MARIA P.,** individually**; A.L.A.T.,** a minor by and
through her parent and next friend, **CASSANDRA
B.,** individually**; G.D.G.R.,** a minor by and through
her parent and next friend, **CYNTHIA R.,**
individually**; J.M.,** a minor by and through her
parents and next friends**, SANDRA and MARTIN
M.,** individually**; MARIA G.R.,** individually**;
VANESSA G.,** individually**; M.D.E.,** a minor by
and through her parents and next friends,
**BERNARD E. and TANAMA J.E.,** individually**;
A.R.,** a minor by and through her parent and next
friend**, DEBORA Q.,** individually**; J.A.M.,** a
minor by and through her parents and next friends**,
LETICIA M. and MIKE M.,** individually**;
M.C.A.,** a minor by and through her parent and
next friend**, MONICA H.,** individually**; ALBERT
V.,** individually**; A.G.,** a minor by and through her
parent and next friend**, SELENA T.,** individually**;
M.C**. a minor by and through her parent and next
friend, **MARISA S.,** individually**; A.M.** a minor by
and through her parent and next friend, **AIKO C.,**
individually**; and DOES 1-3000,** individually

        *Plaintiffs,*

vs.

**THE UVALDE CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT
("UCISD"); UVALDE CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT
POLICE DEPARTMENT ("UCISD-PD")
CHIEF PEDRO ARRENDONDO; UCISD-
PD OFFICER ADRIAN GONZALEZ;
UCISD-PD OFFICER JESUS "J.J."
SUAREZ; CITY OF UVALDE; UVALDE
POLICE DEPARTMENT ("UPD")
LIEUTENANT MARIANO PARGAS; UPD
SERGEANT EDUARDO CANALES; UPD
LIEUTENANT JAVIER MARTINEZ; UPD
SERGEANT DANIEL CORONADO; UPD
OFFICER LOUIS LANDRY; UPD
OFFICER DONALD PAGE; UPD
OFFICER JUSTIN MENDOZA; UVALDE
COUNTY SHERIFF RUBEN NOLASCO;**

**UNITED STATES OF AMERICA;
SECRETARY OF DEPARTMENT OF
HOMELAND SECURITY("DHS")
ALEJANDRO MAYORKAS; DHS
BORTAC COMMANDER PAUL
GUERRERO; TEXAS DEPARTMENT OF
PUBLIC SAFETY ("TDPS") REGIONAL
DIRECTOR VICTOR ESCALON**; **TDPS
DIRECTOR STEVEN MCGRAW;
CAPTAIN JOEL BETANCOURT**; **TDPS
SERGEANT JUAN MALDONADO**,
**DANIEL DEFENSE, LLC; DANIEL
DEFENSE, INC; OASIS OUTBACK, LLC;**
and **DOES 1-3000**,

*Defendants*.

*"The way to right wrongs is to turn the light of truth upon them"*
-Ida B. Wells-

## CLASS/MASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all other similarly situated students, student parents and/or guardians, teachers, and school support staff who were in attendance, or had children in attendance, at Defendant Uvalde Consolidated Independent School District's ("CISD") Robb Elementary School ("Robb Elementary") on May 24, 2022, **and who have sustained emotional and psychological damages as a result of Defendants' conduct and omissions on that date and on account thereof, have expressed physical symptoms and damages [1]**(collectively, "Putative Class members") by and through undersigned counsel, hereby file this Class/Mass Action Complaint, based on Plaintiffs' personal knowledge and upon information and belief as to Plaintiffs and the Class, against Defendants' City of Uvalde, et al., and allege as follows:

## NATURE OF THE ACTION

1.    Regrettably, this court must preside over yet another recurring and deeply tragic occurrence where once again, elementary age children and their dedicated teachers had been murdered and emotionally maimed by a deeply troubled young man wielding a semi-automatic machine gun who, in his delusion colored by glorification of violence perpetuated by both video games and targeted gun manufacturer advertisements, mercilessly released his own childhood trauma and pain upon unsuspecting beautiful and buoyant young children and teachers at school.

2.    This iteration of this now all too frequent tragedy, took place on May 24, 2022 at the Robb Elementary school, in Uvalde, Texas. On this fateful morning, Salvador Ramos ("Ramos")

---

[1] The Putative Class **does not** include those parties and their families who had been shot and/or had been killed on May 24, 2022 at Robb Elementary School.

2

walked onto Robb's campus, armed with a Daniel Defense DDM4 V7 rifle and carrying hundreds of rounds of ammunition, and proceeded to murder 19 children and two teachers, while wounding at least another 17 other children. Uvalde Texas is a close knit, rural community located 80 miles from the United States and Mexican border. Robb Elementary School is a school administered by Defendant Uvalde Consolidated Independent School District ("CISD").

**DANIEL DEFENSE AND OASIS OUTBACK**

3.      Just barely eighteen years old, Ramos, who, despite never firing a gun, fantasized about the power and instant destruction that automatic guns could provide him. To manifest that fantasy, he turned to firearm manufacturer, Defendant Daniel Defense ("Daniel Defense" & "Daniel") who, due to a concerted and intentional marketing campaign specifically aimed at the demographic of young, isolated, troubled, and violent young men, successfully won over and wooed Salvador Ramos.

4.      Daniel Defense targeted Ramos and other young men in his demographic by relying upon militaristic imagery that blatantly and unapologetically suggests that civilian consumers could (and should) use their weapons in the same manner as military service-members who rely upon their automatic weapons to engage in offensive combat missions: i.e., weapons purposefully designed to 'neutralize' as many enemy combatants as possible in the shortest time possible. Daniel Defense's marketing enhanced the import of this message by intentionally contracting with the very video game designers whose games most capture this particular demographics' attention and interest.

5.      Thus, Daniel Defense contracted with Activision, the developer, publisher and distributor of the first-person shooter game, *Call of Duty* in order to imbed their product within the game's premise while simultaneously advertising the product itself to ensure full and complete

marketing immersion. Such intention was directed at the impressionable captive audience of repressed and insular young men who remained glued to the game for hours on end. Thus, it was no accident that a young man with a history of violence, who associated the military with killing people, and was fascinated with *Call of Duty* purchased a Daniel Defense AR-style rifle to carry out an offensive attack on civilians.

6.     Daniel Defense similarly relied upon social media outlets like Instagram in order to amplify their product placement, even suggesting through their messaging that consumers should (and could) reenact the video games in real life with, of course, Daniel Defense products in hand.

7.      It was by no means an accident that a young man with a history of violence and obsessed and addicted to playing *Call of Duty* with its hypnotic and dispassionate emphasis on the goal of killing people anxiously awaited his eighteenth birthday in order to purchase the AR-style weapon that he had been virtually shooting for incalculable hours over years at a time.

8.     In facilitating Ramos' fantasy into reality, Oasis Outback ("Outback"), the gun store in Uvalde who placed the guns and ammunition into Ramos's hands is equally responsible for the death, destruction and trauma that was unleashed on students, teachers, CISD staff, the citizens of Uvalde and the United States on May 24, 2022.

9.     It was readily apparent to individuals who witnessed Ramos' presence at Outback that he was not at all fit to purchase firearms. Despite all the indicia that reasonably raised doubts as to Ramos' fitness to purchase, i.e., a young man dressed head to toe in black attire in Uvalde, Texas who had expressed an urgency in wanting to purchase thousands of dollars of deadly weaponry within days of his eighteenth birthday, Outback's owner permitted the purchase to

unfold, effectively providing him with an inordinate amount of guns, accessories, and ammunition that should have foreseeably raised significant flags of concern.

10.     As a federal firearms licensee, Oasis Outback had a legal duty to refrain from selling guns to prospective purchasers who it knew, or reasonably should have known, were planning to use them to harm others. Given the blatantly obvious red flags that Ramos presented, Oasis Outback's assent to the various sales is a glaringly obvious breach of its legal duty as a licensed procurer of arms and accessories.

11.     While Daniel Defense and Oasis Outback provided Ramos with the means to explosively unleash his rage, the various Defendant law enforcement authorities that both Plaintiff and the entirety of the citizens of Uvalde had placed their utmost trust and confidence in, had woefully failed them, exponentially compounding the horrors that Ramos inflicted on May 24, 2022. Despite a mandatory requirement to comply with the State and local standard of unhesitatingly confronting and neutralizing the shooter without awaiting any affirmative order to do so, Defendant law enforcement officers, who initially responded and were on site in the building within three minutes of Ramos' entry, failed to follow such protocol. Thus, for approximately seventy-four minutes thereafter, the entirety of the local, state, and federal officers who showed up on the scene (all 376 of them) also failed to follow this mandatory protocol but instead, engaged in a uncoordinated travesty of inaction that made certain the death of the young children and their teachers, kept treatment from some who would have survived otherwise, and added to the physical injuries and emotional suffering that will forever follow those who were impacted on that fateful day of May 24, 2022.

**CITY OF UVALDE, UCISD, LAW ENFORCEMENT**

12.    In administering the schools under its control, including Robb Elementary School, Uvalde Consolidated Independent School District (UCISD) employed its own police department ("UCISD-PD"). Not only had UCISD-PD undertaken a state sponsored and mandated active shooter response training, but that CISD had additionally promulgated its own required protocols and standards to employ in the event of an active shooter on one of its campuses. Despite such preparedness, the UCISD police department, along with similarly trained law enforcement agencies including the City of Uvalde's police department ("UPD"), the Texas' Department of Public Safety("DPS"), San Antonio Police Department's SWAT unit, Uvalde's Sheriff's office, and the United States Department of Homeland Security/Customs and Border Protection("Border Patrol" & "BORTAC"), fundamentally strayed from conducting themselves in conformity with what they knew to be the well-established protocols and standards for responding to an active shooter and on account thereof, consciously disregarded the harms that Plaintiffs' were presently incurring that resulted in exceedingly exacerbating the danger they faced and the harms they ultimately incurred.

13.    Thus, on account of such abject failure by such highly trained law enforcements agencies, Plaintiffs and the putative Class members will now be forced to endure the indelible and forever-lasting trauma that Defendants immeasurably caused and amplified on account of their contemptible and flagrant affirmative conduct in failing to undertake prescribed courses of action. Plaintiffs and Class members respectfully request that this Court does its part in providing the framework for redressing the harms that no amount of money nor forgiveness can ever absolve.

## <u>JURISDICTION AND VENUE</u>

14.    This case is brought under 42 U.S.C. § 1983 and under state law. Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331, *Bivens v. Six Unknown Named Agents of*

*the Federal Bureau of Narcotics*, 403 U.S. 388(1971), [2] and 1343. This Court also has supplemental jurisdiction over Plaintiffs' state law claims and over Defendants under 42 U.S.C. § 1367 because the state law claims are interrelated to the federal claims. Additional jurisdiction lies on account of federal-question jurisdiction where such is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–2680, commonly known as the Federal Tort Claims Act. This Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to grant injunctive relief, as well as the authority to award costs and attorneys' fees under 42 U.S.C. §§ 1988 and 3613(c)(2).

15.     Venue is proper within the Western District of Texas, Del Rio Division, under 28 U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district. Defendants regularly conduct business in this district, and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

**JURY DEMAND**

16.     Plaintiffs demand trial by jury with respect to all claims in this action except those brought under the Federal Tort Claims Act.

**<u>PARTIES</u>**

**<u>Plaintiffs</u>**

---

[2] No federal statute exists which authorizes the federal courts to hear suits against federal officers who violated the United States Constitution. However, in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388(1971), the Supreme Court inferred a cause of action for damages against federal officers directly from the constitutional provisions. *Bivens* permits "a citizen suffering a compensable injury to a constitutionally protected interest to invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal officer." *Butz v. Economou,* 438 U.S. 478, 504(1978).

17. **Plaintiff Student Class Representative J.P.** is a minor student who was ten years old when he was in attendance at Robb Elementary on May 24, 2022. **J.P.**'s parents, Plaintiffs **Daniel P. and Crystal P.** are suing Defendants on **J.P.**'s behalf. Plaintiff **J.P.** is also suing Defendants on behalf of the class of students who were on the premises of Robb Elementary on May 24, 2022 and who sustained emotional and psychological damages as a result of Defendants' conduct and omissions on that date. **J.P.** and his parents, Plaintiffs' **Daniel P.** and **Crystal P.** are the parents and legal guardians of J.P., who, as a family, are citizens of Texas and reside in Uvalde, Texas.

18. **Plaintiff Parent Class Representative**, **Andrea V.**, is a parent of minors, **A.V.** and **G.E.** is suing Defendants on behalf of herself, **A.V.** and the putative class of parents of children who were in attendance at Robb Elementary on May 24, 2022. Plaintiffs **A.V.** and his sister **G.E.** were nine years old in fourth grade and seven years old in third grade respectively on May 24, 2022 while in attendance at Robb Elementary. **A.V.** was in lockdown in Room 105 while **G.E.** was on recess in the playground at the time of the shooting. Plaintiff **Andrea V.** is the parent and legal guardian of **A.V.** and **G.E.**, who, as a family, are citizens of Texas and reside in Uvalde, Texas.

19. **Plaintiff Teacher Class Representative, Esther V.** was in attendance at Robb Elementary on May 24, 2022 serving as a teacher's assistant in Room 31 and 32 and is a resident of Uvalde, Texas. Ms. Esther V. is suing Defendants on behalf of herself, and the putative class of teachers employed by CISD who were on the premises of Robb Elementary on May 24, 2022. **Ms. Esther V.** is a citizen of Texas and a resident of Uvalde, Texas.

20. **Plaintiff Support Staff Class Representative Sylvia U.** was driving school bus number 19 on May 24, 20222 serving an employee of the School District as a Bus Driver and is a

citizen of Texas and resident of Uvalde, Texas. Ms. Sylvia U. is suing Defendants on behalf of herself, and the putative class of teachers employed by CISD who were on the premises of Robb Elementary on May 24, 2022.

21.     Plaintiff **Z.R.** was ten years old in fourth grade on May 24, 2022 when she was in attendance in Room 109 at Robb Elementary. Plaintiff **Corina R.** is the parent and legal guardian of Z.R., who, as a family, are citizens of Texas and reside in Uvalde, Texas.

22.     Plaintiff **J.S.** was eight years old in third grade on May 24, 2022 when he was in attendance in Room 19 at Robb Elementary. Plaintiff **Jennifer C.** is the parent and legal guardian of J.S., who, as a family, are citizens of Texas and reside in Uvalde, Texas.

23.     Plaintiff, **M.C.,** a minor who was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 103 at Robb Elementary. Plaintiff **Jasmine C.** is the parent and legal guardian of M.C., who, as a family, are citizens of Texas and reside in Del Rio, Texas.

24.     Plaintiff **I.R.** was eight years old in second grade on May 24, 2022 when he was in attendance in Room 19 at Robb Elementary. Plaintiffs **George R.** and **Alma R.** are the parents and legal guardians of **I.R.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

25.     Plaintiff **L.R.** was nine years old in third grade on May 24, 2022 when she was in attendance and at the cafeteria at Robb Elementary. Plaintiffs **Frank R.** and **Luciene A.** the parents and legal guardians of **L.R.** who, as a family are citizens of Texas and reside in Uvalde, Texas.

26.     Plaintiff **Z.A.** was nine years old in third grade on May 24, 2022 when he was in attendance in room 2 at Robb Elementary. Plaintiffs **Esther V.** and **Luis A.** are the parents and legal guardians of **Z.A.** and on May 24, 2022 was working at Robb Elementary as a teacher's assistant and was in lockdown in Room 31 and 32 during the seventy-seven minute stand-off at

Robb Elementary. Both **Z.A.** and his parents, Ms. Esther V. and Mr. Luis A. are citizens of Texas and reside in Uvalde, Texas.

27.    Plaintiff **M.T** was nine years old in third grade on May 24, 2022 when she was in attendance in room 1 at Robb Elementary. Plaintiff **Louanna R.** is the parent and legal guardian of **M.T.** and as family, are citizens of Texas and reside in Uvalde, Texas.

28.    Plaintiffs **B.G**. and brother **F.G.** were eight years old in third grade and seven years old respectively on May 24, 2022 when they both were in attendance on recess outside on the playground at Robb Elementary when the shooting commenced on the campus. Plaintiff **Beatrice T.** is the parent and legal guardian of both **B.G.** and **F.G**. and together, as a family, are citizens of Texas and reside in Uvalde, Texas.

29.    Plaintiff **J.L**. was seven years old in third grade on May 24, 2022 when he was in attendance at Robb Elementary outside on the playground at the time of the shooting commenced on campus. Plaintiff **Ashley L.** is the parent and legal guardian of **J.L.** and together as a family, are citizens of Texas and reside in Uvalde, Texas.

30.    Plaintiff **J.D.** was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 109 at Robb Elementary. Plaintiff **Sandra V.** is the parent and legal guardian of **J.D.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

31.    Plaintiff **F.L**. was seven years old in third grade on May 24, 2022 when she was in attendance at Robb Elementary and hiding on the cafeteria's stage during the shooting. Plaintiff **Virginia G.** is the parent and legal guardian of **F.L.** who, as a family, reside in Uvalde, Texas.

32.    Plaintiff **A.P.** was eight years old and in third grade on May 24, 2022 when he was in attendance at Robb Elementary. Plaintiffs **Roman P.** and **Aracely P.** are the parents and legal guardians of A.P. who, as a family, are citizens of Texas and reside in Uvalde, Texas.

33.     Plaintiff **A.L**. was eight years old in third grade on May 24, 2022 when she was in attendance in Room 5 or 6 at Robb Elementary. Plaintiff **Crystal G.** is the parent and legal guardian of A.L., who, as a family, are citizens of Texas and reside in Uvalde, Texas.

34.     Plaintiff **D.J.Q**. was eight years old in third grade on May 24, 2022 when in attendance outside on the school grounds near his classroom, Room 8. Plaintiffs **Manuel Q.** and **Yvette Q.** are the parents and legal guardians of D.J.Q, who, as a family, are citizens of Texas and reside in Uvalde, Texas.

35.     Plaintiffs **J.P**. was seven years old and in second grade on May 24, 2022 when in attendance in Room 17 at Robb Elementary. Plaintiff **Jasmin P.** is the parent and legal guardian of J.P. who, as a family, are citizens of Texas and reside in Uvalde, Texas.

36.     Plaintiffs **T.G.** was eight years old and in second grade on May 24, 2022 and was in attendance in Room 18 at Robb Elementary. Plaintiff **Jackie G.** is the parent and legal guardian of T.G. who, as a family are citizens of Texas and reside in Uvalde, Texas.

37.     Plaintiffs **R.F.** was nine years old and in fourth grade on May 24, 2022 when in attendance at Robb Elementary. Plaintiff **Monica O.** is the parent and legal guardian of R.F., who, as a family, are citizens of Texas and reside in Uvalde, Texas.

38.     Plaintiffs **N.S.** was nine years old and in third grade on May 24, 2022 when in attendance in Room 12 at Robb Elementary. Plaintiffs **Alieta P.** is the parent and legal guardian of N.S. and **Maria P**. is the grandmother of N.S., who, as a family, are citizens of Texas and reside in Uvalde, Texas.

39.     Plaintiffs **A.L.A.T** was ten years old and in fourth grade on May 24, 2022 while in attendance in Room 302 at Robb Elementary. Plaintiffs **Cassandra B.** is the parent and legal guardian of A.L.A.T, who, as a family, are citizens of Texas and reside in Uvalde, Texas.

40.     Plaintiff **G.D.G.R.** was seven years old and in third grade on May 24, 2022 while in attendance at Robb Elementary. Plaintiff **Cynthia R.** is the parent and legal guardian of G.D.G.R, who, as a family are citizens of Texas and reside in Uvalde, Texas.

41.     Plaintiff **J.M.** was nine years old and in fourth grade on May 24, 2022 while in attendance at Robb Elementary. Plaintiffs **Sandra M.** and **Martin M.** are the parents and legal guardians of J.M. who, along with J.M. are citizens of Texas and reside in Uvalde, Texas.

42.     Plaintiff **Maria G.-R.** was a bus driver for CISD on May 24, 2022 while on location at Robb Elementary. Ms. Maria G.-R. is a citizen of Texas and resides in Uvalde, Texas.

43.     Plaintiff **Vanessa G.** was a bus driver for CISD on May 24, 2022 while on location at Robb Elementary. Ms. Vanessa G. is a citizen of Texas and resides in Uvalde, Texas.

44.     Plaintiff **M.D.E.** was nine years old and in Room 32 on May 24, 2022 at Robb Elementary School. Plaintiffs **Tanama J.E.** and **Bernard E.** are the grandparents and legal guardians of **M.D.E.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

45.     Plaintiff **A.R.** was ten years old and in Room 109 on May 24, 2022 at Robb Elementary School. Plaintiff **Debora Q.** is the parent and legal guardian of **A.R.** who, as a family are citizens of Texas and reside in Uvalde, Texas.

46.     Plaintiff **J.A.M.** was ten years old and in Room 104 on May 24, 2022 at Robb Elementary School. Plaintiffs **Leticia M.** and **Mike M.** are the parents and legal guardians of **J.A.M.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

47.      Plaintiff **M.C.A.** was nine years old and in the cafeteria on May 24, 2022 at Robb Elementary School. Plaintiff **Monica H.** is the parent and legal guardian of **M.C.A.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

48.     Plaintiff **Albert V.** was on Geraldine Street on May 24, 2022 helping a friend with his vehicle. He heard the gunman crash and ran to the vehicle to ask if he needed help, he says the gunman got out of his vehicle, saw him drop a second AR rifle to the side of his pick-up truck and started shooting towards Plaintiff. Albert V. is a citizen of Texas and resides in Uvalde, Texas.

49.     Plaintiff **A.G.** was nine years old and in the cafeteria on May 24, 2022 at Robb Elementary School. Plaintiff **Selena T.** is the parent and legal guardian of **A.G.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

50.     Plaintiff **M.C.** was ten years old and in Room 102 on May 24, 2022 at Robb Elementary School. Plaintiff **Marisa S.** is the parent and legal guardian of **M.C.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

51.     Plaintiff **A.M.** was ten years old and Room 102 on May 24, 2022 at Robb Elementary School. Plaintiff **Aiko C.** is the parent and legal guardian of **M.C.A.** who, as a family, are citizens of Texas and reside in Uvalde, Texas.

## **Defendants**

52.     The **Uvalde Consolidated Independent School District** ("School District" & "UCISD") is a public school district in Uvalde, Texas. Robb Elementary is a school administered by UCISD. The School District was, at all relevant times, responsible for the care, safety, management, and security of all students, teachers, staff, and campuses within its jurisdiction, including Robb Elementary. At all relevant times, UCISD was charged by law with the administration and operation of the school district, including employment, control, supervision, discipline, training and practices of all school district and UCISD personnel and employees, and with the formulation of its policies, practices, and customs. In addition, UCISD is responsible for ensuring that the personnel of the school district obeyed the laws of the United States and the State

of Texas. The School District acted or failed to act, at all relevant times, through its employees, agents, and/or chief policymakers, and is liable for such actions and/or failure to act.

53.     The **Uvalde Consolidated Independent School District Police Department** ("UCISD-PD") is an agency of the School District. The School District is charged by law with the administration and operation of UCISD-PD, including the employment, control, supervision, discipline, training, and practices of UCISD-PD's personnel and employees, and with the formulation of its policies, practices, and customs. The School District is legally responsible for the acts and omissions of UCISD-PD. The School District and UCISD-PD's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages.

54.     The **Texas Department of Public Safety** ("TDPS") is an agency of the State of Texas. The State of Texas is charged by law with the administration and operation of TDPS, including the employment, control, supervision, discipline, training, and practices of TDPS's personnel and employees, and with the formulation of its policies, practices, and customs. The School District is legally responsible for the acts and omissions of TDPS. The State of Texas and TDPS's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages.

55.     Defendant **Pedro Arredondo** ("Chief Arredondo") is an individual domiciled in Uvalde, Texas. At all relevant times, Chief Arredondo was a council member of the City of Uvalde and the Chief of Police for the UCISD-PD. Chief Arredondo as the chief and final policymaker for the School District and UCISD-PD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Chief Arredondo was acting within the scope of his employment,

under color of state law, and in his individual and official capacities. Defendant Arrendondo is being sued in both his individual and official capacities.

56.     Defendant **Adrian Gonzalez** is an individual domiciled in Texas. At all relevant times, Gonzalez was a police officer with the UCISD-PD. Gonzalez, as a police officer with the UCSID-PD, had acted in the scope of his employment and under color of state law, and on account of his actions and omissions, is liable to Plaintiffs. Defendant Gonzalez is being sued in his individual capacity.

57.     Defendant **Jesus "J.J." Suarez** is an individual domiciled in Texas. At all relevant times, Suarez was a UCISD Board member and, upon information and belief, a reserve officer for the UCISD-PD. Suarez, as a police officer of the UCSID-PD, had acted in the scope of his employment and under color of state law, and on account of his actions and omissions, is liable to Plaintiffs. Defendant Suarez is being sued in his individual capacity.

58.     The **City of Uvalde** ("Uvalde") is a municipality organized under the laws of the state of Texas. The **Uvalde Police Department** ("Uvalde PD") is an agency of Uvalde. Uvalde is charged by law with the administration and operation of the Uvalde PD, including the employment, control, supervision, discipline, training, and practices of Uvalde PD's personnel and employees, and with the formulation of its policies, practices, and customs. Uvalde is legally responsible for the acts and omissions of the Uvalde PD. Uvalde and Uvalde PD's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages.

59.     Defendant **Mariano Pargas** is an individual domiciled in Uvalde, Texas. At all relevant times, Mariano Pargas (or "Lt. Pargas") was a Lieutenant with the Uvalde PD. In Uvalde PD Chief's absence, Lt. Pargas was the acting Chief of Uvalde PD during the unprecedented law

enforcement response to the active shooter at Robb Elementary. At all relevant times, Lt. Pargas was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Lt. Pargas, as the chief and final policymaker for Uvalde PD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs and Class members under Federal and state law. Lt. Pargas is being sued in his official and individual capacities.

60.     Defendant **Javier Martinez** is an individual domiciled in Texas. At all relevant times, Martinez was a lieutenant of the UPD. Martinez, as a lieutenant of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Martinez was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Martinez is being sued in his individual capacity.

61.     Defendant **Eduardo Canales** is an individual domiciled in Texas. At all relevant times, Canales was a sergeant of the UPD. As a sergeant of the UPD acted, Sgt. Canales acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Sgt. Canales was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Sgt. Canales is sued in his individual capacity.

62.     Defendant **Daniel Coronado** is an individual domiciled in Texas. At all relevant times, Coronado was a sergeant of the UPD. As a sergeant of the UPD acted, Sgt. Coronado acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Sgt. Coronado was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Sgt. Coronado is sued in his individual capacity.

63.    Defendant **Louis Landry** is an individual domiciled in Texas. At all relevant times, Landry was an officer with the UPD. Landry, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Landry was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Landry is sued in his individual capacity.

64.    Defendant **Donald Page** is an individual domiciled in Texas. At all relevant times, Page was an officer with the UPD. Page, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Page was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Page is being sued in his individual capacity.

65.    Defendant **Justin Mendoza** is an individual domiciled in Texas. At all relevant times, Page was an officer of the UPD. Mendoza, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Mendoza was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Mendoza is sued in his individual capacity.

66.    Defendant **Ruben Nolasco** is an individual domiciled in Texas. At all relevant times, Nolasco was the Sheriff of Uvalde County. Nolasco, as the chief policymaker, with final policymaking authority, for the County of Uvalde and Uvalde County Sheriff's Office ("UCSO") acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Nolasco was

acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Nolasco is sued in his official and individual capacities.

67.     Defendant **Victor Escalon** is an individual domiciled in Waslaco, Texas. At all relevant times, Victor Escalon ("Director Escalon") was South Texas Regional Director of the Texas Department of Public Safety ("DPS") and was acting Director of DPS on the scene during the calamitous attack on Robb Elementary. Director Escalon acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs and Class members under Federal and state law. At all relevant times, Director Escalon was acting within the scope of his employment, under color of state law, and in his individual and official capacities. Director Escalon is being sued in his official and individual capacities.

68.     Defendant **Steve McGraw** is an individual domiciled in Austin, Texas. At all relevant times, Steve McGraw ("Director McGraw") was the Regional Director of the Texas Department of Public Safety ("TDPS") and was the Chief Director of DPS during the tragic attack on Robb Elementary. Director McGraw acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs and Class members under Federal and state law. At all relevant times, Director McGraw was acting within the scope of his employment, under color of state law, and in his individual and official capacities. Director McGraw is being sued in his official and individual capacities.

69.     Defendant **Joel Betancourt** is an individual domiciled in Texas. At all relevant times, Betancourt was a captain of the TDPS. Betancourt, as a captain of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Betancourt was acting in

the scope of his employment, under color of state law, and in his official and individual capacities. Defendant Betancourt is being sued in his individual capacity.

70.     Defendant **Paul Guerrero** is an individual domiciled in El Paso, Texas. At all relevant times, Guerrero was a commander with the Border Patrol Tactical Unit ("BORTAC") and as commander of BORTAC, acted with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Cmd. Guerrero was acting in the scope of his employment, under color of state law, and possessed and exercised command and control over subordinate BORTAC officers on May 24, 2022 at Robb Elementary School. Defendant Guerrero is being sued in his individual capacity.

71.     Defendant **Juan Maldonado** is an individual domiciled in Texas. At all relevant times, Maldonado was a sergeant of the TDPS. Maldonado, as a sergeant of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Sgt. Maldonado was acting in the scope of his employment, under color of state law, and in his official and individual capacity. Defendant Maldonado is being sued in his individual capacity.

72.     Department of Homeland Security and Department of Customs and Border Protection ("DHS") is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws and in undertaking that mission, maintains under its authority a Border Patrol Tactical Unit ("BORTAC"), the paramilitary arm of the US Border Patrol within the Department of Homeland Security and Customs and Border Protection whose assistance was requested on May 24, 2022 at Robb Elementary School. As the **United States of America** is a proper defendant for the tortious conduct of DHS employees acting in the course of their employment and redressed under the

Federal Tort Claims Act, see 28 U.S.C. §§ 1346(b), 2671, et seq., the United States is properly named herein. Pursuant to 28 U.S.C.S. § 2675, Plaintiffs have sufficiently filed their jurisdictionally required  notice of claim in or about August 2023 and after the passage of six months without a definitive determination, Plaintiffs now rightfully bring suit.

73.     Defendant **Alejandro Mayorkas** is the Secretary of the U.S. Department of Homeland Security, domiciled in Washington, D.C.  who, as part of his supervisory authority oversees DHS' Border Patrol's Tactical Unit ("BORTAC") who were deployed to Robb Elementary School in Uvalde on May 24, 2022. At all relevant times, Defendant Mayorkas possessed and exercised command and control over BORTAC. Director Mayorkas is sued in his individual capacity.

74.     Defendant **Daniel Defense**, LLC, is a Georgia limited liability company that manufactured and marketed the firearm that Salvador Ramos used to cause irreparable and forever lasting harm to Plaintiff and the lives of the people of Uvalde, Texas. Its principal place of business is 101 Warfighter Way, Black Creek, Georgia 31308, where it may be served with process by its registered agent and Chief Executive Officer ("CEO"), Marvin C. Daniel. Daniel Defense, LLC also does business under the name Daniel Defense, Inc., which has an identical control number registered with the Georgia Secretary of State. Collectively, Daniel Defense, LLC and Daniel Defense, Inc. are referred to herein as "Daniel Defense" or Daniel."

75.     Defendant **Oasis Outback, LLC** ("Oasis Outback"), is a Texas limited liability company that transferred the weapon used by Ramos to inflict gruesome and incalculable harm to those on the premises of Robb Elementary school on May 24, 2022, as well as those intimately connected with those on the premises on that fateful day. Oasis Outback also sold Ramos another AR-15-style weapon and hundreds of rounds of ammunition. Its principal place of business is 2900

East Main Street, Uvalde, Texas 78801, with and it may be served with process by serving its registered agent and CEO, William R. Klein, at 236 East Nopal Street, Uvalde, Texas 78801.

76.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as **Does 1-3000**, inclusive, and therefore sue these individuals by such fictitious names. Some of the Does 1-3000 were responsible for the training, supervision, control, assignment and discipline of the sworn and civilian personnel of UCISD and the City of Uvalde, as well as UCISD-PD, UPD, USD, DPS and other local, state and federal law enforcement, including the U.S. Department of Homeland Security/Customs and Border Protection who responded to Robb Elementary on May 24, 2022.  Plaintiffs will give notice of this complaint, and of one or more Does' true names and capacities when ascertained. Plaintiffs are informed and believe and based thereon allege, that Defendant Does 1-3000 are responsible in some manner for the damages and injuries hereinafter complained of.

## GENERAL ALLEGATIONS

**DANIEL DEFENSE, OASIS OUTBACK**

### A.  Daniel Defense and its role in the shooting on May 24, 2022.

77.     The mass shooting that took place at Robb Elementary was integrally enabled by the illegal, reckless and negligent actions of Defendant Daniel Defense, LLC, which egregiously profited from the unfair marketing of its AR-15 rifles, including the DDM4 V7 rifle that Salvador Ramos obsessed over and ultimately purchased just days after his eighteenth birthday. Due to Daniel's concerted and perverse campaign targeting violent and anti-social boys and men who are attracted to Daniel's message that weapons designed for rapid killing during warfare are somehow transferable and applicable to civilians under non-combative circumstances.

78.     Daniel Defense markets its products to adolescent and young men by relying on a barrage of targeted media, including social media content, product placements, and print advertising. For example, Daniel Defense promotes its products heavily on Instagram, a platform populated by young social media users. Daniel Defense also places its products in video games, and in so doing, heavily promotes the video game tie-ins in the company's social media accounts.

79.     Daniel Defense's marketing includes militaristic and combat imagery as well as content specifically aimed at young consumers that both references video games (particularly the ones that expressly highlight their product placement inside the games) and violence obsessed internet meme culture. This has enabled Daniel Defense to appeal to young boys who are effectively being primed as prospective customers of their military styled AR-15 rifles once they reach the legally permitted age for purchase. [3] Thus, Daniel unforgivably fosters its present and future market growth by appealing to traumatized youth obsessed with all things military and their romanticization of its end game of killing and destruction.

80.     According to the Oversight Committee of the U.S. House of Representatives, "Ninety percent of [Daniel Defense]'s sales are direct to civilian consumers, but the company's marketing emphasizes the tactical nature of its products."  This is no accident. Daniel Defense has marketed its rifles to civilian consumers in a manner that appeals to the subset of adolescents and young men attracted to violent combat and military fantasies while expressly implying that civilians can use their weapons for offensive combat-like missions. Such marketing and rhetoric significantly increase the risk that one of these adolescents or young men will use their rifles to perpetrate an act of mass violence.

---

[3] *See* Aimee Picchi, *#Gunporn #pewpew: How gunmakers market firearms to young Americans*, CBS News (June 8, 2022), https://www.cbsnews.com/news/gun-assault-weapons-young-americans-ar-15-gun-control/.

81.     Daniel Defense's marketing includes militaristic and combat imagery as well as content specifically aimed at young consumers, referencing video games and the irreverent tone of internet meme culture. This has enabled Daniel Defense to appeal to young male civilian consumers, which can in turn translate to market growth by priming young buyers to purchase AR-15-style rifles as soon as they are legally able.

82.     Daniel Defense markets its products to adolescent and young men using a range of channels, including social media content, product placements, and print advertising. For example, Daniel Defense promotes its products heavily on Instagram, a platform with a young user base. The company does not use "age-gating" to limit access to its social media accounts to those who cannot legally purchase guns. Daniel Defense also places its products in video games, and then heavily promotes the video game tie-ins in the company's social media accounts.

83.     Thus, Ramos was the quintessential customer for Daniel Defense: a troubled, violence obsessed loner who spent much of his free time on the internet and social media fantasizing about reenacting video game combat in real time and place. Daniel Defense is well apprised of the risks that its marketing strategy poses and is purposeful in its presentation, knowing that its future consumer base is attentive to its messaging of militaristic imagery and the cultural and emotional 'warfare' that has hijacked the hearts and minds of this susceptible and vulnerable demographic. The shooting at Robb Elementary was an all-too-foreseeable result of Daniel Defense's intentionality of marketing its products in a manner that encourages their illegal use.

**1.   The DDM4 V7 is a Military-Inspired Rifle**

84.     Daniel Defense currently manufactures and sells over two dozen models of semiautomatic rifles, including 21 models of AR-15-style rifles and eight large-caliber models of

AR-10-style rifles. Unlike many manufacturers of firearms, Daniel Defense sells its firearms directly from its website (in addition to selling through third-party sellers).

85.      The DDM4 V7 rifle—the assault rifle used by Ramos—comes equipped with a high-capacity, 32-round magazine and a magazine-well that is designed "for the fastest, most secure reloads possible."[4]  Daniel Defense has explained that the "M4" in "DDM4 V7" is a nod to the "iconic M4 carbine used by U.S. military forces," after which Daniel Defense models its DDM4 rifles. [5]

86.      Like all AR-15-style rifles, Daniel Defense's DDM4 V7 rifle is an offspring from the military rifles developed and designed to efficiently kill soldiers on the battlefield.

87.      Thus, in order to sell its $2,000 AR-15-style rifles with limited legitimate civilian uses beyond a thrill of shooting a military grade weapon at the shooting range (or showing off to one's friends), Daniel has marketed and promoted the use of its product as one quintessentially perfect for illegal and dangerous misuse.

## 2.  Marketing Military Combat Weapons to Impressionable Young Men and Boys

88.      Daniel Defense regularly promotes its weapons and accessories through appeals to civilian consumers attracted to the military with its connotations of combat that evoke thrill, excitement, violence in the name of conquering the enemy. While many of Daniel's competitors extol the virtues of military services as enticement to purchase their firearms, Daniel expressly markets its products as the means by which to undertake offensive civilian, combat-like missions.

---

[4] Daniel Defense, *DDM4 V7*, https://danieldefense.com/ddm4-v7.html; *DD Magazine*, https://danieldefense.com/dd-magazine.html (both last accessed June 8, 2022).
[5] Daniel Defense, *Comparing the Features of the Daniel Defense Rifle Line*, https://danieldefense.com/wire/firearm-features (last accessed June 8, 2020); Michael Daly, *Daniel Defense, the Maker of the Uvalde Shooter's 'Perfect Rifle,' Abruptly Exits the NRA Convention*, The Daily Beast (May 26, 2022), https://www.thedailybeast.com/daniel-defensethe-maker-of-the-uvalde-shooters-perfect-rifleabruptly-exits-the-nra-convention.

i.e., Daniel's advertisements encourage civilian viewers to imagine that their products automatically imbue them with soldier-like status and that the missions and possibilities available to servicemembers are also available to them.





*Image from Daniel Defense 2022 print catalog*

89.    Other Daniel Defense ads contain suggestions that their products can be used by civilians undertaking combat-style operations against other civilians. See the advertisement below depicting a point of view through a rifle scope targeting a citizen non-combatant that suggests an impending assassination.



*Instagram* (*Mar. 2, 2022*)

90.     Another social media advertisement shows three men in military fatigues, with weapons drawn as they climb a set of stairs on a freighter, as if in a combat situation. Such advertisements suggest that Daniel's guns are integral in providing the props for 'boys' to reenact wartime exercises directed at civilians.



91.     Despite solely targeting a civilian market, Daniel Defense markets its AR-15-style rifles as if it were targeting U.S. Servicemembers. For instance, the company created a social media campaign directed at young males with a hashtag, #gunporn, that encourages "MK18 Mondays," referring to a soldier's 'close contact' encounters and the benefits of Daniel's MK18 under those circumstances.



*Instagram (Oct. 11, 2021)*

92.     The company's marketing sometimes intersperses online meme culture with combat imagery to sell military-grade weaponry to the civilian population. In the following two posts, the company trades on the "Heading into the weekend" meme.



*Instagram (May 6, 2021)*



*Instagram (June 25, 2021)*

93.     Along with Instagram content and print advertisements, Daniel Defense has produced videos depicting fictional military service members using its weapons as a means of marketing its AR-15 rifles to civilians.

94.     In one such video posted on the company's website and on YouTube, Daniel Defense introduced a "revolutionary" new rifle that pairs the company's "DD4 lower receiver" with its rail system[6] "modeled after the proven RIS II developed for SOCOM."  The pitch assumes that the target civilian consumer understands, without being told, that "SOCOM" stands for "Special Operations Command," and trades on the cachet and attraction of U.S. special operations soldiers. The video intercuts footage of a civilian target shooter with footage of what appears to be an armed military team moving in formation, all synchronized to a heart pounding rhythm. Daniel however provides no warning of the dangers of trying this at home; rather the message is the opposite: "You too could be a soldier on mission during the weekend!"

---

[6] A rail system on an AR-15-style rifle allows users to mount various optics — including iron sights, scopes, and holographic sights — as well as lights, aiming lasers, grips, and other accessories in various positions along the length of the rail system. In general, it allows consumers to customize their AR-15-style rifles.



*Still image from Daniel Defense promotional video. YouTube (Jan. 18, 2022)*

95.     Another video below portrays a (fictional) military raid on a campus of abandoned buildings, one of which appears, hauntingly enough, to be a former school building. It features sweeping shots of a dramatic helicopter arrival, professional stunt work, and suspense-building soundtrack, all in the name of promoting Daniel Defense's rifles as military-grade, special-operations-approved weapons that expressly target the civilian market.



**Daniel Defense MILE (Military & Law Enforcement) Brand Video**
73,057 views  Jan 9, 2017

*Still image from Daniel Defense promotional video. YouTube (Jan. 9, 2017)*

96.     Daniel Defense's video marketing frequently depicts military and law enforcement operations encouraging the civilian consumer to "use what they use." While the U.S. government does buy certain firearm components from Daniel Defense (including rail systems), the only publicly available documentation indicates that aside from a small, limited-time contract for the sale of rifles to the U.S. Navy in 2018, the company does not in fact sell its complete line of rifles or firearms to the U.S. military. Thus, its marketing is solely directed at the civilian market.

97.     Daniel Defense has chosen to aggressively market its rifles so that consumers will associate them with the U.S. and foreign militaries. The company's strategy is to position itself as a purveyor of weapons trusted by real-life soldiers, thereby eliciting the military aspirations and fantasies held by many young male civilian consumers, i.e., one can enjoy and manifest the power and associated gear without the discipline and hard work of enlistment. Daniel Defense's

33

marketing impermissibly and unfairly suggests that consumers should use Daniel Defense rifles to reenact combat, i.e., "extremely maneuverable and easy to move around barriers," even on American streets. For a young consumer, like Salvador Ramos, who was attracted to the excitement and risk of combat missions and thus highly susceptible to suggestive marketing, Daniel Defense offers him and his young demographic, a taste of the military experience via its weapons.

### 3.  Marketing Through Video Games

98.    Daniel Defense also markets its rifles by placing them in violent first-person-shooter video games. This form of marketing appeals to young, disaffected men who are a demographic that is susceptibly influenced by violent imagery. It amplifies its product placement through online and social media channels. The Daniel Defense DDM4 V7S rifle—a short-barreled version of the DDM4 V7, the weapon utilized by Ramos, is featured in the video game, *Call of Duty*: *Modern Warfare.* Daniel leverages this association throughout the company's social media accounts by referencing and tagging *Call of Duty* in many of its posts:



*Facebook (Oct. 25, 2019)*



*Caption reads: "The circle is closing…," a reference to an obstacle called "Circle Collapse" that occurs in Call of Duty: Warzone. Instagram (June 7, 2021)*

99.    *Call of Duty* is a game that allows users to have a "first-person" experience of being in the military, i.e., it provides the user with a point-of-view experience of shooting at others as if in combat. It simulates being in a war zone with an AR-15 rifle styled after those manufactured by Daniel Defense. First-person-shooter video games like *Call of Duty* are extremely popular among teenagers and young adults, including the Uvalde, Buffalo, Parkland, and El Paso mass shooters. [7]  Daniel Defense has most significantly benefited from the use of AR-15-style rifles in *Call of Duty*. In social media posts, Daniel Defense uses hashtags such as #callofduty and #cod to make its *Call of Duty* references explicit. [8]  It is readily apparent that both Daniel Defense and Activision, the owner of *Call of Duty,* are engaged in extensive contractual relations whereby the two have significantly benefited from targeting young impressionable children.

100.    Daniel Defense promotes its connection to the *Call of Duty* franchise with staged photos in its social media feeds, featuring actors dressed like the video game avatars with Daniel Defense weapons in hand on sets designed to look like settings within the game. The not-so-subtle

---

[7] *See* Nicholas Bogel-Burroughs, *The Texas gunman had few friends in high school, classmates say*, N.Y. Times (May 25, 2022), https://www.nytimes.com/2022/05/25/us/texas-shooting-gunman-bullied.html; *Video games and violence, explained*, The Week (Sep. 15, 2019), https://theweek.com/articles/864451/video-games-violence-explained; Megan O'Matz, *Violent video games may have primed the Parkland school shooter*, South Florida Sun-Sentinel (Apr. 29, 2019), https://www.sun-sentinel.com/local/broward/parkland/florida-school-shooting/fl-ne-nikolas-cruz-mental-health-services-20190425-story.html; (Emily Guskin, *Teenagers are fueling a competitive gaming tidal wave*, The Washington Post (Mar. 9, 2018), https://www.washingtonpost.com/news/sports/wp/2018/03/09/teenagers-are-fueling-an-e-gaming-tidal-wave/.

[8] *See, e.g.*, Daniel Defense Instagram posts dated September 28, 2021 (https://www.instagram.com/p/CUX4q0BJ3UV/) and November 19, 2020 (https://www.instagram.com/p/CHygY-el9GD/).

message to young consumers (like Salvador Ramos) is that Daniel Defense products can be used to reenact *Call of Duty* fantasies.



*Caption reads: "Verdansk never looked so good. Tag your Duos buddy below!" "Verdansk" is the name of a fictional city in the Call of Duty franchise. [9]  "Duos" is a term referring to a pair of people who play a video game together in a specific "duos" game mode. Instagram (May 26, 2021)*

### 4. Pop Culture and Marketing to Teens

101.    Daniel Defense's marketing also draws on pop culture themes and relies on online meme culture to attract teens, many of whom are too young to legally purchase a firearm. The company has engaged in marketing stunts to generate "viral" internet activity and publishes content referencing celebrities and pop culture characters that are popular with teenagers.

102.    Unlike many other consumer brands, Daniel Defense however uses these tactics, including a strong reliance on viral meme culture, to sell highly lethal weapons—the kind that are used by young, disaffected mass shooters. Daniel Defense knew that the young people they target as consumers have used AR-15s-styel rifles in mass shootings ranging from Sandy Hook to

---

[9] *Verdansk*, CallofDuty.com (accessed on June 6, 2022),
https://www.callofduty.com/warzone/strategyguide/tac-map-atlas/verdansk-north.

Buffalo to El Paso to Dayton to Parkland. Thus, Daniel Defense's bread and butter AR-15s are effectively the proverbial weapon of choice for school mass shooters in the United States.

103.    For example, on Halloween of 2021, Daniel Defense tweeted out this picture of a tattooed man wearing a jack-o-lantern on his head, carrying a Daniel Defense rifle, and packing several additional large-capacity magazines in a carrier on his chest. The caption of the post asked viewers what costume they had chosen. This sort of content that actively engages users by asking them to comment on the post appeals to the younger user base of Instagram.



*Twitter (Oct. 31, 2021)*

104.    The same applies to Daniel's image of Santa Claus, smoking a cigar and holding a Daniel Defense MK18 assault rifle. The image upends traditional Christmas imagery mixing

military themes with Santa Claus—a childhood icon. This form of mixing jokes and pranks with hyper-masculinity has particular appeal to teens and young males.



*Instagram (Dec. 27, 2021)*



*Individual dressed as an executioner from Squid Game, a hyperviolent Netflix show. Instagram (Oct. 31, 2021*

105.    The company also appeals to younger consumers by posting images of celebrities holding its products, as in the image below, which is captioned, "MK18 got me feeling like a rock star." The post also uses the #gunporn and #pewpew hashtags, both of which are designed for younger consumers immersed in online culture.

40



*Image of Post Malone, a popular musician and producer, holding a Daniel Defense rifle. Instagram (Jan. 23, 2020)*

### 5.  Daniel Defense's Marketing Causes Harm

106.     Teenagers and young men comprise a disproportionate share of the nation's most destructive mass shooters. They are the group most likely to internalize Daniel Defense's promotion of their rifle's amenability to illegal and offensive civilian use. Daniel Defense markets AR-15-style rifles against the backdrop of decades of mass shooters selecting these rifles to commits acts of horrific violence.

107.     From Parkland to El Paso to Uvalde, AR-15-style rifles have been the weapon of choice for the young male shooters who disproportionately commit the most destructive mass

shootings. [10] Daniel Defense is well aware of these facts yet perpetuates is insidious marketing campaign.

108.    Through its marketing, Daniel Defense exploits the heightened susceptibility of teenage boys and young men to produce advertising that plays on this group's propensities for risky and violent behavior.

109.    This marketing strategy was intentionally created to elicit controversy, seek out meme-able content, and propagate violent combat imagery that was intentionally designed to appeal to young, video-game-playing men and boys, like Salvador Ramos.

110.    In directing much of its advertising at young men and adolescents, Daniel Defense chooses to target a group that is particularly susceptible to advertising and most likely to misuse Daniel Defense's products.

111.    Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors. Thus, adolescents and young men are more susceptible to advertising: research indicates that young people are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior. This susceptibility has been similarly exploited by

---

[10] Additionally, the arsenal of the 64-year-old Las Vegas shooter, who killed 58 people and injured 413 more, included two AR-15-style rifles manufactured by Daniel Defense. *See* Timothy Bella, *Families sue Uvalde gunman, signal possible action against gunmaker*, The Washington Post (Jun. 6, 2022), https://www.washingtonpost.com/nation/2022/06/04/uvalde-shooting-lawsuits-daniel-defense-marketing/.

tobacco and alcohol advertisements that promote thrill-seeking conduct to hook young consumers early and convert them into lifelong purchasers of their products. [11]

112.    At the same time, adolescents and young adults are more likely than other age groups to engage in risky, thrill-seeking, violent, and impulsive behavior. Research shows that adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors.  Young people's predilection for risky, thrill-seeking behavior fully accounts for high percentage of young males committing crimes and becoming ensnared in the criminal justice system.

113.    A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, and 18- to 20-year-olds are offenders in gun homicides at a rate nearly three times higher than adults 21 and older.

114.    Daniel Defense knew that certain adolescents and young adult men are susceptible to advertising that plays on negative emotions and are particularly at risk of misusing AR-15 rifles, including the DDM4 V7.

115.    Despite this knowledge, Daniel Defense continues to market the DDM4 V7 in a manner that would appeal to thrill-seeking young men, who desire the power and destruction of a military weapon, with full knowledge and appreciation that the increase in sales of DDM4 V7 was

---

[11] *See* Center on Alcohol Marketing and Youth, *Alcohol Advertising and Youth*, John Hopkins Bloomberg School of Public Health (2007) ("Research clearly indicates that, in addition to parents and peers, alcohol advertising and marketing have a significant impact on youth decisions to drink."), http://www.camy.org/resources/fact-sheets/alcohol-advertising-and-youth/; John J. Pierce et al., *Ass'n Between Receptivity to Tobacco Advertising and Progression to Tobacco Use in Youth and Young Adults in the PATH Study*, 172 JAMA Pediatrics 444 (2018) ("Our study reinforces that tobacco product marketing continues to be an important contributor to tobacco use among young people."), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2676069

due in part to its appeal to a younger demographic of users. Daniel Defense's continuation of this kind of marketing campaign foreseeably led to the mass shooting in Uvalde.

**CITY OF UVALDE, UCISD, LAW ENFORCEMENT**

116.    Given the exponential rise in mass shootings in the United States and their gut-wrenching encroachment into school settings,[12] school districts and law enforcement have been forced to reckon with this national scourge while having their efforts thwarted by callous and unrelenting Second Amendment advocates and opportunistic, profit driven gun manufactures.

117.    Such reckoning has resulted in the aggregation of standards of care and protocols that provide school districts and law enforcement with predetermined and vetted courses of action that enable them to undertake a swift, automatic, and highly organized response whose utmost adherence can save lives within fractions of a second.

118.    Nevertheless, protocols and standards are only effective if and when their dictates and tenets are complied with. Despite the fact that such protocols and standards pertaining to mass school shootings were well in place as of May 24, 2022, the Uvalde school district, as well as local, state and federal law enforcement were woefully in breach of these well-established protocols when in fact their implementation was gut-wrenchingly triggered. Instead of swiftly implementing an organized and concerted response to an active school shooter who had breached the otherwise 'secured' school buildings at Robb Elementary school, the conduct of the three hundred and

---

[12] Mass shootings have doubled in the past four years. In 2018 there were 336 mass shootings, 417 in 2019, 610 in 2020, and 691 in 2021. See, https://www.gunviolencearchive.org/past-tolls; see also, https://everytownresearch.org/maps/mass-shootings-in-america. The National Center for Education Statistics, a research arm of the U.S. Department of Education, reported a total of 93 school shootings with casualties at public and private elementary and secondary schools during the 2020/2021 school year. Only eleven such shooting occurred in 2009. https://nces.ed.gov/whatsnew/press_releases/06_28_2022.asp

seventy-six (376)[13] law enforcement officials who were on hand for the exhaustively torturous seventy- seven minutes of law enforcement indecision, dysfunction, and harm, fell exceedingly short of their duty-bound standards.

119.    As with the largest contingent of law enforcement on the scene at Robb Elementary School on May 24, 2022, the Texas Department of Public Safety("DPS"), the entirety of Texas law enforcement departments subscribed, trained, and were thereby bound by the protocols provided by the Advanced Law Enforcement Rapid Response Training program.[14] ALERRT, a program created in response to the Columbine school shooting in 1999, and considered the national standard in active shooter response training, provides Texas law enforcement with standardized training for responding to active mass shootings.

120.    Primarily, the ALERRT protocol requires that responders must have tools and training to 'immediately' and without delay, make entry and neutralize an active shooter. Thus, when a subject fires a weapon at a school he remains an active shooter until he is neutralized and is not to be treated as a "barricaded subject." ALERRT training lucidly distinguishes between a hostage/barricade and active shooter scenarios. Relatedly, under the ALERRT protocol, law

---

[13] Three hundred and seventy-six law enforcement officers responded to the tragedy at Robb Elementary School. The breakdown of responders, by agency, is as follows: (149) United States Border Patrol, (91) Texas Department of Public Safety, (25) Uvalde Police Department, (16) San Antonio Police Department (SWAT), (16) Uvalde County Sheriff's Office, (14) U.S. Department of Homeland Security, (13) United States Marshals 8 Drug Enforcement Agency, (7) Frio County Sheriff's Office, (5) Kinney County Sheriff's Office, (5) Uvalde Consolidated Independent School District, (4) Dilley Police Department, (4) Zavala County Sheriff's Office, (3) Medina County Sheriff's Office, (3) Sabinal Police Department, (2) City of Uvalde Fire Marshals, (2) Pearsall Police Department, (2) Texas Parks and Wildlife, (2) Uvalde County Constables, (2) Val Verde County Sheriff's Office, (1) Frio County Constables, and (1) Southwest Texas Junior College and (1) Zavala County Constables.

[14] See generally https://alerrt.org/about ("The ALERRT Center at Texas State University was created in 2002 as a partnership between Texas State University, the San Marcos, Texas Police Department and the Hays County, Texas Sheriff's Office to address the need for active shooter response training for first responders.").

enforcement's first priority is to immediately stem the killing of innocent civilians and that every law enforcement officer is expected to be willing to risk his or her life without hesitation. Hence, law enforcement officers are expected to **distract, isolate, and neutralize** the threat, even in tactically complex situations. As such ALERRT mandates that "from that moment forward, every law enforcement officer is expected to be willing to risk his or her life without hesitation." Such overriding mandate exists to stem the ensuing damage by swiftly moving to neutralize the shooter. Time is of the essence as the longer the shooter is active, the more carnage accrues.

121.    In order to establish a coordinated effort to effectuate the overriding mandate of swift neutralization, the ALERRT protocol requires the prompt establishment of an Incident Command structure. Incident Command will be established by the first law enforcement responder who arrives on the scene and is charged with immediately providing dispatch with a brief LCAN (i.e., Location, Condition, Actions, and Needs). Thereafter, the responder assumes immediate command. Further, "as soon as a law enforcement responder notices that there appears to be sufficient officers hunting for the shooter, that responder should find a secure location, take out their Active Shooter Response Card, assume Initial Incident Command, and begin completing tasks listed on the card."[15] Thereafter, the incident commander disseminates vital information, i.e., location, condition, actions and needs, to all the subsequently arriving law enforcement and emergency services who arrive at the scene. The ALERRT protocol stresses that the earlier an incident command structure is established, the more prompt and successful response can be achieved.

---

[15] ALERRT training teaches that every law enforcement responder, "even those recently hired, should carry the Active Shooter Response Card with them at all times," and "they should be prepared to assume command and start completing the tasks listed on the card within the first few minutes."

122.    Thereafter, once an active shooter situation grows larger, both temporally and in complexity, the 'first responder' who initially assumed the incident command position must pass on the command position to an officer of a higher rank or level **and/or department with more widespread jurisdiction**. Thereafter, incident command should move off premises where an overall commander will take charge and assume control over the unfolding chaos of the emergency.

123.    With respect to accessing closed or locked entryways or exits, ALERRT protocol is clear and mandates that "responders should be creative and make use of improvised tools to get inside the building **however they can**." With respect to using keys to gain entry, ALERRT counsels that "the quickest, most discreet, and safest method of entering a locked building is to locate a key—**as long as keys can be located immediately**," but "if a key cannot be located quickly, [law enforcement] responders should use another technique to enter the area without delay." ALERRT suggests sledgehammers and pry tools as reliable, practical, and affordable breaching tools.

124.    Although all Defendant law enforcement agencies subscribed to the ALERRT protocols and standards, Defendant Uvalde Consolidated Independent School District ("CISD") additionally adopted its own standards and protocols set out in a register entitled, "ANNEX 1 Active Shooter," April 15, 2020. ("Annex"). The Annex I was adopted upon direction from the State of Texas mandating that every school officer in Texas must be trained on how to respond to an active shooter.

125.    The CISD Annex outlined the operational concepts, responsibilities, and procedures required in order to coordinate the response to an active shooter by the CISD's administration, teachers, District police officers, and local law enforcement. As with the AERTT protocols, the Annex program stressed the importance of neutralizing the shooter as the number

one priority. The "Priority of Life Scale" dictates that innocent civilians are prioritized over law enforcement and other responders.

126. Thus, the Annex mandated that the CISD police, administrators and teachers have "the daily responsibility to mitigate and prevent an active shooter situation," including '**conducting inspections of classrooms to make sure doors and windows can be secured…doors to all classrooms remain locked during instruction…and that each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.**" In addition, the Annex 1 circumscribed policies in order to diminish the risk of an active shooter occurrence. For example, the Annex required each CISD campus to convene a team to identify, evaluate and address potential threats to school security, including the monitoring of all social media that suggests a connection to Uvalde in order to identify any possible threats made against students and/or staff within the school district. **Perimeter fencing is required to restrict access to Robb elementary, as is staff emergency training, procurement of radios to staff to support campus communications.**

127. The CISD Annex **designates the District's police department's chief as the officer responsible for coordinating the efforts of all law enforcement and first responders who arrive on the scene**, and that the District's administration office should be utilized as the incident command post and should contain the school's emergency systems that include communications, staff and student's locations, and detailed floor plans that are readily available for use in coordinating the response. The Annex stressed that all incoming outside law enforcement and first responders should follow the direction of the District's police chief and accept their assigned roles.

## STATEMENT OF FACTS

48

A. **Pre May 24, 2022 Attack**

**DANIEL DEFENSE, OASIS OUTBACK**

**Salvador Ramos**

128.    The eighteen-year-old Uvalde resident Salvador Ramos significantly fit the profile of other school shooters. His home life and upbringing were riddled with trauma that lead him down a path of alienation and withdrawal which was further met with bullying and ridicule. It is not a coincidence that Ramos intentionally targeted fourth grade students as he himself was the subject of protracted bullying in his fourth-grade year. Thereafter, Ramos withdrew from attending classes so that by 2021, at age seventeen, he had only completed ninth grade.

129.    After withdrawing from school, Ramos spiraled down a dark path with his friends taunting him as a "school shooter." Alienated, Ramos found himself indulging in first person shooter video games, including *Call of Duty* and *Grand Theft Auto*.

130.    Ramos associated military service with killing people, an association which was heightened by Ramos's obsession with first person-shooter games like *Call of Duty*, which he obsessively played. Games like *Call of Duty* can have an outsized influence on the lives of teenagers, particularly teenagers like Ramos who are socially isolated, traumatized, and needing to respond to difficult home environments.

131.    Ramos found the attention he was seeking on social media by depicting himself as a cold hearted, violent and aggressive character who displayed dead animals and play-acted a rageful gun shooter wearing body armor. Ramos hinted on social media that he intended to engage in a school shooting and that he welcomed attention and notoriety.

132.    Although seventeen in 2021, Ramos attempted to effectuate "straw" gun purchases and began to amass gun accessories including body carrier armor. Simultaneous with his purchases,

Ramos began to increase vocalizing his obsession with school shootings. Upon his eighteenth birthday on May 16, 2022, Ramos immediately purchased a Daniel Defense DDM4 V7 (an AR-15 style rifle) that he had shipped to the Oasis Outback gun store in Uvalde.

133.    AR-15-style rifles, like Daniel Defenses' DDM4 V7, discharge high rates of fire and rounds that are larger and travel much faster than handgun bullets. This combination results in its bullets attaining significantly more kinetic energy such that when they strike a person, the resulting damage is staggering. While handgun bullets typically travel in a linear path through the body and create relatively small entry and exit wounds, AR-15 rounds hit the human body with such speed that they can shred organs, destroy large swaths of tissue, and leave exit wounds "the size of an orange."[16]

134.    Daniel Defense's unscrupulous and exploitative marketing tactics took full and complete advantage of Ramos, by effectively placing their AR-15 into his mind through its advertising, making explicit an unmistakable link between military missions and civilian undertakings like a school mass shooting.

135.    One day after purchasing Daniel's DDM4 V7, Ramos purchased another rifle, a Smith and Wesson M&P15, as well as 1,740 rounds of ammunition which again he picked up at Oasis Outback. A background check was conducted, and despite Ramos making multiple gun purchases within a short period of time and therefore should have been mandatorily reported to the Bureau of Alcohol, Tobacco and Firearms ("ATF"), Ramos passed his background checks.

**1.  Daniel Defense's Marketing Was a Proximate Cause of Harms to Plaintiffs**

---

[16] Heather Sher, *What I Saw Treating the Victims From Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/.

136.     Daniel Defense's marketing of its rifles to teenage and young adult men contributed to the shooting at Robb Elementary, and is responsible, in part, for the physical and emotional injuries sustained by Plaintiffs. Daniel Defense markets its AR-15-style rifles to young male consumers by using militaristic imagery and video game references on various social media platforms suggesting that its rifles can be used by civilians for offensive combat-style operations against non-combatants. These advertisements are tailor-made for someone like Ramos: a loner with a history of making violent threats, an obsession with first person shooter video games, violence, and gore, and a prolific user of social media, including, but not exclusively, Instagram and Facebook.

137.     Daniel Defense's unfair and illegal marketing tactics successfully found fertile ground in Ramos' world. Despite the fact that Ramos knew little about guns nor had he previously held or fired one, Daniel Defense's marketing, as described above, had an undue influence upon the susceptible Ramos by steering his web browser to DanielDefense.com. Once inside Daniel's enticing web, Ramos was persuaded into scraping together $2,000 to purchase one of Daniel's most lethal and powerful weapons, despite having had no real-life experience with guns.

138.     Of course, Ramos did in fact spend countless hours virtually firing Daniel Defense rifles when binging on *Call of Duty*, and as such, in his imagination he had the necessary experience to engage with the real thing.

139.     Given that Daniel's deceptive and manipulative marketing presumptively had a significant role to play in the attack on Robb Elementary on May 24, 2022, were Daniel Defense to change its course and take reasonable steps to reform its marketing, such a change would greatly diminish the risk of future catastrophic mass shootings. Daniel Defense could easily reform its practices by (1) tailoring its marketing to less vulnerable and impressionable consumers, (2) cease

marketing through social media platforms with the predominant demographic of young prepubescent, adolescent and young adult males, (3) cease its reliance on combat imagery, and (4) affirmatively highlight the serious known dangers associated with its automatic weapons and their accessories. Such reforms would significantly contribute to the diminishment and prevention of mass shootings in the future.

140.    Daniel Defense's marketing tactics clearly meet the 'unfair' standard that is in direct violation of the Federal Trade Commission Act.

### 2.   Oasis Outback's Negligence in Transferring Firearms and Ammunition to Ramos Was a Proximate Cause of Harm to Plaintiffs

141.    On his eighteenth birthday, May 16, 2022, Salvador Ramos went online and made two purchases. Primarily, he paid $1,761.50 to purchase 1,740 rounds of ammunition for use in an AR-15 rifle from an online retailer. Secondly, he steered his browser to Daniel Defense's webstore, where he ordered a Daniel Defense DDM4 V7 AR-15-style rifle. Ramos requested that the DDM4 V7 be shipped to Oasis Outback, a gun store in Uvalde. Ramos paid $2,054.28 to purchase the rifle.

142.    The next day, May 17, 2022, Ramos went to Oasis Outback in person and bought a Smith & Wesson M&P15 assault rifle for $1,081.42.

143.    The day after, May 18, 2022, Ramos returned to Oasis Outback to buy an additional 375 rounds of AR-15 ammunition.

144.    Thereafter, on May 20, 2022, Ramos returned to Oasis Outback to pick up his Daniel Defense assault rifle. Upon information and belief, Ramos paid a $50 transfer fee to Oasis Outback in order to take possession of his Daniel Defense rifle. Thus, Ramos made three visits to Oasis within a four-day period. In that short period, Ramos had purchased and acquired over $3,000 worth of guns and ammunition, including two AR-style rifles. Oasis Outback was required

to report this multiple sale of rifles and ammunition to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), pursuant to a letter issued by the ATF on July 12, 2011. Fulfilling its reporting requirements, however, does not absolve Oasis Outback from its obligation to block a sale on other relevant grounds, including when Oasis Outback knew or reasonably should have known that the purchaser was likely to harm himself or others.

145. On Ramos's May 20th visit to Oasis Outback to pick up his rifle, he also had employees install a holographic weapon sight on the rifle. Such a sight allows a user to look through a small glass window and see holographic crosshairs superimposed on a target. Holographic sights are designed for rapid short-range shooting and help users quickly acquire targets without having to undergo marksmanship training. Once the crosshairs highlight a target, the user can fire. Additionally, the rifle's holographic sight accessory permits shooters to keep both eyes open in order to identify more targets in their peripheral vision.

146. Oasis Outback had a duty to refrain from selling weapons to the recently turned 18-year-old shooter, who it knew or reasonably should have known, was likely to harm himself or others. The shooter was described by patrons of the store as displaying a nervous disposition and behaving suspiciously. One witness at the store said Ramos "appeared odd and looked like one of those school shooters." He was wearing all black and was described as giving off "bad vibes." [17] The owner of Oasis Outback described him as alone and quiet, and questioned Ramos about how he could afford $3,000 worth of rifles. He also knew Ramos was urgently purchasing a massive arsenal of firepower within days of turning the legal age of 18 years old. Nevertheless, Oasis, with

---

[17] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 36 (Tex. 2022).

profit in mind, proceeded with the sale and sold this readily apparent troubled youth the rifles and ammunition.

147.    Oasis Outback knew or should have known that Ramos was not purchasing the assault rifles for recreational purposes. The shooter was purchasing two extraordinarily lethal assault weapons and enough ammunition to fight off a small army, as well as a holographic sight and Hellfire Gen 2 trigger system, all within days of his 18th birthday and for a cost that was incommensurate with his young age and disposition. Ramos' intended, non-recreational use of his purchases from Oasis hauntingly transpired four days later.

**UVALDE, UCISD, LAW ENFORCEMENT**

### 3.  Safety Compliance at Robb Elementary

148.    Prior to the May 24, 2022 attack, compliance with safety protocols and physical conditions at Robb Elementary school were more than deficient. For example, the school's five-foot tall exterior fence was negligible for impeding a would be intruder. Both Defendant Robb Elementary Principal Gutierrez and CISD Chief of Police Arrendondo were well aware of this 'achilles heel' in the school's safety infrastructure but failed to make affirmative steps to remediate its significant shortcoming in protecting against would-be intruders.

149.    While the school's safety policies mandated that both the school's external and internal doors were to be consistently locked, there existed a culture of noncompliance by school personnel who perpetually and deliberately circumvented the required locking of the doors by consistently propping them open. The school's administrators, including Principal Gutierrez and Chief Arredondo, as well as the CISD school board, were all well aware of such policy breaches but rather then address them, they chose instead to permit their continuation. Similarly, despite being apprised that the doors to many of its classrooms, including the ill-fated Rooms 111 and 112,

were unable to properly lock, Principal Gutierrez and Chief Arredondo failed to ensure that such locks were repaired. Principal Gutierrez testified in front of the Texas House of Representatives Committee investigating the Robb Elementary shooting that school administration knew about the issues with the door to classroom 111.

150.     Principal Gutierrez, Chief Arredondo and the CISD school board were additionally apprised that Robb Elementary's emergency warning system was significantly compromised on account of perpetually poor internet coverage and mobile phone service. Such paltry service also negatively impacted CISD's police radios whose connectivity was consistently challenged.

151.     On account of Uvalde's proximity to the Mexican border, there were frequent instances of Mexican human traffickers crossing the U.S. border while being pursued by U.S. Border patrol. The traffickers would purposefully crash their vehicles in order to permit their smuggled patrons to scatter. In response, the administrators and police at Robb Elementary would sound an alarm via its Raptor alert system and either designate a 'secure' alert or a 'lockdown' alert. The frequency with which these 'bailout' secure or lockdown alerts took place, i.e., 50 lockdown alarms between February and May 2022, lead the school staff to disregard the warnings and to treat the alarms as matter of fact and of little concern.

152.     Rather than creating different alarm signals for different types of emergencies, the administration relied upon only one signal whose frequent use, on account of 50 'bailout' lockdowns in three months, significantly diminished the urgency of response. When coupled with poor internet and cell phone reception, the school administrators and police department were well aware that the school's emergency response system for campus lockdowns was patently inadequate.

### B.  May 24, 2022 Robb Elementary School Shooting

1. **Attacker's Arrival at the School**

153.    On May 24, 2022, Robb Elementary was poised to celebrate the end of the 2022 school year with an awards ceremony for its students and parents. Believing that this would also be the day that his classmates from Uvalde High would reconvene at Robb Elementary as a traditional parting gesture before graduation, Ramos planned to attend and carry out his intended massacre. On that fateful morning, after a heated exchange with his grandmother over a mobile phone plan, Ramos shot his grandmother and set off in her truck towards Robb Elementary school.

154.    On route to Robb Elementary, on or about 11:28 a.m., Ramos, who apparently did not know how to drive, lost control of the truck which landed in a canal ditch. As the crash occurred in the vicinity of the Hillcrest Memorial Funeral Home, two employees walked over to be of assistance. Ascending from the crash, Ramos began shooting at the two Hillcrest employees who fled for their lives back to the funeral home.

155.    Gathering his arsenal, Ramos proceeded to Robb Elementary which was adjacent to where he crashed his grandmother's truck. Ramos easily traversed the school's five-foot perimeter fence which turned out to be a negligible deterrent to would-be intruders.

156.    Ramos was spotted by Coach Yvette Silva who was outside with her third graders. Ramos proceeded to shoot in the direction of Coach Silva who took cover and immediately reported an active shooter through her school radio at approximately 11:29 a.m. Expecting to immediately hear an overhead announcement that the campus was being placed in lockdown, Coach Silva shepherded her students from the playground into lockdown position. The lockdown announcement that Coach Silva had expected to imminently circulate failed to occur.

157.    **Teacher Class Representative Esther V.** ("Ms. Esther V.") also heard the rattle of Ramos's gunshot from her special education classroom, Rooms 31-32. After hearing the

gunshots, Ms. Esther V., a full-time UCISD special education teacher with students ranging from 2nd through 4th grade, proceeded to the window and saw students and teachers scattering in all directions. Ms. Esther V. promptly locked the classroom's doors and shuttled her emotionally and physically disabled students into a closet within the classroom. After everyone was accounted for, there were approximately thirteen students and teachers barricaded within the closet. Some of her special needs students understood what was happening and expressed their fear and confusion. Ms. Esther V. texted her nine-year-old child's teacher to apprise her of the shooter and to determine if her child was safe and under her supervision. Ms. Esther V. received a text back from her child's teacher informing us that she was not with the class as they were in the cafeteria having lunch.

158.    As a special needs teacher, Ms. Esther V. was equipped with a school radio and heard Coach Silva announce the presence of Ramos but did not hear a campus wide announcement and/or a warning on the Raptor system.

### 2.  Failed Active Shooter Warning

159.    Such communication failure unfolded on account that the School's Raptor application system failed to transmit because of the well acknowledged and persistently bad Wi-Fi signal on the campus. Although impeded from broadcasting the active shooter alert through Wi-Fi, Principal Gutierrez did not attempt to communicate lockdown over the campuses' intercom. She did however call Chief Arredondo who commanded her to "shut it down Mandy, shut it down." She thereafter instructed the school's head custodian to ensure that all the doors were locked.

160.    Thus, the lockdown was communicated amongst the school's faculty by word of mouth. Many of the teachers who were exiting the buildings with their students either heard Coach Silva screaming or saw students running and in turn, directed their students to run for cover. One such teacher, Elsa Avila ushered her students into room 109 where on account of yet another faulty

door lock, was required to forcefully slam the classroom's door in order to engage its lock. She and her students then assumed the lockdown positions away from the windows and doors.

### 3.   Arrival of Law Enforcement

161.   Meanwhile, the Uvalde Police Department dispatched the initial 911 report from the funeral home. Commander of Uvalde Police Dept. SWAT team, Sgt. Eduardo Canales ("Sgt. Canales") and Uvalde Police acting Chief Mariano Pargas set off to Robb Elementary. Upon arrival, said officer met UPD officers Javier Martinez and Louis Landry who were also on the scene. Sgt. Canales saw Ramos shooting his AR-15. There were other Uvalde Police officers present, as well as Department of Public Safety ("DPS") Sergeant Juan Maldonando. At 11:33 a.m., Uvalde Police officers observed Ramos carrying a rifle outside the school's west hall entryway. The officer asked his supervisor, Sgt. Daniel Coronado for permission to shoot the suspect. In waiting for a response, it was too late as Ramos had already moved out from his site as the officer turned to shoot at Ramos.

162.   Although otherwise required under the ALERRT protocol to immediately encounter and attempt to neutralize Ramos, neither of these first responding Uvalde Police officers undertook such action nor did they set up an Initial Incident Command in order to begin the coordination of an active shooter response. Thus, the Uvalde PD first responders failed and refused to undertake the required protocol to immediately "distract, isolate, and neutralize the shooter." Under the ALERRT protocol, they were not required to await an order to swiftly confront an active shooter. Nevertheless, Uvalde's police officer first responders chose to disregard that imperative mandatory protocol.

163.   Meanwhile, Uvalde Sheriff Nolasco responded to Ramos's grandmother's house and was informed that her grandson, Salvador Ramos had shot her and told Defendant Nolasco his

name. Defendant Nolasco did not share this information with other law enforcement officers responding to the shooting at Robb, even as they asked for that information.

### 4. Arrival of CISD Police Chief Arredondo

164.    Soon thereafter, Uvalde CISD Police Chief Arredondo arrived having left his office at Uvalde High School. Despite knowing that he was responding to an active shooter incident, Chief Arredondo failed to bring along his body armor or rifle. Even more curious, Arredondo, upon alighting from his squad car, discarded his police radio. Such decision precluded his ability to perform his role of incident commander who was required to set up a communication command center. Thus, at the outset, Chief Arredondo disregarded his prescribed duties under both the CISD Annex and ALERRT protocols for responding to active shooters on CISD property.

### 5. Attacker Enters the School

165.    Meanwhile, Ramos walked along the west side of the west building and then entered the unlocked northwest door. Although Ramos entered the west door, the exterior doors on both the east and south sides of the building were also unlocked such that Ramos had unfettered access to the building's interior.

166.    Once inside the west building, Ramos walked down the hallway and stopped in front of Rooms 111 and 112. At approximately 11:33 a.m., Ramos fired his AR-15 rifle towards Rooms 111 and 112. Thereafter, Ramos entered the door to Room 111 which, as was the case on prior occasions and which the school administration had been duly apprised, was extremely difficult to lock and as such, was unfortunately unlocked and unsecured.

167.    Once inside Room 111, Ramos announced to the children that it was "time to die" and rapidly fired over 100 rounds, both inside the room and the adjoining room 112. After two and

a half minutes, many students and two teachers were murdered.[18] Many had died instantaneously while others died slowly. Ramos apparently had no prior experience with firearms and it was likely that the shooting on May 24, 2022 was the first time he fired a weapon. Terrified teachers and students throughout the west building had heard this extended burst of gunfire, as did several law enforcement responders as they entered the building through the unlocked south and west doors.

### 6. Law Enforcement Enters the School

168. In hearing the gunshots, Uvalde PD Sgt. Canales turned to Defendant Department of Public Safety Sgt. Maldonando, who had arrived on the scene moments before at 11:34, stated "we gotta get in there," to which Sgt. Maldonando replied, "DPS is sending people." Canales responded saying, "He keeps shooting. We gotta get in there."

169. In less than three minutes after the shooting began, Defendants Canales, Martinez, Landry, and Acting Chief Pargas of the UPD approached Rooms 111 and 112. The officers, outfitted with body armor, two rifles and three pistols, took up positions near the classrooms. They heard the shots being fired in the classrooms, as well as shots erupting through the walls.

170. Several of those bullets that had careened through the walls and entered Room 109 which was immediately adjacent to Room 111 and 112 in which Ramos was located.

171. **Class Student Representative, Plaintiff J.P.** was in Room 109 when one of those bullets struck his beloved fourth grade teacher, Elsa Avila in the abdomen. Her students, including J.P. were horrified but encouraged her teacher to hold on. Another of the bullets struck J.P.'s friend and sheared off a section of her nose. As J.P. and his classmates were hunched down in lockdown position, J.P. and his classmates were torturously forced to endure the horror alone in their minds

---

[18] Teachers Irma Garcia and Eva Mireles were killed during Ramos's indiscriminate two and half minute eruption of the AR-15's military grade capacity to automatically deliver repeated and continuous gunfire. Ms. Mireles was located in the adjourning Room 109.

and bodies while listening to the crying, wailing and grimacing of students in their own room as well as through the walls into the carnage of Room 111. Having experienced bullets piercing through the walls and knowing that more could be arriving at any second, each subsequent minute of lockdown was an eternal hell for J.P. and his classmates.

172.    After the two-and-a-half minute shooting spree with sporadic gun shots thereafter, Chief Arredondo, at approximately 11:36 a.m., along with Uvalde PD Sergeant Coronado, Officer Page, and Gonzalez entered the south side of the building. Again, Chief Arredondo, in disregarding the first principal of rapidly moving to neutralize the shooter, determined that it was best to leave his radios behind despite the fact that under CISD Annex active shooter protocol, Chief Arredondo was required to assume the position of incident commander to ensure a coordinated response. Nevertheless, upon information and belief, no such incident command had been enabled prior to Chief Arredondo's arrival and/or entry into the south side of the building.

173.    Although Defendants Lt. Martinez and Sgt. Canales had prepared to breach the doors, the officers were refrained from doing so after shots were fired in their direction. Soon thereafter, approximately 8 or 10 law enforcement, including Uvalde PD Acting Chief Pargas, gathered in or around the vicinity of Rooms 111 and 112. Acting Chief Pargas imparted the command to Uvalde PD officers to stand down and not to confront Ramos. UPD Sgt. Coronado informed other officers that the suspect was "contained" and "barricaded," which the officers understood to mean that they were confronting a non-active shooter situation. Such was a blatant misrepresentation as moments before, Ramos had been actively firing his weapon. Defendant officers knew or had reason to know that they were confronting an active shooter situation and not a barricaded subject situation. Sgt. Coronado knew this to be the case but nevertheless erroneously designated the situation as a non-active shooter scenario. When inside the building, the officers

attempted to communicate on their radios but were unsuccessful on account of limited reception. Without the existence of an incident command nor an incident commander (Chief Arredondo was amongst the officers positioned in or near Rooms 111 and 112), no one had yet to set up an incident command. This absence included Acting Chief Pargas who, despite perceiving a vacuum in an overall incident command, refrained from assuming that role.

174.    In or about 11:41 a.m., officers from the DPS arrived including TDPS Fire Marshall Hernandez, Constable Johnny Field and Constable Emmanuel Zamora who were instructors at the regional police academy. Additionally, CISD-PD J.J. Suarez, who was also as UCISD Board member arrived and entered the building.

### C. Seventy-Seven Minutes

#### 1. Chief Arredondo Orders Officers to Stand Down and Questions Whether Facing Active Shooter Scenario.

175.    After Ramos fired upon the officers positioned outside of Room 111 and 112, Chief Arredondo gave the order to those of his command nearby to stand down and not to engage Ramos. Disregarding the mandated protocol, Chief Arrendondo effectively created a new policy of barricading children inside a classroom with an active shooter, delaying rescue and emergency medical services and depriving them of rapidly reuniting them with their families. Thus, Arrendondo's policy resulted in intentionally trapping children in the classrooms with an active shooter.

176.    Thereafter, Chief Arredondo considered whether there were any students in Room 110. Finding the room's door unlocked, Chief Arredondo discovered an empty classroom and somehow jumped to the conclusion that by not seeing any injured students or teachers, that the 'active shooter' scenario had changed to that of a 'barricaded subject' scenario, i.e., that Ramos

was isolated and alone in the classroom and as such, the strategy was to rescue the children in the adjacent classrooms and wait out Ramos and then neutralize him.

177.    This theory unfortunately proved to be false throughout the course of the seventy three minutes, particularly when a series of 911 calls[19] were received from terrified students who were huddled in agony in Room 111 and 112 confirming that the active shooter scenario was torturously unfolding.

178.    Meanwhile, Robb Elementary disingenuously announces on Facebook that the school is under lockdown status "due to gunshots in the area" but nevertheless "the students and staff are safe in the building. The building is secure in a Lockdown status." At the same time, the Uvalde PD posts on Facebook that there exists a "large police presence at Robb Elementary. We ask the public to avoid the area."

## 2.  Chief Arredondo Accepts Active Shooter Scenario and is Unaware of Law Enforcement Responses in Other Parts of the Building

179.    Chief Arredondo used his cellphone to call Uvalde PD's dispatch and inquire whether a teacher was with Ramos in Room 111. Thereafter, Chief Arredondo admitted that he believed that there were either students and a teacher inside the room with Ramos and that there was a strong likelihood of casualties as well. Chief Arredondo repeated this same understanding

---

[19] At approximately 12:03, a young female student called 911 and over several calls over thirteen minutes, informed officials that multiple students had been shot and killed and that there were only eight to nine students still alive. The caller apparently retrieved her dying teacher's cellphone pleading for an ambulance for Ms. Mireles and taking her life in her hands as she would have been certainly killed had Ramos discovered the phone call.At approximately 12:19 p.m., another 911 call was placed by a different student in an adjourning classroom. The student hung up upon the insistence of another student. A subsequent call was received where 911 heard the sound of three gunshots. At approximately 12:36 p.m., the initial young female student called 911 and informed dispatch that "he shot the door," and "please send the police now." She informed the 911 dispatcher that she was able to open the door to allow law enforcement to enter. The 911 dispatcher ordered her not to open the door.

such that he repudiated his hunch that Ramos was a barricaded subject. Nevertheless, Defendant Arredondo called police dispatch seeking additional officers to participate in the barricade. He said "he's [Ramos] in one room. I need a lot of fire power, so I need this building surrounded. I need it surrounded by as many AR-15s as possible." He did not request or set up for a breach of the classroom; rather, he requested additional officers to fortify the barricade.

180.    Uvalde Police Sgt. Coronado exited the building to make a call to dispatch (rather than to the non-existent incident command center whose required existence went thoroughly ignored) requesting ballistic shields, flashbang grenades and helicopter support. Sgt. Coronado admitted that he was unsure as to whether the door to either Room 111 or Room 112 was unlocked and reaffirmed that Ramos was contained and barricaded within Room 111. Sgt. Coronado remained outside the building for approximately 30 minutes while students and teachers were being evacuated through punched-out windows on the west side of the building.

181.    While not located on the west side of the building, **Teacher Class Representative Esther V.** and her special needs and physical and emotionally disabled students were escorted out of her classroom's closet. Law enforcement were pressuring her to move quickly despite her student's special needs conditions which otherwise impeded such a rapid response. Ms. Esther V lifted up her smallest student and explained to her other students that they needed to run and/or move quickly. Ms. Esther V clutching her student in her arms, ran across campus to the safe haven of the funeral home.

182.    Ms. Esther V immediately texted her husband, who, after being mistaken as a first responder, had been helping to evacuate other students across campus. She also sought information as to her son who was in lockdown in the school's cafeteria. In the morning of May 24, 2022.

**Plaintiff Jasmine C**

183.    Plaintiff **Jasmine C ("Ms. C"),** a CISD food service employee, was awaiting the arrival of one of the second grade classes in order to attend to her job of serving lunch.

184.    The morning of May 24, 2022 was a busy one in the cafeteria where the school hosted an award ceremony for its first, second and third grade students that finished around 11:00 a.m. Along with other student parents, Ms. C proudly watched her son, M.C. receive an award.

185.    After the proud parents left, the second graders filed in for their scheduled lunch period. After lunch service commenced, the school's janitor came storming into the cafeteria and in a frenzy, screamed, "Jasmine, run, run, hide, hurry, hurry." Having been unapprised of any emergency occurring on campus, Jasmine responded, "whoa, whoa, whoa, what's going on?" to which the janitor replied, "they're shooting, they're shooting, there's gunshots."

186.    Ms. C then heard gunshots. She immediately ran to the cafeteria's back door in order to lock it and while there, heard the pa-pa-pa-pa sound of gunshots. The children in the cafeteria were then guided up on the cafeteria's stage and instructed to remain absolutely quiet and to lie down. Ms. C panicked, thinking that her son, M.C. was outside in the playground near the location of where she heard the gunshots. Realizing this, the terrified Ms. Carrillo moved to leave the cafeteria and go outside to find her son. Ms. C's colleagues and other teachers had to restrain her, screaming, "you have to wait, you have to relax, you can get us all killed." Ms. C was beside herself, pacing back and forth, exclaiming "I have to save my son" while her colleagues were begging her to relax.

187.    Ms. C texted her boyfriend telling him to come to Robb Elementary and find M.C. as she was being restrained from leaving the cafeteria to find him. Soon thereafter, many students had been relocated into the cafeteria and directed towards the stage and into lockdown position.

The children were hysterically crying, with their teachers trying to instill calm so as not to bring attention to themselves were the shooter to pass by the cafeteria.

188.    After approximately sixty minutes, law enforcement entered the cafeteria. They immediately instructed the teachers and students to take off running from the back door. The second graders were panicking and took off out the door upon the direction of their teachers.

189.    Law enforcement also instructed all teachers and staff, including Ms. C, to take off and run across campus. As she was running, one of the children ran in front of her and in order not to trample and fall over him, Ms. C crashed down onto her knee on the asphalt ground. The pain was excruciating but the adrenalin got her up immediately, and she continued to run.

190.    Meanwhile, Ms. C's ten-year old son, Plaintiff M.C., was terrified in lockdown with his fourth-grade friends in Room 103 when an officer shattered the classroom's window and screamed for the children to scramble out through the window. Terrified, M.C. propped himself up and out through the window. While doing so, a shard of glass lacerated his chest and drew blood. M.C. and his fellow classmates ran across the campus and were directed to the funeral home. M.C. was absolutely terrified, his shirt stained with blood. Upon arriving to the funeral home, M.C. had the wherewithal to call his mom's cellphone.

191.    After assisting others and jumping over the gate, Ms. C's phone rang. Her son spoke into the phone, crying "mommy, mommy, mommy, where are you?  I'm alive. I'm not dead. Come to the funeral home." Not sure where the funeral home was located, Ms. Carrillo immediately set off, asking others for directions.

192.    Arriving at the funeral home, law enforcement refused to locate M.C. for Ms. Carrillo. Ms. Carrillo felt tremendous pain in her knee from the fall when evacuating the cafeteria.

193.    Upon reuniting with Plaintiff M.C., Plaintiff Ms. C returned home with her son. Ms. C's knee puffed up like a balloon and the pain was excruciating.

194.    Meanwhile, M.C., who had to jump out the window of his class after Border Patrol smashed his classroom window, returned home traumatized. M.C. fell into a pattern of waking up terrified every two hours at night. He cried when he was alone and asked his mom to remain with him all the time. M.C. pleaded with his mom, Ms. Carrillo to not take him back to school. M.C. kept asking his mom, "What if it happens again, and then this time, I do die?"

195.    In order to diminish the trauma and respond to M.C.'s needs, Ms. Carrillo and M.C. were forced leave Uvalde and relocate to Ms. C's home town of Del Rio, Texas. When arriving in Del Rio, M.C. was still too traumatized to return to school and has been home schooling. M.C. cowers in fear when he sees a police officer and/or alarms go off in his vicinity.

196.    After going to an orthopedic doctor, Ms. C was informed that she had torn the meniscus in her knee in two places and that surgery was absolutely necessary. Having lost her employment and associated health insurance, Ms. C has been forced to postpone the required surgery and endures the severe pain of attempting to walk with a torn meniscus.

197.    As such, Ms. C's long standing goal of becoming a law enforcement officer was now immeasurably attenuated, and perhaps shattered completely. She couldn't foresee how could she possibly pass the strenuous physical examination to become a proud law enforcement officer.

198.    In sustaining both the trauma of watching her son M.C. navigate through his own debilitating trauma, as well as her own compromised physical state from the injuries she sustained at Robb Elementary school, **Ms. C's** ability to provide her son with the care and assistance he needs has been exceedingly diminished.

### 3.   Chief Arredondo Remains Idle and Searches for a Master Key

199.    During the entirety of this time, Chief Arredondo remained inside the building and according to Sgt. Coronado, was "in charge" of the response despite not having the capacity to receive dispatches and communications. For example, both Chief Arredondo and Sgt. Coronado were unaware that the U.S. Border Patrol Tactical Unit ("BORTAC") were assembling and operating at the opposite side of the building from where both the Chief and the Sergeant were located.

200.    At approximately 11:44 a.m., Ramos started shooting again providing further proof that Ramos was an active shooter. No officer responded, including the police academy instructors, Constables Field and Zamora nor Officers Hernandez, Suarez or Mendoza. Rather, the assembled officers saw fit to search for a negotiator and bullhorn to negotiate with Ramos as if he was a barricaded subject rather than an active shooter.

201.    Despite being unaware as to whether the door to Rooms 111 and 112 were indeed locked, Chief Arredondo determinatively sought a master key when, as Chief of the CISD police force, the procurement of such master key should have been accomplished in short order. Nevertheless, Arredondo stressed that before any attempt to enter the classroom could occur, he needed a master key and breaching tools. Despite awaiting the arrival of what Arredondo conceived to be the only means of entering the classroom and neutralizing the shooter, there was no incident command in place such that Arredondo could have been informed when these two 'necessary' instruments had arrived on the scene.

### 4.   Law Enforcement Response on North Side of the Building

202.    While Chief Arredondo was orchestrating his response from the south side of the West building, an entirely separate response was being undertaken on the north side of the building.

On this north side, officers from the Uvalde PD, including acting chief Lt. Pargas, Lt. Martinez and Sgt. Canales were stationed awaiting some command response. Acting Chief Pargas acknowledged that he was never in communication with Chief Arredondo nor with the other law enforcement officers on the north side of the building. It was Lt. Pargas' understanding that Arredondo must have been coordinating the law enforcement response given his supervisory jurisdiction over the school. According to Lt. Pargas, the Uvalde PD was merely there to provide support. As such, Lt. Pargas did not assert Uvalde PD's jurisdictional authority over Chief Arredondo and the CISD-PD to set up a command center nor did he seek to coordinate with any of the other agencies that were responding. Rather, Lt. Pargas was awaiting the arrival of the Department of Public Safety or BORTAC who he assumed would be providing better equipment.

203.    Also on hand were Uvalde Sheriff deputies who were told by Sheriff Nolasco that "DPS is coming. I got the captain. We need to, we need to get this contained and see who's in charge." Despite Nolasco's order, it should have been apparent to him that "containment" was an inappropriate response to an active shooter.

204.    Nolasco's response was informed on account that he had not completed a state active shooter training nor did the Uvalde's Sheriff Department under his command have an active shooter policy in place on May 24, 2022.

### 5.  DPS Texas Rangers Ordered to Stand Down

205.    However, when the DPS Texas Rangers did arrive, law enforcement at the perimeter, who were unaware of what was happening inside the building instructed them to merely assist with the perimeter. Such instruction was reaffirmed by DPS commanding officer Captain Joel Betancourt who directed his DPS team to remain on the perimeter and to not enter the building. Betancourt ordered the DPS team to "stand by" and await the arrival of a more highly-skilled group

who were on the way. Captain Betancourt also ordered a DPS team that was gearing up and poised to breach the classroom to stand by. Captain Betancourt's order resulted in the large contingent of DPS personnel on site to disregard their training and refrain from taking immediate and swift action to neutralize the shooter. Such command resulted in the majority of the ninety-one strong DPS units to wait more than seventy minutes into the seventy-seven minute long shooting to take any substantive action.

206.    Upon information and belief, Captain Betancourt was carrying out both DPS Regional Director Victor Escalon and DPS overall Director Steve McGraw's directives as to how DPS should engage while responding to an active shooter at Robb Elementary school despite the state mandated and required protocols that they were required to undertake.

207.    However, DPS Special Agent Luke Williams ignored such instruction and proceeded over to the north side of the building and began clearing the students and teachers along the north hallway. When interfacing with officers stationed outside Rooms 111 and 112, DPS Agent Williams was informed that they were waiting for instruction from "whoever was in charge figuring things out."  After discerning that law enforcement's response was seemingly unfolding in a haphazard manner and without a centralized command, DPS Agent Williams was required to follow the ALERRT protocol by asserting his authority as a DPS Texas ranger and take the reins in setting up a command center and tightening up the response. However, DPS Agent Williams, as well as the other 91 DPS law enforcement personnel on the scene, failed to take charge despite their mandate and jurisdictional authority to do so.

**6.  Law Enforcement Blocks Plaintiff Parents Entry From Retrieving their Children**

208.    Meanwhile, at the perimeter of the school's campus, many parents had assembled seeking to retrieve their children. They were vehemently denied entry onto the campus by law

enforcement despite having received no affirmative communication apprising them of the state of law enforcement's response to neutralizing the active shooter. Approximately twenty or so minutes after Ramos had entered the building, a group of terrified parents pleaded with law enforcement to permit their entry which was forcefully rebuffed. The student's parents were forcefully held back, pinned to the ground, pepper sprayed and tasered. One parent however was able to break through the grip of law enforcement who were preventing her entry. She ran into the building and rescued her two children. Among law enforcement officers at the perimeter was Defendant Nolasco who kept parents from entering the school, even as parents yelled at him to do something, anything, to rescue their children.

209.     In or about this same time frame, the word got out that there was an ensuing active shooter at Robb Elementary. **Parent Class Representative Andrea V.** ("Ms. Andrea V.") received a call from her sister informing her that such nightmare was unfolding. Ms. Andrea V's son and granddaughter were in attendance at school on that day. A.V. was in fourth grade and G.E. was in third grade. At first, Ms. Andrea V didn't believe her sister as there was nothing posted on the school's Facebook page which in the past, the school was sure to communicate. Panicking, Ms. Andrea V. drove in the direction of the school and after passing the school's street, drove towards the back of the school near the funeral home.

210.     At the funeral home, several parents and law enforcement were assembled. Ms. Andra V. was determined to find her son but was thwarted by law enforcement. A woman was gathering the names of students from their parents and promised to determine whether they were safe. Ms. Andrea V. provided her children's names. Other parents were banging on the doors and windows looking for answers as to their children's safety. When the woman with the list returned and wasn't able to confirm A.V.'s presence, Ms. Andrea V panicked.

211.    Ms. Andrea V. forcefully screamed and cried, panicking that A.V. had been murdered. In pressing to determine if her son was alive, Ms. Andrea V. was able to receive word that A.V. was alive inside the school. After hearing that the school was going to load the children onto school buses and bring them to the Civic Center, Ms. Andrea V. left for the Civic Center to see for her own eyes that A.V. was safe and sound. After lining up at the Civic Center, Ms. Andrea V was finally reunited with her son A.V. A.V.'s teacher told Ms. Andrea V. how proud she was of A.V.'s bravery and how strong he was during the experience.

**7.  Homeland Security BORTAC Prepare to Breach Classroom and Neutralize Attacker**

212.    As events unfolded inside the building, unbeknownst to Lt. Pargas, Homeland Security's BORTAC unit, under the command of Paul Guerrero, had been assembling and were themselves awaiting an order to breach the classroom. Cmd. Guerrero was well informed that students were trapped in the classroom with Ramos. Nevertheless, Cmd. Guerrero informed his officers that it was "going to take time" to breach the door. Between the time period of 11:37 a.m. and 12:50 p.m., surveillance footage depicted a steady stream of law enforcement agencies moving in and out of the north hallway, purportedly positioning and preparing themselves for the eventual 'breaching effort.' Upon information and belief, Cmd. Guerrero was expressing Homeland Security's policy and practice of delaying a rapid response to scenarios requiring swift action. BORTAC's conduct at Robb Elementary glaringly highlights its ignorance of active shooter protocols that, upon information and belief, reflect DHS's ineffective supervision and training overseen by U.S. Border Patrol Chief, Raul Ortiz and and DHS Secretary Alejandro Mayorkas. BORTAC was present at Robb Elementary approximately twenty minutes after Ramos entered into the interior of school building, yet the unit remained inactive throughout Ramos' subsequent shooting inside the classrooms. Such inaction occurred despite BORTAC being equipped with

ballistic shields, tactical weapons and breaching equipment and personnel who were purportedly trained in SWAT team protocol and procedure.

213.    Despite the fact that Chief Arredondo and Uvalde P.D.'s acting Chief Pargas were awaiting the arrival of ballistic shields in order to effectuate the breach of Room 111, surveillance video taken between the hours of 11:52 a.m. and 12:21 p.m. depicted the arrival of four different ballistic shields to the north end of the building. A rifle-rated shield arrived at around 12:20 p.m. some thirty minutes before the classroom was finally breached. However, Chief Arredondo, who was located at the south end of the building and was operating without the assistance of a centralized command center, was unaware that the shields, particularly the rifle-grade shield had arrived. Similarly, Chief Arredondo was also unaware that BORTAC had assumed operational control at approximately 12:20 p.m.

214.    On or about 12:15 p.m., a student from inside the building called and reported that her teacher, Ms. Mireles, was alive but had been shot. Ms. Mireles was the wife of Uvalde PD officer Ruben Ruiz who received a call from his wife at 11:48 a.m. confirming that she had been shot. This 911 call followed an earlier call at 12:03 p.m. wherein a student called informing 911 dispatch that there were eight to nine students still alive in her classroom. In or about the same time, Defendant Officers, including acting Chief Pargas received a radio dispatch that one of the classrooms was "full of victims."[20] Acting Chief Pargas responded, "ok, ok, thanks" and after informing Border Patrol as to the victims, stepped out of the school building for thirty minutes. Despite that such information reinforced the fact that the officers were facing an active shooter scenario, Defendant officers persisted in responding as if it were a 'barricaded subject" scenario.

---

[20] Lt. Pargas was well apprised that along with the shooter, there were a classroom of children and a teacher in Room 111 and 112. See, https://www.cnn.com/2022/11/14/us/uvalde-investigation-acting-police-chief-mariano-pargas

Such response continued despite officers hearing that Ramos began firing his weapon in Room 111 at 12:21 p.m., some 37 minutes after the last shooting had occurred.

215.    Just before 12:30 p.m., on the north side of the hall, a group of officers established a position closer to Rooms 111 and 112, as well as staged medical triage equipment on the east side of the hall. This took place under the tactical command of BORTAC. BORTAC's acting commander Paul Guerrero arrived at the north side with a breaching tool and again, without coordinated communication, Chief Arredondo was unaware that BORTAC was poised to breach Rooms 111 and 112.

216.    In taking control of the situation, Commander Guerrero determined that the use of the Halligan breaching tool would not work fast enough such that his officers would face a heightened risk of gunfire. Similarly, in acquiring and testing a master key on an adjacent classroom door, Cdr. Guerrero determined that the master key that he received from the school did not work. Although there was reasonable doubt as to whether the door to Room 111 was locked, Cdr. Guerrero obtained a second master key which he determined had worked. Nevertheless, despite having all the elements in place to breach the classroom and in taking charge of the tactical command inside the building, Cdr. Guerrero waited to give the order for his team to move forward.

### 8.  BORTAC Breaches Room 111 and Kills Attacker

217.    Finally, after assembling a stack of BORTAC officers, as well as charging one officer with holding the rifle-rated ballistic shield, Cdr. Guerrero commanded the students through the door, "Yell if you need help," and after Ramos shot the responding student, opened the door to Room 111 where Ramos fired his rifle at the stack. The stack killed Ramos with a barrage of bullets. Although such undertaking unfolded in a matter of seconds and was otherwise the required response under the standards and protocols for responding to an active shooter, law enforcement

took seventy-seven minutes to accomplish what they were duty bound to expeditiously perform. Each second of those seventy-three minutes exponentially compounded Plaintiffs and class members harms to a degree that it is indelibly etched into the hearts and souls of the survivors, their families, and the Uvalde community at large.

### 9. Evacuation of Children and Staff

218.    After receiving a dispatch at approximately 11:40 a.m., **Support Staff Class Representative Sylvia U.,** upon arriving at the funeral home with her school bus, found a chaotic and crazed scenario with parents screaming, law enforcement scurrying to and fro, an awaiting ambulance, and an impossibility to maneuver her large bus through the chaos. Prior to arriving at the funeral home, Ms. Sylvia U. was not informed what was happening at Robb. Dispatch merely informed her to pick up children at Robb and take them to Uvalde High School.

219.    It was only upon her arrival at the funeral home did she learn what was tragically unfolding. Panicked and unable to drive forward or backward, Ms. Sylvia U. locked her bus and awaited instruction from law enforcement. Sometime around 12:50 p.m., Ms. Sylvia U. heard a barrage of gunshots. Minutes thereafter, BORTAC officers, with bloodied children in their arms, came storming onto her bus with six profusely bleeding children. The officers set the children in the back of the school bus.

220.    Realizing that three of the six children were in a more critical state, BORTAC retrieved the three and carried them out to an ambulance. The three remaining children were also profusely bleeding with the BORTAC officer commanding Ms. Sylvia U. to quickly drive to the hospital. As the bus was blocked from going forward, law enforcement had to move vehicles and clear the traumatized and panicking parents to allow the bus to depart.   A police car escorted both the ambulance and Ms. Sylvia U.'s bus to the hospital. Upon driving out, Ms. Sylvia U. witnessed

the bodies of the deceased children being lined upon the sidewalk, as well as EMS applying CPR in an attempt to save the life of one of the teachers.

221.    After finally arriving to the hospital and delivering the traumatized and bleeding children, Ms. Sylvia U. drove back in the direction of Robb Elementary with the BORTAC officer. She was then ordered to return to Robb Elementary to pick up children and deliver them to Uvalde's Civic Center. However, as her bus was covered in blood, both on the seats and throughout the entirety of the floors, Ms. Sylvia U. drove back to bus garage to pick up another bus.

222.    Upon arriving back to Robb Elementary, Ms. Sylvia U. witnessed a chaotic mass of teachers with their traumatized and screaming children and parents being held back by law enforcement. As the children were being loaded onto the bus, Ms. Sylvia U. saw many of the children that she regularly transported to school. The children were screaming and crying all the way to the Civic Center. Upon arriving at the Civic Center, Ms. Sylvia U. witnessed parents clamoring to locate their children but were kept from reuniting with them by law enforcement until after the children entered the building. Parents were then requested to show proof that they were indeed their children's rightful parents.

223.    After dropping off the children at the Civic Center, Ms. Sylvia U. was required to return to Robb and pick up the remaining children. She did so and after making that last run to the Civic Center, Ms. Sylvia U. returned the bus to the bus garage, finally allowing herself to break down and express the horror that she had just experienced.

224.    Although Ms. Sylvia U. had been a bus driver for the Defendant UCISD for several years, the CISD had never provided training on the proper measures to take when executing school evacuations, let alone evacuations on account of active shooter scenarios.

225.     As the above unfortunate scenario attests, there was no systematic attempt to to plan for the many casualties who would need emergency medical treatment and transport after neutralizing the shooter. Because of the barricade, ambulances were unable to park directly next to the entrance to the school since law enforcement vehicles blocked their way. Additionally, helicopters that offered to land at the school with supplies of blood and the ability to transport victims to Level I trauma facilities were turned away. As Sylvia U's engagement tragically attests, there were so few available ambulances that injured children were transported to the hospital in school buses with no medical professionals on board. Thus, the ineffectual policies undertaken on that fateful day placed classmembers in considerable harm even after the tortious seventy seven minutes they were forced to endure.

### D. Post Attack

#### 1. Law Enforcement Fails to Follow Required State Protocols for Responding to Active Shooter

226.     The narrated facts above glaringly expose law enforcements complete and utter disregard of the standards and protocols required when responding to an active shooter scenario. In total, three hundred and seventy-six law enforcement were on hand and not one complied with the absolutely mandatory requirement that they immediately distract, isolate and neutralize the active shooter. Reports compiled post-attack indicated that despite the state mandated requirement that all law enforcement in the state of Texas undergo active shooter training, only 50% of the UPD officers who had responded on May 24, 2022 had received training. In addition, Defendant officers failed to establish an incident command. Each law enforcement agency who arrived ignored the all too apparent reality that they were confronting an active shooter scenario and that there was no coordinated, centralized command in place to orchestrate the response, let alone any

centralized communication center informing and coordinating the various agencies of the overall tactical plan.

227.    In addition, the response was so completely ineffectual that after Ramos was neutralized and students were liberated from the classrooms, the students, including those wounded were evacuated to the hospital on a regular school bus rather than the required ambulances. The school buses were without EMT's or other adults aboard so when the bus arrived at the hospital, those children who had been wounded had to limp off the bus without assistance.

### 2.    Texas SPD Fails to Assert Command Authority Despite Chaotic and Disorganized Response

228.    As law enforcement officers with the primary state law enforcement agency, the ninety plus SPD Texas Rangers on the scene were imbued with jurisdictional authority over the situation yet permitted the organizational void to persist over an unconscionable seventy-seven minute delay. Although there was a vague assumption that the Chief of the CISD police, Chief Arredondo had assumed command, the fact that Arredondo had positioned himself within the south side of the building and was therefore out of contact with the response efforts assembling on the north side, as well as those on the perimeter, such assumption was clearly unreasonable.

229.    This is particularly so given that the responding agencies had all undergone both the state mandated ALERRT active shooter training, as well as their own individual agency trainings and thus, were well aware of the protocols and command chains that were required. It was glaringly clear to all law enforcement agencies that such protocols were not in place and functioning at Robb Elementary school throughout that fateful seventy-seven minutes of protracted confusion and unimaginable physical and emotional suffering endured by the students, teachers and parents.

### 3.    A Communications Vacuum Perpetuated the Disorganized Response

230.     Similarly, as the primary required response was to "stop the killing," the entirety of law enforcement never attempted to breach the classroom nor take affirmative steps to determine whether the rooms were easily breachable, i.e., whether the classroom doors were indeed unlocked. Chief Arredondo's protracted search for a master key, despite his position as the police chief of the entirety of CISD's campuses, consumed his attention thereby delaying the otherwise required rapid neutralization of the shooter. Neither Arredondo or any law enforcement asked the school's principal, Maddy Gutierrez or the head custodian for a master key despite such being in their possession.

231.     Such oversight encapsulated the entirety of law enforcement's response as there was a vacuum of communications, both literally as radio and cell service within the building was purportedly non-existent and figuratively as there existed no incident command to serve as a conduit for communicating between the various responding parties and locations on the campus.

### 4.  DPS and Governor Disseminate an Exaggerated Account of Law Enforcement's Response

232.     In an attempt to obfuscate and camouflage the complete and utter disarray of law enforcement's response, the initial public statements and press briefings provided by the DPS intentionally painted an inaccurate and exaggeratedly positive picture of law enforcement's response. DPS Regional Director Victor Escalon's briefing provided the information that Texas Governor Greg Abbott relied upon in his press conference the day after the massacre. Governor Abbott repeated a false narrative that the entire incident only lasted as little as forty minutes and praise was due to the officers who rapidly devised a plan, stacked up, and neutralized Ramos. Thus, the Governor presented a false narrative that law enforcement conducted a seamless mission keeping Ramos pinned down while children were being carefully evacuated.

5.  **Expression of Emotional and Physical Trauma Plague Plaintiffs and Class Members**

233.    On account of Defendants' Daniel Defense and Oasis Outback's unapologetic and insidiously negligent conduct, as well as the preposterous length of time that it took Defendant law enforcement agencies to finally neutralize Ramos and liberate the students, the amount and degree of trauma, distress, and life shattering anxiety that Plaintiffs and class members incurred had exponentially increased with each moment that Defendants refused to affirmatively act. Defendants' conduct significantly prolonged the time that Plaintiffs were required to assume lockdown conditions and on account thereof, the resulting emotional and physical scarring incurred by Plaintiffs had been significantly and exponentially increased.

234.    For example, [21] **Student Class Representative J.P.,** who, after watching his beloved teacher Ms. Avila endure close to seventy minutes of agony responding to a gunshot to her abdomen and his friend attend to her bloodied and severed nose, has refused to either leave his house or his parents side since the shooting incident. J.P. obsessively draws the window blinds to his house and repeatedly locks its doors and sleeps in his parent's room.

235.    Although the expressions vary, sch emotional and physical manifestations have rampantly expressed themselves throughout the daily lives of each Plaintiff and class member, significantly plaguing and obsessing them, as well as the entirety of the Uvalde community.

**Life Long Rupturing Damages**

---

[21] Although the following Plaintiffs had not specifically set out a narrative of the specific harms they incurred as a result of Defendants' conduct, such harms have expressed themselves as various emotional and physical ailments associated with, and reflective of post-traumatic stress. Such Plaintiffs will specifically articulate their respective harms and injuries during discovery disclosure. M.D.E., a minor, BERNARD E. and TANAMA J.E., individually; A.R., a minor, DEBORA Q., individually; J.A.M., a minor, LETICIA M. and MIKE M., individually; M.C.A., a minor, MONICA H., individually; ALBERT V., individually; A.G., a minor, SELENA T., individually; M.C. a minor, MARISA S., individually; A.M. a minor, AIKO C.,

236. On account of the experience in lockdown and the harrowing imagery of law enforcement in their 'Darth Vader' armored outfits commanding them to run for their lives from their classrooms and the alienating disorder of awaiting their parents to retrieve them, the Plaintiff students, as well as their parents, teachers, and support staff have each been exhibiting their own personal expressions of the post-traumatic stress that has irrevocably upended their daily lives.

237. For example, Plaintiff, **Z.R.,** was ten years old in fourth grade when she was in lockdown in Room 109 at Robb Elementary. When Z.R. returned home and learned that her favorite cousin had been killed during the shooting on campus. Z.R. has been beside herself and in deep mourning and grief. She's now afraid to be alone and complains about undiagnosed physical pain. Z.R.'s parent, Plaintiff **Corina R.** incurred her own trauma when she learned of the school shooter's presence at Robb and whether her daughter was alive or dead. Now, that trauma is exacerbated as she painfully watches how her vibrant and engaged daughter has descended into darkness.

238. Plaintiff, **J.S**., was eight years old in third grade when he was in lockdown in Room 19 at Robb Elementary. When he returned home, he began constantly exhibiting irrational fits of hysterical crying over matter-of-fact inconveniences. He also began exhibited an obsessive compulsive act of tying strings to the door so that the 'bad man' won't harm him. J.S.'s parent, Plaintiff **Jennifer C.** has incurred her own trauma when she learned of the school shooter's presence at Robb and whether her son was alive or dead. Now that trauma is exacerbated as she painfully watches how her son suffers unbridled hysterical outbursts and retreats into obsessive imaginary locations.

239. Plaintiff **I.R**. was eight years old in second grade when he was in lockdown in Room 19 at Robb Elementary. When he returned home, I.R. would not leave his mother's side and

refused to sleep in his own bed. I.R. attempted to undergo therapy but the memories and flashbacks that were elicited were too much. I.R. refuses to talk about or remember that horrifying day. Plaintiffs **George and Alma R.** have incurred their own trauma. Alma R. was at work when she learned of the shooter at Robb. As she was unable to leave her job, she endured hours wondering whether I.R. was safe. Still stuck at her job, she was unable to retrieve her son from the Civic Center and had to rely on her sister-in-law to reunite with I.R. Both George and Alma R. are fearful that her son has now been indelibly harmed.

240.    Plaintiff **L.R.** was nine years old in third grade on May 24, 2022 when she was in lockdown in Room 3 at Robb Elementary. When L.R. returned to her home, she immediately began wetting her bed which has been consistently recurring. L.R. becomes extremely emotional over small, inconsequential things, particularly when she has to depart from friends believing that she'll never see them again. L.R.'s attention span has severely diminished as periodically she 'zones out' from conversations and interactions. L.R. has transformed from being a quiet, demure young girl to exhibiting temper tantrums and being intolerant of loud noises and voices and is triggered from watching action movies. Upon learning of an active shooter, L.R.'s father, **Frank R.** immediately drove the one hour distance to Uvalde obsessively imagining that he would arrive to find out that L.R. had been killed. Although that scenario did not ring true, both he and his wife, Plaintiff, **Luciene A**. have been heartbroken in watching the downward transformation of their daughter.

241.    Plaintiff **Z.A.** was nine years old in third grade on May 24, 2022 when he was in lockdown in room 2 at Robb Elementary. When Z.A. returned home, he refused to leave his mom's side. He constantly opens all the doors and refuses to be in the bathroom with the doors closed. Z.A. also insists that he will only attend a school where his mom works. Plaintiff Esther V. was working as a special education teacher at Uvalde on that fateful day. After hearing gunshots and

observing students and teachers fleeing for their lives, **Esther V**. locked her classroom's door and ushered her second through fourth grade developmentally disabled students into a closet. Knowing that her son Z.A. was outside in the playground, her heart stopped wondering if he was o.k. She called Z.A.'s teacher but received no answer. When law enforcement finally liberated her classroom, Esther V. had to run across campus carrying while cradling one of her students. The combination of watching her son's fear induced behavior while recalling her own experience on that day has caused Esther V. a heightened fear of what other tragedy will next arrive.

242.     Plaintiff **M.T** was nine years old in third grade on May 24, 2022 when she was in lockdown in room 1 at Robb Elementary. Although back in school, M.T. wonders whether it is safe to return to school. She worries that she'll experience a repeat of the chaos and horror that she experienced at Robb on May 24, 2022. M.T.'s mom, Plaintiff **Louanna R**. also wonders how the future will play out for her daughter given the horror she experienced at nine years old.

243.     Plaintiffs **B.G.** and brother **F.G.** were eight years old in third grade and seven years old respectively on May 24, 2022 when they both were outside on recess when the shooting commenced. Having to run for their lives upon the appearance of a man with a large gun, both B.G. and F.G. express recurring anxiety and constantly wonder when they will have to quickly run for their lives at any moment. The boys' mom, **Beatrice T.** also fears for her sons' future and their ability to feel safe as they mature in manhood**.**

244.     Plaintiff **J.L**. was seven years old in third grade on May 24, 2022 when he was outside on the playground at Robb Elementary at the time of the shooting. He, and his friends had to abruptly run upon his teacher's command. Thereafter, J.L. is hyper attentive to all loud noises and jumps when startled. J.L.'s mom, Plaintiff **Ashley L.** is saddened that her innocent young boy is now like a shell-shocked soldier.

245.     Plaintiff **J.D.** was ten years old in fourth grade on May 24, 2022 when he was in lockdown in Room 109 at Robb Elementary. When J.D. returned home, he's refused to return to school as he watched his teacher, Ms. Avila get shot. J.D. is unable to speak about what transpired on that fateful day and he has been unable to sleep. J.D.'s mom, Plaintiff **Sandra V.** wonders whether her son will ever return to his normal, happy go lucky self.

246.     Plaintiff **F.L.** was seven years old in third grade on May 24, 2022 when she was in lockdown hiding on the cafeteria's stage during the shooting. While on the cafeteria stage, F.L. was panicking and wanted her mom to come save her. Upon returning to home, F.L. does not want to return to school and wants her mom to remain constantly by her side. F.L.'s mother, Plaintiff **Virginia G.** is fearful that by having experienced such a frightful event at such a young age F.L. will ever be able to trust that life will be happy and safe.

247.     Plaintiff **A.P.** was eight years old and in third grade on May 24, 2022 when he was out on the playground when the shooter arrived shooting. A.P ran to the nearest classroom and was separated from his other classmates. While in the classroom with students he didn't know, the students barricaded the door with chairs and desks. Upon arriving safely home, A.P. continues to reply the events in his mind as does his parents **Roman P.** and **Aracely P.** who, in going to the funeral home to wait for A.P., witnessed law enforcement forcefully prevent parents from attempting to rescue their children. The chaos of that scene, as well as the nightmare in retrieving A.P. from the Civic Center will forever plague their hearts.

248.     Plaintiff **A.L.** was eight years old in third grade on May 24, 2022 when she was outside of her classroom on recess when the shooting began. A.L. was quickly ushered into a classroom where she could see out the window and across the building to where the shooter was located. Upon returning home, A.L. began wetting her bed and refused to allow any doors to be

closed. At night, she was petrified by the darkness. A.L.'s mother, **Crystal G.** was panic stricken upon learning that an active shooter had descended upon Robb Elementary. She immediately drove to the school, but her entry was blocked by law enforcement. Although she observed that other students made it out of the school safely, she didn't reunite with her daughter until much later in the day. Crystal G. constantly imagines that her daughter did not make it out alive.

249.    Plaintiff **D.J.Q**. was eight years old in third grade on May 24, 2022 when in attendance outside on the school grounds near his classroom, Room 8. D.J.Q. saw and heard everything before scurrying into a classroom to hide. Upon returning home, D.J.Q. insists upon sleeping with his mom and needs her nearby at all times. D.J.Q. lost his dear friend during the shooting and constantly asks his mother to take him to the cemetery. D.J.Q.'s health has deteriorated, having recently been diagnosed with type one diabetes. D.J. Q's mom, Plaintiff **Yvette Q.** is beside herself, crying herself to sleep every night imagining that she could have lost her son and wonders whether she will ever be the same.

250.    Plaintiffs **J.P**. was seven years old and in second grade on May 24, 2022 when he was outside the building on recess. J.P. heard the initial car crash and thereafter, the gunshots. J.P's teacher ushered J.P and his classmates into Room 17 and had them bunch up together in a corner. The teacher proceeded to assemble a wall of desks and bookshelves around her students to protect them. Upon arriving at Robb Elementary. Plaintiff **Jasmin P.** witnessed the chaos unfolding at the funeral home. Upon arriving home, J.P. was terrified to sleep alone and repeatedly recalls the events of that tragic day.

251.    Plaintiffs **T.G.** was eight years old and in second grade on May 24, 2022 and was in lockdown attendance in Room 18 at Robb Elementary. T.G. was kneeling down in her classroom with the lights off wondering when the shooter was going to arrive and kill her. When T.G. returned

home, she was afraid of the dark and had difficulty sleeping. T.G. kept continuously hearing all kinds of noises and was adamant that she didn't want to return to school. In hearing that an active shooter was on campus, Plaintiff **Jackie G.** headed off in school's direction and had a panic attack on route. Jackie G. was triggered upon seeing other parents pleading with law enforcement to determine whether their children were safe.

252.    Plaintiffs **R.F.** was nine years old and in fourth grade on May 24, 2022 when she was in lockdown in the school's cafeteria. During lockdown, R.F felt extremely anxious that she and the other students were exposed on the cafeteria's stage were the shooter to arrive. Upon arriving home, R.F. still wonders what would have happened were the shooter to arrive when all the students were piled up on the stage.  Plaintiff **Monica O.** was extremely anxious when she was notified that an active shooter was at her daughter's school. She worries what kind of damage the experience has wrought on her daughter.

253.    Plaintiffs **A.V.** was nine years old in fourth grade on May 24, 2022 while in lockdown in Room 105. Upon returning home, A.V. expressed his concern with how and why people harm each other. He wonders whether he or anyone can ever be sure of their safety. Plaintiff **Andrea V.** worries about her son's ability to feel safe and secure in the future.

254.    Plaintiff **J.P.** was ten years old and in fourth grade on May 24, 2022 when he was in lockdown in Room 109 at Robb Elementary. J.P. watched as his beloved teacher was shot in the abdomen from a bullet that flew through the wall from where the shooter was located. He also watched in horror as his classmate's nose was severed from a bullet coming from 'nowhere.' Similarly, J.P. heard the screaming and moaning coming from Room 111, the room next to his classroom where the shooter killed so many of his classmates. Upon returning home, J.P. obsessively ensures that all the doors to his house are locked and the window blinds drawn. J.P.

constantly wanders the house making sure that his parent, Plaintiffs **Daniel** and **Crystal P.** are safe and available. Plaintiffs' Daniel and Crystal P. are traumatized watching their otherwise happy-go-lucky son act in an obsessive and compulsive manner which they are powerless to remedy.

255.    Plaintiffs **N.S.** was nine years old and in third grade on May 24, 2022 when he was in lockdown in Room 12 at Robb Elementary. He was forced to sit in the dark and remain quiet despite constantly asking his teacher to telephone his mother. His teacher kept refusing over and over. Upon returning home, N.S. learned that his cousin had been killed. N.S.'s mom, Plaintiffs **Alieta P.** was panicked to hear that an active shooter was on her son's campus. On that day, Alieta P. was working at a health clinic nearby Robb Elementary which was also placed under lock down. After lockdown was lifted, Alieta rushed over to the school and witnessed the children's bodies being brought out of the classroom. Alieta P. was beside herself as she couldn't find N.S. Upon reuniting with him, Alieta P. was unable to sleep for an entire week as the fate of her nephew had not been determined. Plaintiff **Maria P.**, N.S.'s grandmother's health has been greatly impacted upon the anxiety and worry she experienced on May 24, 2022 and thereafter.

256.    Plaintiffs **A.L.A.T** was ten years old and in fourth grade on May 24, 2022 when she was outside leaving school accompanied by her biological father. Upon hearing the shots, A.L.A.T and her biological father ran for their lives through the parking lot next to the building where the shooter was located. When A.L.A.T. returned home, she found out that her best friend was killed on that day. A.L.A.T. is continually texting her mother, **Cassandra B.**, who, on that day was prohibited by her employer to leave work and go to her daughter's school. Cassandra B. is concerned that the loss that her daughter incurred will prevent her from forming close friendships or relations in the future.

257.     Plaintiff **G.D.G.R.** was seven years old and in third grade on May 24, 2022 while on lockdown at Robb Elementary. Upon returning home, G.D.G.R. expresses a concern for her safety by always checking to see who is in her immediate presence. Her mom, Plaintiff **Cynthia R., worries** that her daughter is permanently damaged**.**

258.     Plaintiff **J.M.** was nine years old and in fourth grade on May 24, 2022 when under lock down at Robb Elementary. J.M. shows signs of insecurity and insularity after the events of May 24, 2022.   Plaintiffs **Sandra and Martin M.** have sadly observed the changes in their daughter.

259.     Plaintiff **Maria G.R.** was a bus driver for the Uvalde School District on May 24, 2022 while on location at Robb Elementary. Maria G.R. was dispatched to Robb Elementary school without being told that she was responding to a school shooting. Upon arriving to the funeral home, Maria G.R. was astounded to find law enforcement and chaotic and terrified parents clamoring for information from law enforcement as to the safety of their children. Maria G.R.'s bus was boxed in so she was unable to move. Immediately thereafter, law enforcement came barging onto her bus with six bleeding children in their arms. They marched to the back of the bus and laid the children down. Thereafter, law enforcement removed three of the children and was ordered to take the remaining three children to the hospital. With a police escort and seriously injured children in the back of her bus, Maria G.R. drove rapidly to the hospital. After dropping off the children, she was dispatched back to Robb Elementary. However, given that her bus was soaked with blood, she had to return it to the garage and swap out another bus. She did so and after making two runs to the Civic Center with full busloads of hysterical and terrorized children, Maria G.R. broke down sobbing after the events that she had just experienced.

260.    Plaintiff **Vanessa G.** was a bus driver for CISD on May 24, 2022 while on location at Robb Elementary. Vanessa G. was dispatched to Robb Elementary to pick up and transport children from the school to the Civic Center in order to be reunited with their parents. Although the children on her bus expressed joy and happiness in heading home after a school day, the trips to the Civic Center were filled with crying and screaming. After making two runs to the Civic Center, Vanessa G. was deeply impacted by the sadness and horror in which she had just observed.

261.    Each of the above Plaintiffs suffered damages that despite being incorrectly designated as emotional, were in fact physical harms wherein the traumatic events experienced resulted in palpable brain injuries caused by physical alterations of the brain on account of the production of excessive brain chemicals such as Cortisol that are medically and scientifically known to a great probability to cause Post Traumatic Stress Disorder ("PTSD").

262.    Dr. David Spiegel, M.D., Associate Chair of Psychiatry & Behavioral Sciences and endowed Professor at Stanford University School of Medicine provides the following analysis illuminating the otherwise false dichotomy between physical and psychological damages when such applies to Post Traumatic Stress Disorder.

263.    Dr. Spiegel opines:

"The experience of exposure to life-threatening trauma is both a mental and a physical injury that cannot be separated. Children who witnessed their friends being shot, wounded and killed have been forever changed. Their previously safe environment was suddenly turned into a chaotic and bloody nightmare. Adults who were supposed to protect them were either themselves injured or killed, or failed to provide protection and safety. Their world was turned upside down. If this could and did happen in their school, it could happen anywhere, at any time. Studies show that exposure to trauma in childhood puts these children at greater risk of developing PTSD after exposure to trauma later in life. This means that their brains suffer damage that becomes apparent later in life with further trauma exposure, like a broken leg that has not healed perfectly and is more likely to break again with milder trauma.

The distinction between such mental and physical damage is artificial at best. The brain is a part of the body, regulates and receives information from every part of the

89

body, and is permanently altered by the experience of trauma. As the organ that records and reacts to experience, it suffers damage from exposure extreme experience of threat and violence. The brain is profoundly affected by stress, leading to chronic dysregulation of stress hormones such as cortisol and epinephrine, disruption of sleep through hyperactivation of the sympathetic nervous system, and alteration in the relationship between the prefrontal cortex which controls executive functions, and the limbic system, which manages emotion and memory. It has long been known that 'neurons that fire together wire together,' so events that profoundly alter experience cause the brain to reconfigure. The brain never entirely heals from exposure to trauma, making it more sensitive to subsequent even relatively minor trauma exposure. The brain records, reacts to and coordinates response to traumatic experience. It is changed by those experiences.

The damage done by trauma exposure is not limited to brain function. Decades of research on adverse childhood experiences demonstrates that trauma exposure in childhood produces lifelong lasting physical damage. Those who have suffered such experiences make more subsequent medical and emergency room visits decades later. Exposure to life-threatening violence as a child results in damage to the body that becomes apparent years later with earlier onset of many serious illnesses, including more severe cardiovascular and lung disease as well as subsequent psychiatric illness well into adult life. The children exposed to this murderous rampage have literally been scared to death, and their subsequent physical as well as mental health has been damaged.

I hold the above opinions to a reasonable degree of medical certainty.

David Spiegel, MD. See Exhibit A, "Damage to Brain and Body during Uvalde Shooting," dated November 28, 2022.

## CLASS ALLEGATIONS

264.     Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action as a class action on behalf of themselves and all other similarly situated (1) students, teachers and support staff who were located within the perimeter of Robb Elementary school's campus on May 24, 2022 and (2) the students' parents regardless of their location on May 24, 2022. The danger posed to the lives, health, and safety of these class plaintiffs was exponentially increased on account of Defendants' affirmative conduct in refusing and failing to comply with mandated state and CISD protocols for protecting against and responding to the active shooting

that occurred at Robb Elementary on May 24, 2022. Plaintiffs reserve the right to amend these putative class definitions as discovery or other case circumstances may warrant.

265.    Alternatively, to the extent that the Court should find that a class is unavailable, Plaintiffs reserve the right to designate their action as a mass action pursuant to the requirements of 28 U.S.C. § 1332(d).

266.    Class certification is appropriate because the class sought to be certified is more than sufficiently numerous to make joinder impractical. The number of members in the putative Class is great, but not so great as to make the class unmanageable. It is therefore impractical to join each Class member as a named plaintiff. While the exact number of Class members is not yet known, there are a significant number of similarly situated students, teachers, school support staff, and parents such that utilization of a class action is the most economically feasible means of litigating the merits of this action.

267.    Class certification is appropriate because Plaintiffs and their counsel are adequate class representatives. Like all members they seek to represent, Class Representative Plaintiffs were located on the Robb Elementary campus(or with respect to Parents class members had children on campus) on May 24, 2022 between the prescribed hours; and on account of Defendants conduct constituting deliberate indifference reflected in their affirmative conduct and disregard of their mandated protocols for both protecting against and responding to the active shooter, caused and exacerbated the debilitating harms that they will have have to endure for the balance of their lives. Plaintiffs' counsel is experienced in class action litigation, including having engaged in previous class-wide litigation and will therefore more than adequately represent the interests of putative class members.

268.    Class certification is appropriate because Plaintiffs' action raises common questions of fact or law, whose means of proof predominates over questions that may call for individual adjudication. Among these predominating common questions of fact or law are, but not limited to:

(a)     Whether municipal Defendants, through the conduct of their final policymakers, undertook a custom and practice of failing to comply with state and district standards and protocols for protecting against and responding to an active shooter at Robb Elementary on May 24, 2022 and whether such practice was undertaken with deliberate indifference to Plaintiffs' health and safety by creating and/or increasing the threat-of and danger-to Plaintiffs;

(b)     Whether individual Defendants, by affirmatively acting in contravention to state and district standards and protocols for protecting against and responding to an active shooter, were deliberately indifferent to Plaintiffs' health and safety by creating and/or increasing the threat-of and danger-to Plaintiffs.

(c)     Whether Defendant Daniel Defense, through the marketing of its firearms, munitions and accessories, including its AR-15-style rifles, to civilian purchasers, including thrill-seeking, impulsive and susceptible teens and young men who are attracted to violence and military fantasies, encouraged the illegal and dangerous misuse of its products by implying that civilians can use their weapons for offensive combat-like missions,

(d)     Whether said marketing violated the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by knowingly engaging in unfair trade practices that are exempted from the immunity otherwise conferred under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902;

(e)     Whether by marketing the illegal misuse of its products, Daniel Defense violated the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

(f)      Whether Defendant Oasis Outback, a licensed purveyor of firearms, failed to exercise reasonable care in selling and transferring firearms, including AR-15-style rifles to an outwardly appearing suspicious young man who, despite obtaining the

age of majority a few days earlier, spent thousands of dollars on multiple guns and large quantities of ammunition over a four-day period and as such, presented a reasonable likelihood that he would use the transferred products in a manner that posed an unreasonable risk of physical injury to other persons;

(g)   Whether such facts and circumstances warranted the exemption of immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

269.   Class certification is appropriate because Plaintiffs' claims are typical of the claims asserted on behalf of the putative class members. All claims asserted by Plaintiffs are also asserted on behalf of all class members, and there are no conflicts of interest that render Plaintiffs' claims or interests atypical of the claims or interests of the class members. Each class member has suffered the same type of damages and have incurred similar actual damages on account of Defendants' deliberate indifference and are of a similar type and amount to the actual damages suffered by each class member.

270.   Class certification is appropriate because class-wide adjudication of the claims alleged by Plaintiffs is superior to separate adjudication by individual class members, which may yield conflicting results, judgments, and obligations. In accordance with Fed.R.Civ.P. Rule 23(b)(2), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

271.   Also in accordance with Fed. R. Civ. P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties.

272.     Further, the costs of litigating this action against municipal and state actors renders individual litigation impractical and unfeasible, thereby rendering class-wide adjudication a superior means of resolving the claims alleged in this Class Action Complaint.

273.     Lastly, class certification is most appropriate because Defendants have acted in a manner where injunctive and/or declaratory relief would be instrumental in precluding future harm as it impacts the class as a whole.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
### MUNICIPAL LIABILITY
*(All Plaintiffs and Class Members against the Uvalde Consolidated Independent School District & City of Uvalde)*

274.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

275.     Section 42 U.S.C. § 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. A municipality is a "person" subject to liability under Section 1983 for violating an individual's constitutional rights on account of an official and/or unofficial policy and custom.

### Uvalde Consolidated Independent School District

276.     Municipal liability attaches to Uvalde's Consolidated Independent School District (CISD) on account of its custom and practice of failing to ensure its police department's compliance with its own, as well as the City of Uvalde and State of Texas' rules, regulations and protocols ensuring the safety and protection of its students and staff in the event of an active shooter incident occurring on its school campuses.

277.    Upon information and belief, the CISD's school board had provided the Chief of CISD's police department, Pedro Arredondo with final policymaking over safety and law enforcement matters, including the assurance that CISD's campuses are compliant with its own, as well as the City of Uvalde and State of Texas rules, regulations and protocols that provide for the safety of CISD's students and staff.

278.    In summarizing the exhaustive accounting above, the following security infirmities and safety infractions in violation of both the ALERRT and Annex 1 protocols existed at Robb Elementary school on or before May 24, 2022: (1) substandard and easily breachable perimeter fencing; (2) complete lack of enforcement over mandated requirements that both exterior and interior doors are to be locked at all times and exist in an operable state of repair; (3) interference of the campuses' emergency warning system on account of poor internet and cellphone service; and (4) the failure to amend the School's Raptor lockdown alert system in order to account for the inordinate frequency of 'false alerts' broadcasted on account of the school's proximity to the Mexican border.

279.    Upon information and belief, the CISD school board was apprised of the above security infirmities and infractions occurring at Robb Elementary but failed to take any affirmative action to remediate the school's noncompliance with its own and State mandated safety protocols for protecting against and responding to an active shooter on campus.

280.    On account of its custom and practice of permitting noncompliance with the required rules, regulations and protocols enacted to ensure the safety of plaintiffs and class members in the event of an active shooter scenario, Defendant CISD, through the deliberate indifference of its final policymaker, CISD Chief of Police Arredondo and chief administrator, Principal Gutierrez, violated Plaintiffs' Fourteenth Amendment rights to bodily and emotional

integrity, as well as parental rights to make decisions regarding their children's care, custody and control.

281.    By affirmatively disregarding the state of noncompliance with the required protocols for campus preparedness to protect against and respond to an active shooter at Robb Elementary, CISD final policymaker Chief Arredondo and CISD Principal Gutierrez "used their authority to create a dangerous environment for plaintiffs" by "consciously disregarding a known and excessive risk of harm," in violation of Plaintiffs' Fourteenth Amendment rights.

282.    On account of such conduct, CISD has caused Plaintiffs and class members unspeakable and lifelong physical, emotional, and societal harm.

283.    School District liability also attaches for violation of Plaintiffs and class members aforementioned Fourteenth Amendment rights on account Defendant CISD Chief of Police Arredondo's failure as the District's final policymaker, to comply with CISD and State protocols required when responding to the active shooter incident that unfolded over the agonizing seventy-seven minute period at Robb Elementary on May 24, 2022.

284.    By failing to take both affirmative action in compliance with said protocols, as well as affirmatively inhibiting action to take place, Defendant Chief Arredondo, as CISD's final policymaker for safety on CISD properties, displayed a "deliberate indifference" to Plaintiff and class members' Fourteenth Amendment rights to bodily integrity, emotional wellbeing and parental rights to the care, custody and control of their children.

**City of Uvalde**

285.    City of Uvalde's liability exists on account of the Uvalde's law enforcement's final policymaker's deliberate indifference to Plaintiffs and Class members' 14th Amendment rights to bodily integrity, emotional wellbeing and parental rights to the care, custody, and control of their

children by failing to take affirmative action to comply with the District and State's required active shooter protocols and policies. Upon information and belief, the City of Uvalde's City Council had provided the Chief of Uvalde's police department with final policymaking authority to ensure that the City of Uvalde was not only compliant with the State's mandated active duty training protocols, but that such protocols would be dutifully executed in the event of an active shooter within the jurisdiction of the city of Uvalde.

286.    On May 24, 2022, Lt. Mariano Pargas was the acting Uvalde police chief who was on the scene at Robb Elementary and as Uvalde's final policymaker, was charged with complying with the Uvalde's and the State of Texas' protocols for responding to the unfolding active shooter at Robb Elementary. Acting Chief Pargas undertook his supervisory decision-making authority by making a deliberate choice to follow a course of action "made from among various alternatives…," including ordering his subordinates to stand down and delay the expeditious neutralization of Ramos. Acting Chief Pargas' choices and decisions were rendered in a manner that was deliberately indifferent to Plaintiffs' and class members rights to bodily integrity, emotional wellbeing and parental rights to the care, custody, and control of their children.

287.    Lastly, a municipality may be held liable under 42 U.S.C. § 1983 for "failure to supervise or train," where the "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."

288.    Here, on account that both the ALERRT and Annex protocols for responding to an active shooter mandates immediate action to neutralize the shooter, even at the risk of the respondents' life, UCISD-PD and UPD officers magnificently failed to follow this nonnegotiable prescriptive protocol. Such nonfeasance is understandable given that reports indicate that the

District and the City of Uvalde failed in fact to provide training to half of its respective police force despite again, the State's mandatory requirement that all district police officers undergo active shooter training.

289.    Additionally, although the ALERRT and Annex protocols unconditionally require that the responding officers to immediately establish a command center to assist with communicating and coordinating the rapidly arriving emergency services, such mandated response was also patently disregarded by UCISD-PD and UPD officers, including most glaringly, Chief Arredondo and Acting Chief Pargas.

290.    Thus, given UCISD-PD and UPD's complete and utter failure to comply with their mandated requirements for responding to an active shooter, the inadequacy of their training was more than obvious and apparent. Although thankfully there hadn't been a prior active shooting incident within the school district, UCISD-PD and UPD's utterly reprehensible response fully satisfies a showing of deliberate indifference such that this single incident fully supports Plaintiffs' claim for failure to train.

291.    On account of the acts and omission of Defendants' CISD and the City of Uvalde's final policymakers' resulting in the violation of Plaintiffs and Class members' Fourteenth Amendment rights, Defendants municipalities were the direct ad proximate cause of Plaintiffs' and injuries and damages, including, but not limited to the following: post-traumatic stress disorder, fright, shock, and terror; pain and suffering; anxiety; mental anguish; emotional distress; fright and shock; mortification; past and future reasonable medical, psychological and hospital expenses; past and future wage loss and loss of earnings capacity; need for household services; need for attendant care; exemplary damages; Any and all compensatory damages, both past and future; attorneys' fees and costs; other damages, injuries, and consequences that are found to be related to the

incident that develops during the course of discovery; and Any other damages permitted by Federal and Texas law.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983
### Liability for Violation of Plaintiffs' Substantive Due Process Rights under the Fifth and Fourteenth Amendment
(*All Plaintiff & Class Members against Defendants, Pedro Arredondo, Adrian Gonzalez, Jesus Suarez, Mariano Pargas, Eduardo Canales, Javier Martinez, Daniel Coronado, Louis Landry, Donald Page, Justin Mendoza, Ruben Nolasco, Alejandro Mayorkas(Bivens action), Paul Guerrero(Bivens action), Victor Escalon, Steve McGraw, Joel Betancourt, Juan Maldonado*)

292.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

293.    42 U.S.C. § 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party.

294.    Similarly, a private right of action for damages resulting from a deprivation of constitutional rights by federal officers is redressable under in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 ("*Bivens* action").

295.    The Due Process Clause of the Fifth and Fourteenth Amendments provide that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. V, XIV, § 1. To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs must show that they have asserted a recognized liberty interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest under color of state law. The Fifth and Fourteenth Amendments protect against the government's interference with 'an individual's bodily integrity and protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

99

296.     While the Fifth and Fourteenth Amendments' right to bodily integrity and parental rights do not ordinarily extend to circumstances when harm is incurred at the hands of a private actor, where however, a state actor's acts with deliberate indifference to a person's plight and creates a more dangerous circumstance, a person's Fifth and Fourteenth Amendment rights attach and the state actor is amenable to liability. A viable "state-created danger" claim requires the State to take an affirmative step to create the danger or make the plaintiff more vulnerable to it.

297.     Here, Defendants' Pedro Arredondo, Adrian Gonzalez, Jesus Suarez, Mariano Pargas, Eduardo Canales, Javier Martinez, Daniel Coronado, Louis Landry, Donald Page, Justin Mendoza, Alejandro Mayorkas, Paul Guerrero, Victor Escalon, Steve McGraw, Joel Betancourt, Juan Maldonado were performing under the color of state (and/or federal) law and as such, are being sued in their individual capacities under Section 1983 and/or a *Bivens* action (Mayorkas and Guerrero). But for DHS Director Mayorkas and SPD Director McGraw, the above designated Defendants were on site at Robb Elementary on May 24, 2022 and thereby, upon their own volition, directly acted and/or ordered their subordinates to act, in complete contravention of the required standards and protocols for responding to an active shooter.

298.     As the above statement of facts exhaustively makes plain, each of the above named Defendants acted in manner that was deliberately indifferent to Plaintiffs' safety and wellbeing in that their conduct considerably heightened the danger that Plaintiffs faced on account of Defendants failure to implement the required active shooter protocols in the expeditious fashion that they were otherwise mandated.

299.     Primarily, the danger faced by Plaintiffs and class members were significantly enhanced by Principal Gutierrez and Defendant Chief Arredondo who, despite being well aware that the security systems in place at Robb Elementary were severely compromised, consciously

disregarded such fact and on account of such, provided Ramos easy access, both to (1) the perimeter of the campus on account of significantly low and breachable perimeter fences, and (2) the school building and classrooms on account of a pattern and practice of permitting the external doors to be unlocked and the internal classroom doors to be broken and unlockable. Similarly, Gutierrez and Arredondo's failed to rectify the consistently unreliable internet service on campus which inhibited the school's Raptor alert system, as well as reliable police radio communications and/or cell phone use.

300.    Such circumstance came to pass on the morning of May 24, 2022 where the faulty cell service inhibited a prompt emergency message to disseminate to teachers and staff resulting in a delayed response to Ramos's presence on campus. Such failure to warn significantly heightened the danger posed to plaintiff students, including those on the playing fields who were forced to confront Ramos directly by having to scurry inside the school building, as well as those in the building who were forced to frantically assume lockdown positions within unlocked classrooms.

301.    The above dereliction of Gutierrez and Arredondo's duties to ensure that Robb Elementary was in compliance with the state mandated active shooter ALERRT requirements more than created and exacerbated dangerous conditions at Robb Elementary and on account of their knowledge and disregard, evinced their deliberate indifference to a known and excessive risk to Plaintiffs' safety.

302.    Secondly, the danger faced by Plaintiffs and class members were significantly enhanced by the above designated law enforcement Defendants' conduct on May 24, 2022, where said defendants' were well apprised of the continuing danger that Plaintiffs faced yet intentionally

disregarded compliance with the state mandated protocols to take swift and affirmative steps to "isolate, distract and neutralize" Ramos.

303.    Rather than appropriately order their particular law enforcement agencies to undertake this mandatory directive, Defendants' Arredondo, Pargas, Escalon, Guerrero, Mayorkas, and McGraw disregarded such directive but instead deferred to each-others agencies where it was blatantly obvious that no agency in particular was taking charge. Defendant Arredondo had barricaded himself within the school's south hallway flatly ignoring his mandatory responsibility to serve as the incident commander and establish and coordinate a unified response amongst the various responding law enforcement agencies. Similarly, Chief Arredondo commanded the UCISD officers in his vicinity to stand down and refrain from confronting Ramos

304.    Thus, given the lack of radio and internet services within the building, Chief Arredondo was unable to either receive or send communications such that he was out of touch with the efforts that were being undertaken on the north side of the building that was commandeered by Uvalde PD and its acting Chief Pargas. Despite being the first responders into the building mere seconds after Ramos slaughtered the students and teacher in Room 111, Defendants UPD and UCISD officers, Arredondo, Gonzalez, Suarez, Pargas, Canales, Martinez, and Coronado, Louis Landry, Donald Page, Justin Mendoza, and Juan Maldonado refrained from swiftly confronting Ramos. Thereafter, despite perceiving the necessity to initiate an incident command on account of Chief Arredondo's refusal to assume his required role, Uvalde PD Acting Chief Pargas both failed to assume that role as well as affirmatively instructed his Uvalde PD officers to stand down and not expeditiously confront Ramos.

305.    This same affirmative command to indiscriminately violate state and federal active shooter protocol by "standing down" and refraining from actively confronting Ramos was

perpetuated by DPS under the leadership of Regional Director Escalon and Director McGraw and BORTAC under the leadership of Cmd. Guerrero and DHS Director Mayorkas. Despite the more jurisdictionally superior, well equipped, experienced, and by the far, the most represented law enforcement agency on the campus (ninety-one DPS officers on site), Regional Director Escalon disseminated the order throughout DPS ranks that DPS involvement should be limited to perimeter control. DPS Captain Betancourt's unequivocal 'stand down' order more than affirms such directive. Similarly, and in alignment with DPS's decision to relegate its participation to a supportive rather than a leadership role, Director Escalon and his subordinates refrained from filling the glaringly apparent vacuum of incident command despite that such decision was in direct violation of the required ALERRT protocols.

306.  Thus, Defendants' Arredondo, Pargas, Guerrero, Mayorkas, Escalon, and McGraw ("Supervisory Defendants") took decisive, affirmative steps to exacerbate and prolong the danger posed to Plaintiffs and class members by permitting an active shooter to remain inside Room 111 for an excruciatingly unreasonable period of time when Defendants knew that (1) there were students within the same room who had been murdered and/or injured and in need of prompt medical assistance and (2) Ramos was armed with significant firepower that could penetrate the surrounding hallways and classrooms where Plaintiffs and class members were locked down. Thus, Supervisory Defendants' incorrigible procrastination and lack of coordinated response heightened the risk of danger and protracted harm that manifested in Plaintiffs incurring crippling and life shattering fear and dread, particularly by those class members locked in Room 111 surrounded by their mutilated and dying friends.

307.  As Supervisory Defendants were in charge of law enforcement agencies who were in complete control over both the scope and timing of their response to the active shooter on May

24, 2022, the unreasonable hesitation with which they proceeded greatly enhanced the dangerousness with which Plaintiffs were forced to face and endure. In making their decisions on how to proceed, it is clear that they raised their own safety above and beyond Plaintiffs.

308.    Similarly, on account of law enforcement's conduct, Plaintiff class members were effectively barricaded in their classrooms and as such, were unable to take individual initiatives to free themselves and/or solicit outside assistance from family and/or community members who themselves were restrained and 'barricaded' by law enforcement at the school's perimeter. Such 'policy of barricade' immeasurably exacerbated the dangerousness under which class members were initially placed when confronting an active shooter on the school campus. Thus, class members were either trapped in the school and were not free to leave and/or were intentionally prevented from effectuating rescue by law enforcement at the school's perimeter.

309.    Defendants' conduct reasonably reflected a deliberate indifference to the Fourteenth Amendment rights of the named Plaintiffs and class members by placing them in a state of danger that grew more dangerous with each passing moment as those already injured were torturously dying and those in lock down were torturously incurring physical and emotional trauma that will plague them for the balance of the many years left of their future.

**Special Relationship**

310.    A violation of substantive due process is additionally triggered where a state actor affirmatively acts to restrain an individual's freedom to act on their own behalf, i.e., a restraint on an individual's personal liberty such that they are in the State's custody and control that otherwise evokes a 'special relationship' as the individuals are unable to care for themselves.

311.    Here, by effectuating a perimeter that resulted in barricading Plaintiffs students, teachers, and support staff inside their particular classrooms, offices, and other spaces within Robb

Elementary's campus, the above-named law enforcement Defendants had an affirmative duty to provide for Plaintiffs' safety and protection on account of establishing a 'special relationship' with said Plaintiffs. By effectively cutting off private avenues of lifesaving rescue and failing to come to Plaintiffs students, teachers, and support staffs' aid for seventy-seven minutes, Plaintiffs substantive due process rights to bodily and emotional integrity were exceedingly violated.

312.    Similarly, the rights of Plaintiff Parents to make decisions regarding their children's care, custody and control were violated as law enforcement Defendants forcefully prevented their access onto the campus in order to exercise their substantive parental rights which were severely and utterly compromised. Thus, on account of fully taking charge over the children's safety and well-being while affirmatively rebuffing the parents attempt to undertake their own rescue measures, Defendants, in creating a special relationship, had emphatically failed to provide for the children's safety, despite having the affirmative duty to do so. Thus, Defendants seventy-seven-minute reluctance to liberate Plaintiffs, while effectively rebuffing and preventing others, including Plaintiff children's parents, from coming to their aid, Defendants most significantly violated Plaintiffs' substantive due process rights to bodily and emotional integrity.

313.    On account of their acts and omissions resulting in the violation of Plaintiffs and Class members' Fourteenth Amendment rights, Defendants' were the direct ad proximate cause of Plaintiffs' and injuries and damages, including, but not limited to the following: post-traumatic stress disorder, fright, shock, and terror; pain and suffering; anxiety; mental anguish; emotional distress; fright and shock; mortification; past and future reasonable medical, psychological and hospital expenses; past and future wage loss and loss of earnings capacity; need for household services; need for attendant care; exemplary damages; any and all compensatory damages, both past and future; attorneys' fees and costs; other damages, injuries, and consequences that are found

to be related to the incident that develops during the course of discovery; and Any other damages permitted by Federal and Texas law.

### THIRD CAUSE OF ACTION
### Federal Tort Claims Act: Negligence-Failure to
### Protect from Harm
**(*All Plaintiffs and Class Members against the United* States)**

314.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

315.    This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the Complaint is made were proximately caused by the negligence, wrongful acts or omissions of representatives, employees or agents of the United States of America working for the United States Department of Homeland Security/Customs and Border Protection, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

316.    Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth herein were filed with and presented administratively to the United States of America on or about September 22, 2022. Each claim stated a "sum certain." The United States failed to make final disposition of this claim within six (6) months of presentation of their claims. This action was filed more than six (6) months from the presentation of the claims underlying the lawsuit. Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this lawsuit.

317.    As fully alleged above, in arriving at the Robb Elementary with information that they were responding to an active shooter with children's safety imminently at risk, the BORTAC

officers, as agents of Defendant United States who were acting under color of law and their authority as federal officers. assumed a responsibility to protect Plaintiffs' prospects such that Plaintiffs detrimentally relied upon said officers' to promptly respond and neutralize the shooter as required by Federal and State active shooter protocols.

318.    Given that a special relationship ensued where Plaintiffs were dependent on BORTAC, who, along with other law enforcement agencies, assumed the role as sole rescuers and in so assuming, precluded Plaintiffs' self-help and/or assistance from third parties, including parents, friends and community members. In assuming that role, BORTAC had a duty to exercise due care in undertaking its role as rescuer. and upon its breach, is liable to Plaintiffs for (a) failing to exercise such due care that increased the risk of harm, and/or (b) the harm suffered by Plaintiffs occurred on account of their reliance upon BORTAC's undertaking as rescuers.

319.    When acting as agents of Defendant United States, BORTAC personnel, including Defendant Cmd. Paul Guererro, breached their duty of care by failing to act with ordinary care and diligence and to do that which a person of ordinary prudence would have done under same or similar circumstances by reasonably carrying out the required active shooter protocols to promptly neutralize the shooter. Rather, BORTAC, and other law enforcement agencies exacerbated Plaintiffs' harms by procrastinating some seventy-seven minutes before finally breaching the shooter's classroom and liberating Plaintiffs from BORTAC, and law enforcement's self-imposed restriction on alternative third-party rescue measures.

320.    By failing to take affirmative action, BORTAC personnel's conduct, as agents of the Defendant United States, significantly contributed to and increased the harms incurred by Plaintiffs and thus, constitute negligence under the applicable law of the place where the relevant acts took place.

321.    As agents of Defendant United States, BORTAC personnel's negligence proximately caused Plaintiffs to incur substantial and unnecessary injuries, physical pain and emotional suffering, as well as diminishment of the love, support, nurturing, and companionship with friends, families and communities that they thrived upon prior to the mass shooting at Robb Elementary.

322.    Said agents also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

### FOURTH CAUSE OF ACTION
### Negligent Failure to Train and Supervise
*(By Plaintiffs & Class Members Against the United States)*

323.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

324.    The United States and its agencies have an obligation to adequately train and supervise employees. As glaringly reflected by BORTAC's glaring failure to act in compliance with their required active shooter protocols, the United States, through its agent Department of Homeland Security patently failed in its operations, organization, training, and supervision of its BORTAC unit, as described in detail in this Complaint.

325.    The United States, through its agencies, failed to adequate supervise the individuals who were tasked with responding to active shooter scenarios, particularly in border regions falling under the jurisdiction of U.S. Homeland Security, such that their supreme para-military unit BORTAC could so fail in undertaking their required duties at Robb Elementary School in Uvalde on May 24, 2022. Had the United States adequately supervised its Texas based BORTAC unit, the

tortious time elapse between the shooter's entry into the school building and his ultimate neutralization would have been exceedingly minimized.

326.     Additionally, as reflected by both the misfeasance and nonfeasance with respect to BORTAC's response on May 24, 2022, upon information and belief, the United States, through its agents Department of Homeland Security and Customs and Border Protection, during the period relevant to this complaint, had not trained its employees, including members of the the BORTAC unit in the proper protocols and procedures required when responding to an active shooter scenario. These failures by the United States, through its agents, to train and supervise its reporting personnel led to its employee's failure to respond as required. Thus, the United States is liable for negligent training and negligent supervision.

327.     By failing to reasonably supervise and provide the required requisite level of training, the United States, through its agents, U.S. Department of Homeland Security/U.S. Customs and Border Protection significantly caused Plaintiffs to incur substantial and unnecessary physical injuries, pain and emotional suffering, as well as diminishment of the love, support, nurturing, and companionship with friends, families and communities that they thrived upon prior to the mass shooting at Robb Elementary.

328.     Said agents also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

## FIFTH CAUSE OF ACTION
### Negligence and Gross Negligence
*(By Plaintiffs & Class Members Against Defendant Daniel Defense)*

329.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

330. Defendant Daniel Defense was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

331. Defendant Daniel Defense had a duty to exercise reasonable care in selling, offering for sale, marketing, and shipping its firearms, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

332. Defendant Daniel Defense's marketing of its AR-15 firearms breached its duty to exercise reasonable care. The company's marketing encouraged the illegal and dangerous misuse of its AR-15 firearms by marketing assault weapons to the civilian purchasers, via social media, with violent and militaristic imagery that unfairly and illegally implied that civilians can use their weapons for offensive combat-like missions. Such marketing was intentionally created to appeal to the thrill-seeking and impulsive tendencies of susceptible teens and young men who are attracted to violence and engage militaristic ideation and fantasies. Aside from the notoriety achieved through product placement of its DDM4 V7 assault rifle into the popular video game, *Call of Duty*, much of Daniel Defense's illegal marketing strategy is profit-driven. Both Daniel Defense and *Call of Duty's* owner, Activision have profited significantly from their collaboration.

333. On or about May 16, 2022, Defendant Daniel Defense sold its rifle to Ramos who relied upon it to undertake a mass shooting at Robb Elementary.

334. Ramos's acquisition and illegal use of the Daniel Defense DDM4 V7 was a direct result and foreseeable consequence of the manner in which the company marketed its AR-15 products.

335. Each of the above acts or omissions by Defendant Daniel Defense constitutes negligence and/or gross negligence, and that negligence was a proximate cause of the injuries sustained by Plaintiffs.

336.    By engaging in unfair trade practices, Defendant Daniel Defense knowingly violated the Federal Trade Commission Act, 15 U.S.C. § 45(a). This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902

337.    Daniel Defense's marketing practices were unfair because they encouraged the illegal misuse of their AR-15 product through their deliberate and intentional marketing campaign and strategy as described above. This foreseeably caused or was likely to cause substantial injury to consumers and foreseeable victims of gun violence by increasing the risk that disaffected adolescent and young men predisposed towards committing acts of mass violence will carry out those acts by encouraging them to purchase and acquire exceedingly lethal weapons such as the Daniel Defense DDM4 V rifle.

338.    Plaintiffs were consumers who could not reasonably avoid the injuries caused by Daniel Defenses marketing practices. Plaintiffs were without the means to avoid the risks that a Daniel Defense consumer would undertake a scenario reflected by Daniel Defense's marketing, i.e., the carrying out a combat operation against civilians.

339.    The increased risk of mass violence perpetrated by adolescent and young men caused by Daniel Defense's marketing practices is not outweighed by any countervailing benefits to consumers or competition. Daniel Defense could cease marketing its AR-15 rifles to adolescent and young men through appeals to the military and the offensive combat capabilities of its rifles without creating a burden on itself or any other individual or entity. Instead, it has continued these activities after being confronted with the tragic consequences of its marketing strategy.

340.    Ramos' purchase of the especially lethal and destructive Daniel Defense DDM4 V7 rifle to carry out the massacre at Robb Elementary was, upon information and belief, influenced

by Daniel Defense's marketing as described above, and the result was a more lethal attack, more carnage, and greater pain and suffering.

341.    These knowing violations of the FTC Act were a proximate cause of Ramos's purchase and decision to use the Daniel Defense DDM4 V7 rifle and the physical pain, mental anguish, and emotional suffering that Plaintiffs have incurred.

342.    Daniel Defense's negligence proximately caused Plaintiffs to incur substantial and unnecessary physical pain and emotional suffering, as well as diminishment of the love, support, nurturing, and companionship with friends, families and communities that they thrived upon prior to the mass shooting at Robb Elementary.

343.    Daniel Defense also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

## SIXTH CAUSE OF ACTION
### Negligence Per Se
*(By Plaintiffs & Class Members Against Defendant Daniel Defense)*

344.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully here.

345.    In addition to manufacturing firearms, Daniel Defense is a "dealer" of firearms, as defined in 18 U.S.C. § 921(a)(11).

346.    By marketing the illegal misuse of its products, Daniel Defense violates the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An unfair act or practice "causes or is likely to cause substantial injury to consumers which is not reasonably avoided by consumers themselves and not outweighed by countervailing benefits to consumers or competition." 15 U.S.C. § 45(n).

347.     Daniel Defense marketed its rifles in a manner that encourages illegal activities, namely engaging in offensive combat, against civilians, on American soil. It targets this marketing at the group most likely to engage in violent and/or impulsive behavior: adolescent and young men.

348.     These marketing practices proximately caused the harms suffered by Plaintiffs.

349.     Plaintiffs were consumers who could not reasonably avoid the injuries caused by these marketing practices.

350.     The risk of injury from Daniel Defense's marketing is not outweighed by benefits to consumers or competition. Daniel Defense chose to push the envelope in its marketing strategy to gain "notoriety." There is no reason Daniel Defense could not focus its marketing on the lawful uses of its products.

351.     Plaintiffs were within the class of people that the FTC Act is designed to protect. This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

**SEVENTH CAUSE OF ACTION**
**Negligent Transfer**
*(By Plaintiffs & Class Members Against Defendant Oasis Outback, LLC)*

352.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

353.     Defendant Oasis Outback had a duty to exercise reasonable care in transferring firearms, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

354.     Defendant Oasis Outback's transfer of the Daniel Defense DDM4 V7 rifle to Ramos breached its duty to exercise reasonable care.

355.     Despite his youth and having just turned 18 days before, Ramos spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a

four-day period. This was so sufficiently unusual that it caused Oasis Outback's owner to question Ramos as to where he amassed the money to make such a sizeable purchase.

356.    Other patrons at the store noticed Ramos acting unusual and nervous during his repeat visits. Ramos was dressed in all black which was highly unusual in Uvalde, Texas and, as one customer described him, he looked "like one of those school shooters."

357.    Oasis Outback knew or reasonably should have known that Ramos was a dangerous person who was likely to use the rifle for unlawful purposes, including to injure and kill people.

358.    Oasis Outback enhanced the dangerousness of the rifle it transferred to Ramos by installing a holographic sight.

359.    It is well established that Oasis Outback, as a purveyor of firearms, has the right to refuse service to anyone.

360.    Oasis Outback is a licensed seller of firearms. It transferred a firearm to Ramos when it knew, or reasonably should have known, that the Ramos, as the person procuring the the firearm, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons. As such foreseeable events did take place, this claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

361.    These acts were a but for and proximate cause of Plaintiffs' physical and emotional injuries, as well as their substantial and unnecessary physical pain and emotional suffering.

362.    Oasis Outback also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

//
//

## EIGHTH CAUSE OF ACTION
### Negligent Sale
*(By Plaintiffs Against Defendant Oasis Outback, LLC)*

363.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

364.     Defendant Oasis Outback had a duty to exercise reasonable care in selling firearms and ammunition, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

365.     Defendant Oasis Outback's sales of ammunition and an AR-15-style rifle to Ramos breached its duty to exercise reasonable care.

366.     Despite his youth and having just turned 18 days before, Ramos spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period, which was so sufficiently unusual that it caused Oasis Outback's owner to question Ramos as to where he amassed the money to make such a sizeable purchase.

367.     Other patrons at the store noticed Ramos acting unusual and nervous at the store during his repeated visits. Ramos dressed in all black which was highly unusual in Uvalde, Texas and, as one customer described him, he looked "like one of those school shooters."

368.     Oasis Outback knew or reasonably should have known that Ramos was a dangerous person who was likely to use the firearms and ammunition for unlawful purposes, including to injure and kill people.

369.     It is well established that Oasis Outback, as a gun purveyor, has the right to refuse service to anyone.

370.     Oasis Outback is a licensed seller of firearms. It sold ammunition and a firearm to Ramos when it knew, or reasonably should have known, that the person to whom the ammunition and firearm being supplied, Ramos, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons. As such foreseeable events did take place,

this claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

371.     These acts were a but for and proximate cause of Plaintiffs physical and emotional injuries, as well as her substantial and unnecessary physical pain and emotional suffering.

372.     Oasis Outback also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

**WHEREFORE,** the named Plaintiffs and class members they seek to represent pray that the Court will:

a) Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

b) Issue a class-wide judgment declaring that Defendants' Uvalde CISD and the City of Uvalde's policy, practice and custom of failing to undertake and comply with the state mandated and district required protocols and standards for protecting against and responding to an active shooter violated Plaintiffs and class members Fourteenth Amendment rights to the United States Constitution;

c) Issue a judgment declaring that Daniel Defense's marketing campaign, that targets young impressionable youth by intentionally leading them to believe that the guns and tactics relied upon for Military combative missions are transferable and applicable to civilian non-combative interactions, is in patent violation of the Federal Trade Commission Act, 15 U.S.C. § 45(a);

d) Issue a judgment declaring that Daniel Defense's marketing campaign, that targets young impressionable youth by intentionally leading them to believe that the guns and tactics relied upon for Military combative missions are transferable and applicable to civilian non-combative interactions, is in patent violation of the Federal Trade Commission Act, 15 U.S.C. § 45(a);

e) Issue an order for the following injunctive relief:

    i) enjoining the CISD and City of Uvalde from continuing its policy and custom of noncompliance with the district and state's mandated protocols and standards for protecting against an active shooter scenario

    ii) requiring the CISD and City of Uvalde to institute and implement improved policies, programs, training and infrastructure with respect to proactively educating, preventing, discovering, and responding to young adults who display a propensity to engage in mass shooting;

    iii) requiring the CISD and City of Uvalde to institute and implement appropriate measures to ensure compliance with City, State and Federal directives pertaining to responding to active shooter scenarios, as well as other emergencies at schools or other institutions involving children and youth;

    iv) requiring the school principals and other supervisory staff on all CISD campuses to undertake mandatory training in preventing and responding to active shooter scenarios, as well as provide training to all teaching and support staff in how to detect and respond to students who display a potential for engaging in mass violence on campus;

    v) enjoining Daniel Defense, Inc. from perpetuating its marketing campaign directed at young, underage youth wherein it irresponsibly dismisses and makes light of the dangerousness of their firearms by implying that (1) their use in a military combative mission is applicable and transferable to a civilian noncombative environment and (2) they are a plaything or toy and/or their impact is comparable to the ramifications of videogame;

    vi) requiring Daniel Defense to provide a clear and conspicuous warning cautioning its youth demographic that the militaristic and combative measures depicted in its advertisements and associations with first person shooter games are not transferable nor applicable to nonmilitary, non-combative civilian interactions;

f) Award named Plaintiffs and class members' damages in amount of Twenty-Seven Billion Dollars ($27,000,000,000);

117

g) Plaintiffs and class members against Defendants,' Pedro Arredondo, Adrian Gonzalez, Jesus Suarez,  Mariano Pargas, Eduardo Canales, Javier Martinez, Daniel Coronado, Louis Landry, Donald Page, Justin Mendoza, Victor Escalon, Paul Guerrero Steve McGraw, Joel Betancourt, Juan Maldonado, Chief Arredondo, Principal Gutierrez, to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, Punitive Damages in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

h) Award Plaintiffs and against Defendants' Daniel Defense, Inc., Oasis Outback, LLC., and Does 1-3,000, to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, Punitive Damages, in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

i) Award all Plaintiffs, including the members of the class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

j) Award all Plaintiffs, including the members of the class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

k) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:  March 31, 2023                    **Respectfully Submitted,**

                                          */s/Charles A. Bonner*

**RYDER LAW FIRM**                        **LAW OFFICES OF BONNER & BONNER**
JESSE RYDER                               CHARLES A. BONNER
6739 Myers Road                           CABRAL BONNER
E. Syracuse, NY 13057                     ERIC SEIFERT (App. to be admitted forthcoming)
Tel: (515) 382-3617                       475 Gate Five Rd., Suite 211
e-mail: ryderlawfirm@gmail.com            Sausalito, Ca 94965
                                          Tel: (415) 331-3070
**EVANS LAW OFFICE P.P.L.C.**             Fax: (415) 331-2738
JERRY EVANS                               e-mail: cbonner799@aol.com
127 N. West Street                        e-mail: cabral@bonnerlaw.come-mail
Uvalde, Texas 78801                       e-mail: eseifert00@hotmail.com
Tel: (830) 900-5021

e-mail: devanslawoffice@gmail.com

**THE BONNER LAW FIRM, P.C**.
VICTOR BONNER
4820 Old Spanish Trail
Houston, Texas 77021
Tel: (832) 433-6565
e-mail: vicbonneresq@gmail.com

**Legal Center of Jose Angel Gutierrez, P.C.**
JOSE ANGEL GUTIERREZ, JUDGE RET.
429 W. 12th Street,
Dallas, Texas 75208
Tel: (214)941-1900
e-mail: joseangelgutierrez@yahoo.com