**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | |
|---|---|
| **J.P.,** a minor by and through his parents and next friends, **CRYSTAL P.** and **DANIEL P.**, et al., <br><br> *Plaintiffs,* <br><br> vs. <br><br> **THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT ("UCISD")**, et al., <br><br> *Defendants.* | Civil Action No.: 2:23-cv-00015-AM |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO THE DEFENDANT'S CITY OF UVALDE AND CITY'S**
**ACTING POLICE CHIEF MARIANO PARGAS'S**
**MOTION TO DISMISS**

**TO HONORABLE CHIEF JUDGE ALIA MOSES**

COMES NOW, PLAINTIFFS' J.P., a minor, et al., to file this brief in opposition to the motion to dismiss Plaintiffs' Amended Complaint filed by the Defendant City of Uvalde ("Uvalde City" or the "City") and UPD Lieutenant and Acting Police Chief Mariano Pargas ("Chief Pargas" "Pargas". The Court should deny the Defendants' motion for the reasons set forth below.

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND............................................................................................. 2

ARGUMENT ...................................................................................................................... 4

    I.   STANDARD OF REVIEW ................................................................................. 4

    II.  PLAINTIFFS HAVE ALLEGED THAT DEFENDANT PARGAS CREATED OFFICIAL CITY POLICY THROUGH HIS DECISION-MAKING  (ALL CLAIMS)........................................................................................................... 5

        a.   Pargas Was an Official Policymaker.................................................... 5

        b.   Pargas's Decision to Treat the Shooter as a Barricaded Subject Created City Policy........................................................................................... 7

    III.  THE PLAINTIFF PARENTS HAVE STANDING UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT .............................. 9

    IV.  PLAINTIFFS HAVE STATED MONELL CLAIMS FOUNDED ON THE SPECIAL RELATIONSHIP THEORY OF LIABILITY (DUE PROCESS)............ 11

    V.  PLAINTIFFS HAVE STATED *MONELL* CLAIMS UNDER THE STATE-CREATED DANGER THEORY OF LIABILITY (DUE PROCESS)...................... 12

        a.   The Fifth Circuit Has Repeatedly "Recognized" the State-Created Danger Theory and Defined It with Particularity................................ 12

    VI.  THIS CASE DEMANDS RECOGNITION OF THE STATE-CREATED DANGER........................................................................................................ 15

    VII.  PLAINTIFFS HAVE PLEADED FACTS THAT ESTABLISH A CONSTITUTIONAL DEPRIVATION...................................................................... 19

    VIII.  PLAINTIFFS NEED NOT SHOW A PROPERTY INTEREST............................ 20

IX.  PLAINTIFFS HAVE STATED FAILURE TO TRAIN CLAIMS
     (DUE PROCESS) .................................................................................................... 20

X.   IN THE ALTERNATIVE, THE COURT SHOULD PERMIT PLAINTIFFS
     TO AMEND .......................................................................................................... 23

CONCLUSION .......................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, (2009) ........................................................................ 5

*Bae Sys. Resol. Inc. v. Mission Transp.*, LLC, No. CV SA-19-CA-0974-FB, 2020

    WL 7482036, (W.D. Tex. Aug. 19, 2020)................................................................ 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007) ......................................................... 5

*Bennett v. City of Slidell*, 728 F.2d 762, (5th Cir. 1984) .............................................. 6

*Blackburn v. City of Marshall,* 42 F.3d 925, (5th Cir. 1995)....................................... 20

*Breen v. Tex. A&M Univ.*, 494 F.3d 516, (5th Cir. 2007) ............................................ 14

*Breen v. Texas A&M Univ.*, 485 F.3d 325, (5th Cir. 2007) .......................................... 14

*Brooks v. George County*, 84 F.3d 157, (5th Cir. 1996). ............................................... 7

*Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, (5th Cir. 2019) .................................. 8, 9

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998). ......................................... 18, 19

*DeShaney v Winnebago County Department Social Services*,

    489 U.S. 189, (1989) ............................................................................................... 13

*Diaz v. City of San Antonio*, No. SA-05-CA-0888-RF, 2006 WL 509061,

    (W.D. Tex. Feb. 22, 2006) ....................................................................................... 22

*Dixon v. Alcorn County Sch. Dist.*, 499 Fed. App'x 364, (5th Cir. 2012)................... 14

*Doe v. Covington County Sch. Dist.,* 675 F.3d 849, (5th Cir. 2012) ..................... 14, 16

*Doe v. Hillsboro Independent School District*, 113 F.3d 1412 (5th Cir. 1997)........... 11

*E.G. by Gonzalez v. Bond*, No. 1:16-CV-0068-BL, 2017 WL 3493124,

    (N.D. Tex. June 29, 2017)........................................................................................ 21

*Est. Of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, (5th Cir. 2017) ....... 14, 16

*Fisher v. Moore*, No. 21-20553 F. 4th 2023 WL 4539588 (5th Cir. July 14, 2023) ................... 14

*Flanagan v. City of Dallas*, 48 F. Supp. 3d 941, (N.D. Tex. 2014)........................... 7

*Garza v. City of Donna*, 922 F.3d 626 (5th Cir. 2019) ................................................ 6

*Goodman v. Harris County*, 571 F.3d 388, (5th Cir. 2009)........................................ 22

*Gros v. City of Grand Prairie*, 181 F.3d 613, (5th Cir. 1999)...................................... 5

*Johnson v. Dallas Independent School District*, 38 F.3d 198 (5th Cir. 1994)..................... passim

*Kemp v. City of Houston,* No. CIV.A. H-10-3111, 2013 WL 4459049,

    (S.D. Tex. Aug. 16, 2013) ....................................................................................... 15

*Leffall v. Dallas Independent School District*, 28 F.3d 521 (5th Cir. 1994)................................ 13

*Lewis* or *Plumhoff v. Rickard*, 572 U.S. 765 (2014) .................................................................. 18

*Mathews v. Eldridge*, 424 U.S. 319, (1976)................................................................................. 20

*Meloy v. Alief Independent School District*, No. H-05-2840, 2007 WL 9752122

    (S.D. Tex. Feb. 20, 2007) ......................................................................................................... 11

*Monell v. New York City Dept. of Soc. Servs*, 436 U.S. 658 (2018) ................................ 5, 6, 7, 11

*Morgan v. Swanson*, 659 F.3d 359, (5th Cir. 2011)..................................................................... 13

*Parham v. J. R.*, 442 U.S. 584, (1979) ......................................................................................... 10

*Pembaur v. City of Cincinnati*, 475 U.S. 469, (1986).................................................................... 7

*Porter v. Epps*, 659 F.3d 440, (5th Cir. 2011) ................................................................... 20, 21, 22

*Quilloin v. Walcott,* 434 U.S. 246, (1978) ................................................................................... 10

*Rios v. City of Del Rio, Tex.*, 444 U.S. 417, (5th Cir. 2006)........................................................ 14

*Roundtree v. City of San Antonio, Texas*, No. SA18CV01117JKPESC, 2022

    WL 903260, (W.D. Tex. Mar. 28, 2022)................................................................................... 6

*Santosky v. Kramer,* 455 U.S. 745, (1982) .................................................................................. 10

*Scanlan v. Texas A&M University*, 343 F.3d 533 (5th Cir. 2003)................................................. 14

*Schydlower v. Pan Am. Life Ins. Co.*, 231 F.R.D. 493, (W.D. Tex. 2005) ............................... 5, 12

*Stanley v. Illinois,* 405 U.S. 645, (1972)....................................................................................... 9

*Thompson v. Bass*, 616 F.2d 1259, (5th Cir. 1980) ..................................................................... 20

*Troxel v. Granville,* 530 U.S. 57, (2000) ..................................................................................... 10

*Vargas v. City of San Antonio,* No. SA-08-CA-1026-OG, 2009 WL 10700088,

    (W.D. Tex. May 15, 2009) ...................................................................................................... 22

*Walton v. Alexander*, 20 F.3d 1350, (5th Cir. 1994)............................................................. 11, 12

*Walton v. Alexander*, 44 F.3d 1297, (5th Cir. 1995)............................................................. 11, 12

*Washington v. Glucksberg,* 521 U.S. 702, (1997) ....................................................................... 10

*Webb v. Town of Saint Joseph*, 925 F.3d 209 (2019) .................................................................... 6

*Wisconsin v. Yoder,* 406 U.S. 205, (1972) .................................................................................. 10

*Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, (5th Cir. 2016) ....................................... 5

**Statutes**

42 U.S.C § 1983................................................................................................................................ 13

Fed. R. Civ. P. 8(a) ............................................................................................................................ 4

U.S. CONST. amend. XIV...................................................................................................... 9

Uvalde Municipal Code § 2.56.010 ................................................................................... 7

**INTRODUCTION**

Regrettably, this court must preside over yet another recurring and deeply tragic occurrence where once again, elementary age children and their dedicated teachers had been murdered and emotionally maimed by a deeply troubled young man wielding a semi-automatic machine gun who, in his delusion colored by glorification of violence perpetuated by both video games and targeted gun manufacturer advertisements, mercilessly released his own childhood trauma and pain upon unsuspecting beautiful and buoyant young children and teachers at school.

Fewer than three minutes after the shooting began, law enforcement officers, including Defendant Pargas, arrived at the scene of the massacre and were separated from the shooter by a mere classroom door. In accordance with their active shooter training, there was only one reasonable course of action required of them: to immediately breach the doors to classrooms 111 and 112 and engage the active shooter to incapacitate him within minutes of the commencement of the shooting. Had Pargas and the officers under his command complied with such protocol, he could have saved countless lives that day. Instead, and acting as the chief of Uvalde City's police department, Pargas decided to undertake an alternative policy and protocol of barricading the children in the classroom with the shooter which actively contributed to suffering and death, as well as affirmatively prevented the children's desperate parents from attempting to save their children.

The City's policy, as undertaken and initiated by its chief and final police policymaker, violated the Plaintiffs' constitutional rights. The initiated policy of barricading the shooter inside the school's classroom and actively preventing anyone, including Plaintiff's parents from rescuing Plaintiff's students expressly violated the Plaintiffs' substantive due process rights under the Fourteenth Amendment both on account of the state-created danger and custodial relationship

1

theories of liability. Furthermore, as evidenced by inexcusable inaction on the part of Chief Pargas and the other UPD officers on the scene, the City's abject failure in training its officers to follow the active shooter protocols most affirmatively violated the Plaintiffs' Fourteenth Amendment rights.

Through the actions of chief policymaker Pargas, Uvalde City sealed the fates of many children that day. For 77 agonizing minutes, Chief Pargas enabled the shooter to murder and severely wound two classrooms full of children. City Defendants' motion must be denied in its entirety.

## FACTUAL BACKGROUND

On May 24, 2022, Robb Elementary was poised to celebrate the end of the 2022 school year with an awards ceremony for its students and parents. Am. Compl. ¶ 83.[1] Ramos was spotted by Coach Yvette Silva who was outside with her third graders. Am. Compl. ¶ 86. Ramos proceeded to shoot in the direction of Coach Silva, who took cover and immediately reported an active shooter through her school radio at approximately 11:29 a.m. *Id.*

The Uvalde Police Department dispatched the initial 911 report from the funeral home. Am. Compl. ¶ 91. Commander of Uvalde Police Dept. SWAT team, Sgt. Eduardo Canales ("Sgt. Canales") and Uvalde Police acting Chief Mariano Pargas set off to Robb Elementary. *Id.* Upon arrival, said officer met UPD officers Javier Martinez and Louis Landry who were also on the scene. *Id.* Sgt. Canales saw Ramos shooting his AR-15. *Id.* There were other Uvalde Police officers present, as well as Department of Public Safety ("DPS") Sergeant Juan Maldonado. *Id.* At 11:33 a.m., Uvalde Police officers observed Ramos carrying a rifle outside the school's west hall entryway. *Id.* The officer asked his supervisor, Sgt. Daniel Coronado for permission to shoot the

---

[1] Citations to "Am. Compl." are to Plaintiffs' Amended Complaint for Damages, ECF No. 15.

suspect. *Id.* In waiting for a response, it was too late as Ramos had already moved out from his site as the officer turned to shoot at Ramos. *Id.*

Although otherwise required under the ALERRT protocol to immediately encounter and attempt to neutralize Ramos, neither of these first responding Uvalde Police officers undertook such action, nor did they set up an Initial Incident Command in order to begin the coordination of an active shooter response. Am. Compl. ¶ 91. Thus, the Uvalde PD first responders failed and refused to undertake the required protocol to immediately "distract, isolate, and neutralize the shooter." *Id.*

In less than three minutes after the shooting began, Defendants Canales, Martinez, Landry, and Acting Chief Pargas of the UPD approached Rooms 111 and 112. Am. Compl. ¶ 99. The officers, outfitted with body armor, two rifles, and three pistols, took up positions near the classrooms. They heard the shots being fired in the classrooms, as well as shots erupting through the walls. *Id.*

After the two-and-a-half minute shooting spree with sporadic gunshots thereafter, Chief Arredondo, at approximately 11:36 a.m., along with Uvalde PD Sergeant Coronado, Officer Page, and Gonzalez entered the south side of the building. Am. Compl. ¶ 102.

Although Defendants Lt. Martinez and Sgt. Canales had prepared to breach the doors, the officers refrained from doing so after shots were fired in their direction. Am. Compl. ¶ 103. Soon thereafter, approximately 8 or 10 law enforcement, including Uvalde PD Acting Chief Pargas, gathered in or around the vicinity of Rooms 111 and 112. *Id.* Acting Chief Pargas imparted the command to Uvalde PD officers to stand down and not confront Ramos. UPD Sgt. Coronado informed other officers that the suspect was "contained" and "barricaded," which the officers understood to mean that they were confronting a non-active shooter situation. *Id.* Such was a

blatant misrepresentation as moments before, Ramos had been actively firing his weapon. Defendant officers knew or had reason to know that they were confronting an active shooter situation and not a barricaded subject situation. *Id.*

At approximately 11:44 a.m., Ramos started shooting again, providing further proof that Ramos was an active shooter. Am. Compl. ¶ 114. No officers responded, including the police academy instructors, Constables Johnny Field and Emmanuel Zamora, Officers Hernandez, Suarez, or Mendoza. Rather, the assembled officers saw fit to search for a negotiator and bullhorn to negotiate with Ramos as if he was a barricaded subject rather than an active shooter. *Id.*

Thus, given the lack of radio and internet services within the building, Chief Arredondo was unable to either receive or send communications such that he was out of touch with the efforts that were being undertaken on the north side of the building that was commandeered by Uvalde PD and its acting Chief Pargas. Am. Compl. ¶ 189. Despite being the first responders into the building mere seconds after Ramos slaughtered the students and teacher in Room 111, Defendants UPD and UCISD officers, Arredondo, Gonzalez, Suarez, Pargas, Canales, Martinez, and Coronado, Louis Landry, Donald Page, Justin Mendoza, and Juan Maldonado refrained from swiftly confronting Ramos. *Id.* Thereafter, despite perceiving the necessity to initiate an incident command on account of Chief Arredondo's refusal to assume his required role, Uvalde PD Acting Chief Pargas both failed to assume that role as well as affirmatively instructed his Uvalde PD officers to stand down and not expeditiously confront Ramos. *Id.*

## ARGUMENT

### I.    STANDARD OF REVIEW

Plaintiffs need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To defeat Rule 12(b)(6) Motion, the complaint

need only include sufficient factual allegations "to raise a right to relief above the speculative level" and to provide "fair notice" of the plaintiff's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). In considering a Rule 12(b)(6) motion, the Court must "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff . . . and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them . . . and must review those facts in a light most favorable to the plaintiff." *Schydlower v. Pan Am. Life Ins. Co*., 231 F.R.D. 493, 498 (W.D. Tex. 2005). Plaintiffs have met their low burden at the pleading stage.

## II.   PLAINTIFFS HAVE ALLEGED THAT DEFENDANT PARGAS CREATED OFFICIAL CITY POLICY THROUGH HIS DECISION-MAKING (ALL CLAIMS)

### a.   Pargas Was an Official Policymaker

The City Defendants acknowledge that liability under *Monell v. New York City Dept. of Soc. Servs*, 436 U.S. 658 (2018), may be found as to the City for the actions of its official policymakers but argue that Defendant Pargas was not one such policymaker because the "City Manager" "directs and supervises the administration of all departments, including the police department in which Pargas served as Acting Police Chief on the day of the incident." Br. at 14. But a government official being a policymaker for *Monell* purposes is not dependent on whether they "direct[] and supervise[]" a government department pursuant to a City Charter. *See Gros v. City of Grand Prairie*, 181 F.3d 613, 616 (5th Cir. 1999) ("The sources of state law which should

be used to discern which municipal officials possess final policymaking authority are state and local positive law, as well as 'custom or usage' having the force of law."). Rather, as the Supreme Court stated in *Monell*, an official policymaker is one "whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.

Policymakers are those that "decide the goals for a particular city function and devise the means of achieving those goals," *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984), and police chiefs are traditionally those that "decide the goals" and means of achieving them for police departments. The City Defendants rely upon *Webb v. Town of Saint Joseph*, 925 F.3d 209 (2019) in support of their argument that Pargas was not an official policymaker, but as that case makes clear, whether someone is a policymaker is a question of state law 925 F.3d 209, 215 (5th Cir. 2019). And "[a]lthough the Fifth Circuit has not held that Texas police chiefs are final policymakers for their municipalities as a matter of law, it has 'previously found that Texas police chiefs are final policymakers for their municipalities, and it has often not been a disputed issue in the cases.'" *Roundtree v. City of San Antonio, Texas*, No. SA18CV01117JKPESC, 2022 WL 903260, at *5 (W.D. Tex. Mar. 28, 2022) (quoting *Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) and collecting cases). In any event, even if Acting Chief Pargas was not the "final policymaker," the Fifth Circuit has held that "a municipal employee may also possess final policymaking authority where the final policymaker has delegated that authority, either expressly or impliedly." *Webb*, 925 F.3d at 215.

Plaintiffs have met their burden at the pleading stage by alleging that both (i) Pargas was the official policymaker representing Uvalde City's interests as Pargas was the acting chief of the UPD at the time of the shooting, and (ii) that Pargas exercised that authority in deciding to overrule the required active shooter protocol by treating the shooter as a

barricaded subject. *See Flanagan v. City of Dallas*, 48 F. Supp. 3d 941, 951-52 (N.D. Tex. 2014) ("At this juncture, the Court accepts as true Plaintiffs' allegation as to Chief Brown's policymaking authority for purposes of the City's Rule 12 dismissal motion."). The City has delegated decision-making authority over the "goals" of the police department to the police chief in decreeing, through the Uvalde Municipal Code, that "[t]he executive officer of the police department shall be the chief of police." Uvalde Municipal Code § 2.56.010. The Municipal Code also provides that, "[i]n the prevention and suppression of crime and arrest of offenders, the chief shall have, possess and execute like power, authority, and jurisdiction as the sheriff." *Id.* § 2.56.030. Uvalde City is liable under *Monell* for Pargas's actions on May 24, 2022. *See Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996).[3]

### b. Pargas's Decision to Treat the Shooter as a Barricaded Subject Created City Policy.

Under *Monell*, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. If the decision to adopt a particular course of action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 470 (1986); *see also Brooks*, 84 F.3d at 165 (5th Cir. 1996) (same). The City Defendants have argued that the *Monell* claims fail because there was no traditional "policy or pattern" of practice, *see* Br. at 15, but fail however to engage with the single decision exception as provided for in *Pembaur*. The City Defendants turn their attention instead and argue that "[a] moving force under *Monell* must also result from the [alleged] deliberate indifference resulting in a constitutional violation." *see* Br. at 16.

At this early stage, Plaintiffs need not set forth allegations of factual certainty as to the deliberate decisions made by Pargas but rather must plead facts that "make it *plausible* that

[Pargas] made the deliberate decision" to barricade the students in their classrooms and allow the shooter to perpetuate. *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 317 (5th Cir. 2019) (emphasis added). That standard is met here, as the Amended Complaint is replete with allegations that make it more than plausible that Pargas made "a deliberate choice to" barricade the children in with the shooter, i.e., "a course of action [] made from among various alternatives" available to Pargas that day. *Cherry Knoll*, 922 F.3d at 317 (*quoting, Pembaur*, 475 U.S. at 483).

The Amended Complaint alleges that, almost immediately upon arriving at the scene of the shooting, Pargas affirmatively acted to create and advance the City's amended policy of barricading the children in the classrooms with the shooter. For example, once Pargas and his officers "observed Ramos carrying a rifle outside the school's west hall entryway," (Am. Compl. ¶ 91) they were "otherwise required under the ALERRT protocol to immediately encounter and attempt to neutralize Ramos." However, neither Pargas nor other first responding Uvalde Police officers undertook such action nor did they set up an Initial Incident Command in order to begin the coordination of an active shooter response. Thus, the Uvalde PD first responders failed and refused to undertake the required protocol to immediately "distract, isolate, and neutralize the shooter." Am. Compl. ¶ 92. Evidencing his deliberate indifference to the lives of the students in the classroom, Pargas did not change course nor breach the classroom as the active shooter protocol otherwise required him to do. Such was even more readily apparent after Pargas received a direct communication from radio dispatch "that one of the classrooms was 'full of victims.'" *Id*. ¶ 128. Despite learning "that eight or nine were still alive in the room, but the student couldn't be sure of the exact number because it was hard to tell who was injured versus who was already dead," Pargas simply responded, "ok, ok, thanks" and stepped out of the building for thirty minutes. *Id*.

Finally, Pargas made these affirmative decisions despite having "various alternatives" available to him. *Cherry Knoll*, 922 F.3d at 317. Pargas could have breached the classroom immediately instead of deciding to institute a new and amended policy of barricading everyone inside the classroom. He had numerous opportunities to do so before and after learning that the classrooms were "full of victims" or that "eight or nine [children] were still alive in the room." Am. Compl. ¶ 128. These factual allegations make it more than plausible that Pargas made "a deliberate choice" *Cherry Knoll*, 922 F.3d at 317, to barricade the children in with the shooter and to prevent anyone from trying to save them. Plaintiffs have plausibly alleged more than sufficient allegations as to Pargas's affirmative conduct that, as the City's final policymaker, rendered liability onto the City.

### III.   THE PLAINTIFF PARENTS HAVE STANDING UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

Plaintiff parents have standing to sue under the Fourteenth Amendment based on the Defendant officers' violation of their parental rights. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." The Clause includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* The liberty interest at issue in this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by this Court. *Id.*

The Supreme Court has consistently recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., *Stanley v. Illinois,* 405 U.S. 645, 651, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'comes to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from

shifting economic arrangements'" (citation omitted)); *Wisconsin v. Yoder,* 406 U.S. 205, 232, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin v. Walcott,* 434 U.S. 246, 255, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978) ("We have recognized on numerous occasions that HN6 the relationship between parent and child is constitutionally protected"); *Parham v. J. R.*, 442 U.S. 584, 602, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course"); *Santosky v. Kramer,* 455 U.S. 745, 753, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982) (discussing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right . . . to direct the education and upbringing of one's children"). In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville,* 530 U.S. 57, 66 (2000).

Here by taking control of the crime scene yet failing to do anything to rescue or protect the student plaintiffs while, at the same time, forcibly holding back, pinning them to the ground, pepper spraying, and tasing parents, Defendant City of Uvalde, acting through its policy maker, Defendant Pargas, directly violated the parents' constitutional rights. These affirmative steps,

directly contrary to the plaintiff's parents' constitutional rights, give the plaintiff's parents standing to bring this action.

## IV.     PLAINTIFFS HAVE STATED MONELL CLAIMS FOUNDED ON THE SPECIAL RELATIONSHIP THEORY OF LIABILITY (DUE PROCESS)

The special relationship between Uvalde City's chief policymaker and Student Plaintiffs provides a first independent source of liability under the Due Process Clause. The Fifth Circuit has found a special relationship between a person and the state "when this person is involuntarily confined against his will through the affirmative exercise of state power." *Walton v. Alexander*, 44 F.3d 1297, 1306 (5th Cir. 1995). "[T]he duty owed by a state to prisoners and the institutionalized might also be owed to other categories of persons in custody by means of 'similar restraints of personal liberty.'" *Walton v. Alexander*, 20 F.3d 1350, 1354 (5th Cir. 1994), *on reh'g en banc*, 44 F.3d 1297 (5th Cir. 1995) (cleaned up). The Fifth Circuit has noted that a special relationship exists where "the state has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety." *Walton*, 44 F.3d. at 1305 (emphasis in original).

The City Defendants argue that ordinarily, liability under the custodial relationship theory is unavailable in the public-school context, as there is typically no "special relationship" between students and state actors in that context, and thus that there was no underlying constitutional violation on which to assert a *Monell* claim. Br. at 10-11. The City Defendants rely upon *Doe v. Hillsboro Independent School District*, 113 F.3d 1412 (5th Cir. 1997) and *Meloy v. Alief Independent School District*, No. H-05-2840, 2007 WL 9752122 (S.D. Tex. Feb. 20, 2007), both of which reject the notion that Texas's compulsory school attendance laws create a custodial relationship. But here, unlike in those cases, Plaintiffs were not free to leave because they were

surrounded by a barricade of armed law enforcement officers, not on account of the otherwise relied upon school attendance requirements. *Hillsboro* and *Meloy* are not analogous.

The City Defendants may well disagree that Pargas's actions and the resulting policy rose to the requisite level of culpability under *Walton*, but such a determination "is necessarily a fact-intensive inquiry which must be resolved during discovery or at the Rule 56 stage." *Bae Sys. Resol. Inc. v. Mission Transp.*, LLC, No. CV SA-19-CA-0974-FB, 2020 WL 7482036, at *2 (W.D. Tex. Aug. 19, 2020). The

This Court should reasonably refrain from denying Plaintiffs the opportunity of engaging further by dismissing this claim at such an early stage, particularly in light of this most exceptional set of facts and circumstances. Instead, "the court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them . . . and must review those facts in a light most favorable to the plaintiff." *Schydlower v. Pan Am. Life Ins. Co.*, 231 F.R.D. 493, 498 (W.D. Tex. 2005). The Amended Complaint most emphatically alleges that Pargas, on behalf of Uvalde City, placed Plaintiffs in a situation that provided "no realistic means of voluntarily terminating" the barricade outside classrooms 111 and 112 and deprived the Plaintiff Students and the Plaintiff Parents "of the ability or opportunity to provide for [their] own care and safety." *Walton*, 44 F.3d. at 1305. The Amended Complaint states a claim under the custodial relationship theory.

## V.    PLAINTIFFS HAVE STATED *MONELL* CLAIMS UNDER THE STATE-CREATED DANGER THEORY OF LIABILITY (DUE PROCESS)

### a.  The Fifth Circuit Has Repeatedly "Recognized" the State-Created Danger Theory and Defined It with Particularity.

Primarily, controlling authority exists in the Fifth Circuit that, while not expressly adopting the state-created danger theory, such authority most definitively "defines the contours of the right

in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011).

The state-created danger theory stems from the Supreme Court's decision in *DeShaney v Winnebago County Department Social Services*, 489 U.S. 189, 201 (1989), in which the court indicated that Section 1983 liability for private-actor conduct arises if the state played any part in creating the danger the victim faced. *Id.* at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.") (emphasis added). Since at least 1994, the Fifth Circuit has repeatedly recognized and discussed in great detail the "contours" of the theory. In *Leffall v. Dallas Independent School District*, 28 F.3d 521 (5th Cir. 1994), the parent of a student sued a school district under § 1983 after the student was killed by random gunfire in the school's parking lot. The court discussed the theory in detail, including the level of "culpability" required to state such a claim, and noted in doing so that the court "may assume without deciding that our court would recognize the state-created danger theory." *Id.* at 530. Ultimately, the Court found the particular allegations in that case insufficient to state a claim. *Id.* at 532.

Three months after *Leffall*, the Fifth Circuit again set out the theory in even greater detail in *Johnson v. Dallas Independent School District*, 38 F.3d 198 (5th Cir. 1994). Its discussion clearly defined the "contours" of the theory:

> The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus, the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur. Put otherwise, the defendants must have been at least deliberately indifferent to the plight of the plaintiff.

*Id*. at 200–01 (cleaned up). Again, the Fifth Circuit acknowledged the theory, concluding only that the pleadings in that case were insufficient to state a claim. *Id*. at 201.

The Fifth Circuit again recognized the theory, concluding in *Scanlan v. Texas A&M University*, 343 F.3d 533 (5th Cir. 2003) that "the district court should have concluded that the plaintiffs stated a section 1983 claim under the state-created danger theory." Id. at 538. In a subsequent case, the Fifth Circuit went on to note that *Scanlan* "clearly implied recognition of state-created danger as a valid legal theory," but later withdrew that portion of the opinion on rehearing. *Breen v. Texas A&M Univ*., 485 F.3d 325, 336 (5th Cir. 2007); *Breen v. Tex. A&M Univ*., 494 F.3d 516, 518 (5th Cir. 2007).

The Fifth Circuit has since clarified that *Scanlan* did not officially adopt the theory. *See, e.g., Rios v. City of Del Rio, Tex*., 444 F.3d 417, 422–23 (5th Cir. 2006). But in subsequent cases, the Fifth Circuit has only held that the pleadings did not adequately satisfy the theory. *See Doe v. Covington County Sch. Dist.,* 675 F.3d 849, 865–66 (5th Cir. 2012) ("Although we have not recognized the [state-created danger] theory, we have stated the elements that such a cause of action would require. . . . even if we were to embrace the state-created danger theory, the claim would necessarily fail [due to insufficient allegations]."); *Dixon v. Alcorn County Sch. Dist*., 499 Fed. App'x 364, 368 (5th Cir. 2012) ("There is, therefore, no need to determine whether this Court should adopt the state-created danger theory of liability on the present facts."); *Est. Of Lance v. Lewisville Indep. Sch. Dist*., 743 F.3d 982, 1003 (5th Cir. 2017) ("[T]his case does not sustain a state-created danger claim, even assuming that theory's validity"). "validity.").

While the City Defendants have argued that the recent decision in *Fisher v. Moore*, No. 21-20553 F. 4th 2023 WL 4539588 (5th Cir. July 14, 2023) precludes a state-created danger claim here, *Fisher* does not bar this case. *Fisher* does hold that the state-created danger doctrine was not

"clearly established," as of November 2019. While that is arguably a central question to a qualified immunity analysis, it is not relevant here, where Plaintiffs sue under a theory of municipal liability and thus qualified immunity has no bearing.   Moreover, *Fisher* expressly left "for another day" the question of whether to adopt the doctrine."

## VI.     THIS CASE DEMANDS RECOGNITION OF THE STATE-CREATED DANGER

Because the Fifth Circuit has not expressly rejected the theory, but rather has laid out the theory's elements, Plaintiffs should be allowed to develop evidence as to a state-created danger claim in discovery and at trial. See *Kemp v. City of Houston,* No. CIV.A. H-10-3111, 2013 WL 4459049, at *6 (S.D. Tex. Aug. 16, 2013) (allowing state-created danger claim to proceed to trial because "[w]hether the evidence at trial rises to a level sufficient to submit this claim to the jury, particularly since the Fifth Circuit has not yet adopted the theory, remains to be seen.").

Although the City Defendants have argued that "there is no state action that overcomes the absence of a legal duty to prevent the criminal actions of a private actor," Br. at 10, the facts alleged in the Amended  Complaint show that  Pargas and the other law enforcement officers created and maintained a barricade that ensured that Plaintiffs would be trapped with an active shooter while also cutting off alternative sources of aid, including that of parent Plaintiffs. Prior Fifth Circuit cases have declined to apply the state-created danger theory on particular facts due to lacking a key requirement: that the state actor actually knew or had reason to know that the private bad actor was likely to commit misconduct as a result of the state actor's conduct, evidenced by the state actor impeding others from preventing the bad actor's misconduct.  "The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Johnson*, 38 F.3d at 201 (cleaned up) (emphasis

added).  The Fifth Circuit's analyses on the merits of the theory have typically stopped there, as it is understandably rare for a plaintiff to be able to plead facts reflecting that culpable knowledge and conduct. *See, e.g., Covington,* 675 F.3d at 866; Lance, 743 F.3d at 1001-02.

Here, the Amended complaint alleges the following:

- That acting Chief Pargas arrived at Robb Elementary school and failed and refused to "undertake the required protocol to immediately "distract, isolate, and neutralize the shooter." Am. Compl. ¶ 92.

- In less than three minutes after the shooting began, Defendants Canales, Martinez, Landry, and Acting Chief Pargas of the UPD approached Rooms 111 and 112. The officers, outfitted with body armor, two rifles and three pistols, took up positions near the classrooms. They heard the shots being fired in the classrooms, as well as shots erupting through the walls. Am. Compl. ¶ 99.

- Although Defendants Lt. Martinez and Sgt. Canales had prepared to breach the doors, the officers were refrained from doing so after shots were fired in their direction. Soon thereafter, approximately 8 or 10 law enforcement, including Uvalde PD Acting Chief Pargas, gathered in or around the vicinity of Rooms 111 and 112. Am. Compl. ¶ 103.

- Defendant officers knew or had reason to know that they were confronting an active shooter situation and not a barricaded subject situation. S Am. Compl. ¶ 103.

- Acting Chief Pargas acknowledged that he was never in communication with Chief Arredondo nor with the other law enforcement officers on the north side of the building. It was Lt. Pargas' understanding that Arredondo must have been coordinating the law enforcement response given his supervisory jurisdiction over the school. According to Lt. Pargas, the Uvalde PD was merely there to provide support. As such, Lt. Pargas did not

16

assert Uvalde PD's jurisdictional authority over Chief Arredondo and the CISD-PD to set up a command center nor did he seek to coordinate with any of the other agencies that were responding. Am. Compl. ¶ 116.

- Many parents had assembled seeking to retrieve their children. They were vehemently denied entry onto the campus by law enforcement despite having received no affirmative communication apprising them of the state of law enforcement's response to neutralizing the active shooter. Approximately twenty or so minutes after Ramos had entered the building, a group of terrified parents pleaded with law enforcement to permit their entry which was forcefully rebuffed. The student's parents were forcefully held back, pinned to the ground, pepper sprayed and tasered. One parent however was able to break through the grip of law enforcement who were preventing her entry. She ran into the building and rescued her two children. Am. Compl. ¶ 122.

- Defendant Officers, including acting Chief Pargas received a radio dispatch that one of the classrooms was "full of victims." Acting Chief Pargas responded, "ok, ok, thanks" and after informing Border Patrol as to the victims, stepped out of the school building for thirty minutes. Despite that such information reinforced the fact that the officers were facing an active shooter scenario, Defendant officers persisted in responding as if it were a 'barricaded subject' scenario. Such response continued despite officers hearing that Ramos began firing his weapon in Room 111 at 12:21 p.m., some 37 minutes after the last shooting had occurred.

These allegations establish that the City of Uvalde, through Pargas' policy decisions, knowingly placed Plaintiffs in a concerted state of danger. *Johnson,* 38 F.3d at 200. Their conduct went far beyond mere negligence. By failing to take action, Defendants locked in a madman with

a gun with helpless and defenseless children, teachers and school staff.  The above allegations described affirmative actions taken over the course of an hour by the City of Uvalde through Pargas' command, not as a "split-second judgment."

The City Defendants also argue that intent to harm is required in Fourteenth Amendment claims, citing *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). Br. at 7-8, 13. But *Lewis* did not announce so broad a rule. *Lewis* Involved "a high-speed automobile chase aimed at apprehending a suspected offender," which resulted in a crash that left a passenger in the chased vehicle dead. *Id*. at 836. The Supreme Court had granted *certiorari* to resolve a circuit split "over the standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case," *id.* at 839, and it limited its holding to pursuit cases. *Id*. at 854 (holding that "purpose to cause harm. . . ought to be needed for due process liability **in a pursuit case**" (emphasis added)). In a high-speed pursuit case such as *Lewis* or *Plumhoff v. Rickard*, 572 U.S. 765 (2014) (also relied upon by the City, *see* Br. at 8), it may make sense to argue, as the City Defendants do, that Plaintiffs "merely [engaged in] second guess" "split-second judgments." Br. at 9, 13. But here, Pargas and others under his command had countless "split-seconds"—74 minutes' worth of split-seconds—during which they willfully disregarded the mandates of active shooter response.

Uvalde City's policy of barricading students in with the shooter prolonged and exacerbated a dangerous and deadly environment, and Pargas knew it was dangerous when he created the policy. Given Pargas's status as chief policymaker, Uvalde City is liable for those decisions.

18

**VII.    PLAINTIFFS HAVE PLEADED FACTS THAT ESTABLISH A
CONSTITUTIONAL DEPRIVATION**

The Amended Complaint more than adequately alleges that Defendant City of Uvalde, acting through its policy maker, Defendant Pargas, had "culpable knowledge and conduct in affirmatively placing Plaintiffs in a position of danger." *Johnson*, 38 F.3d at 201. The facts set forth in the Amended Complaint describe exactly the scenario envisioned by the state-created danger theory.

The City Defendants argue that deliberate indifference is insufficient to establish liability for a substantive due process claim outside the context of custodial relationships. See Br. at 12-13. They are wrong as a matter of law. The Fifth Circuit was clear in *Johnson* that for liability to attach under the state-created danger theory, "the defendants must have been at least deliberately indifferent to the plight of the plaintiff." *Johnson*, 38 F.3d at 201 (emphasis added). The City Defendants' argument that the Supreme Court has not found deliberate indifference sufficient in non-custodial contexts also fails, because as discussed above, a custodial relationship existed in this case. Even if it did not, and the "conscience shocking" standard unilaterally applies, Pargas's conduct shocks the conscience. This case is not one, as the City Defendants suggest, that required only "split-second judgments." Br. at 12. Rather, Pargas arrived on-scene of the shooting mere minutes after it began, and instituted and perpetuated a policy of barricading the shooter in the classroom for over an hour through decisions that did not require "split-second judgments" but rather prolonged deliberation with other officers and police dispatchers. See Am. Compl. ¶¶ 98-103, 116, 122, 128, 188-193. These decisions thus do not implicate the intent "to cause harm" standard as the City suggests. See Br. at 12. Rather, Pargas's actions were "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n.8 (1998).

Defendant City of Uvalde, acting through its policy maker, Defendant Pargas, knowingly prolonged and exacerbated a dangerous environment, and over an hour, Defendants "used [their] authority to create an opportunity that would not otherwise have existed for the third party's crime" to continue, even as Plaintiffs suffered. *Johnson* 38 F.3d at 201. This Court should reject their attempt to escape accountability for their actions.

## VIII.   PLAINTIFFS NEED NOT SHOW A PROPERTY INTEREST

Citing *Blackburn v. City of Marshall,* 42 F.3d 925, 936-37 (5th Cir. 1995), and other cases, the City Defendants argue that Plaintiffs were required to "identify a property interest of which they were deprived." Br. at 12-13. They misapply *Blackburn* and the other cases it cites, which makes clear that to establish a substantive due process claim, "a plaintiff must first identify a life, liberty, or property interest." *Blackburn*, 42 F.3d at 935 (emphasis added). For the avoidance of doubt, Plaintiffs' substantive due process claims are founded on Plaintiffs' "life" interest—i.e., to not be barricaded in a classroom with an active shooter—not a property interest. The City Defendants' other citations are thus similarly inapposite. See *Thompson v. Bass*, 616 F.2d 1259, 1265 (5th Cir. 1980) (in employment context, analyzing property interest because a "life" interest was not at issue); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (analyzing property interest in the context of procedural, not substantive, due process).

## IX.   PLAINTIFFS HAVE STATED FAILURE TO TRAIN CLAIMS (DUE PROCESS)

Plaintiffs have also stated a municipal liability "failure to train" claim by alleging that "1) the supervisor either failed to supervise or train the subordinate official, 2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and 3) the failure to train or supervise amounts to deliberate indifference." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

**First**, the Amended Complaint plainly alleges that Uvalde City "failed in fact to provide training to half of its respective police force despite again, the State's mandatory requirement that all district police officers undergo active shooter training." Am. Compl. ¶ 174. Plaintiffs meet the first *Porter* prong.

**Second**, contrary to the City Defendants' first argument on this claim, the Amended Complaint is replete with allegations that plausibly establish a causal link between the City's failure to conduct active shooter training and the harms Plaintiffs suffered, and thus that the failure to train was a "moving force" in causing Plaintiffs' harms. *Porter*, 659 F.3d at 446. Further, the City Defendants cite no case law for its assertion that Plaintiffs need to allege the precise "training these particular officers received" to meet this prong. Br. at 18. Rather, at the motion to dismiss stage, Plaintiffs need only identify training "procedures that are inadequate." *E.G. by Gonzalez v. Bond*, No. 1:16-CV-0068-BL, 2017 WL 3493124, at *6 (N.D. Tex. June 29, 2017), *report and recommendation adopted*, No. 1:16-CV-068- C, 2017 WL 3491853 (N.D. Tex. Aug. 14, 2017).

To that end, the Amended Complaint details at length the specific national standards for active shooter trainings and how the City's inadequate training failed to meet those standards. It notes that ""the ALERRT protocol requires that responders must have tools and training to 'immediately' and without delay, make entry and neutralize an active shooter. Thus, when a subject fires a weapon at a school, he remains an active shooter until he is neutralized and is not to be treated as a "barricaded subject." Am. Compl. ¶ 67. The Amended Complaint further alleges that the officers—including Pargas and the officers under his command—failed to "make any attempt to 'stop the killing,' the primary tenet of all active shooter training and responses." *Id*. ¶ 144. Because they were not adequately trained to "immediately distract, isolate, and neutralize the active shooter," the Uvalde City officers "ignored the all too apparent reality that

they were confronting an active shooter scenario." *Id*. ¶ 140. These allegations make plain the causal link between the City's failure to train its officers and the harms Plaintiffs suffered, which resulted in "conduct [that] considerably heightened the danger that Plaintiffs faced on account of Defendants failure to implement the required active shooter protocols in the expeditious fashion that they were otherwise mandated." Id. ¶ 183.

Third, contrary to the City Defendants' argument on this claim, the Amended Complaint adequately alleges deliberate indifference. *Porter*, 659 F.3d at 446. Plaintiffs may establish deliberate indifference by alleging facts showing "that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009). The Defendants' central argument on this point is that Plaintiffs only cite "one incident." Br. at 19. Courts in the Fifth Circuit have noted that such an argument is more appropriate for a motion for summary judgment after the benefit of discovery, rather than a motion to dismiss. *See, e.g., Vargas v. City of San Antonio,* No. SA-08-CA-1026-OG, 2009 WL 10700088, at *2 (W.D. Tex. May 15, 2009); *see also Diaz v. City of San Antonio*, No. SA-05-CA-0888-RF, 2006 WL 509061, at *2 (W.D. Tex. Feb. 22, 2006). In any case, even if Plaintiffs had to allege that a "pattern" of school shootings put the City on notice regarding its inadequate training policies, the Amended Complaint alleges facts demonstrating that the City was on notice that failing to train 50% of its officers on active shooter protocols would likely result in these constitutional violations. The Amended Complaint alleges that "the Advanced Law Enforcement Rapid Response Training program ALERRT," was "created in response to the Columbine school shooting in 1999," (Am. Compl. ¶ 66) which was 23 years before the events at Robb Elementary School. Further, national standards promulgated by the ALERRT are considered the nation standard in active shooter response training. *Id*. yet only 50% of the UPD officers who had responded on May 24, 2022 had received training. *Id*. at 140. The City Defendants may disagree

on the merits at trial, but this "is necessarily a fact intensive inquiry which must be resolved during discovery or at the Rule 56 stage," *Bae Sys. Resol. Inc.*, 2020 WL 7482036, at *2, and therefore, "a motion to dismiss is not appropriate at this stage in the litigation," *Dixon*, 2017 WL 2778245, at *2.

## X.     IN THE ALTERNATIVE, THE COURT SHOULD PERMIT PLAINTIFFS TO AMEND

Plaintiffs have met the pleading standard necessary to assert viable claims, and the City Defendants' motion should therefore be denied. In the alternative, however, Plaintiffs respectfully request that the Court allow them to amend the Amended Complaint to allege additional facts to the extent the Court finds the allegations therein insufficient on any claim. For example, on May 24, 2023, the Washington Post published an investigation into law enforcement officers' response to the shooting. *See Joyce Sohyun Lee, et al.*, *A year after Uvalde, officers who botched response face few consequences*, WASHINGTON POST (May 24, 2023), https://www.washingtonpost.com/nation/2023/05/24/uvalde-school-shooting-police-response/.

Similarly, Plaintiffs also recently obtained unabridged audio recordings of 911 calls made from the classroom and can allege additional facts about those calls. Finally, a state judge recently ordered the Texas Department of Public Safety to release records related to the Uvalde shooting response by police officers; those records are expected to be released in the fall. Lexi Churchill and William Melhado, *Judge says DPS must release documents related to Uvalde shooting response*, TEXAS TRIBUNE (June 29, 2023), https://www.texastribune.org/2023/06/29/uvalde-shooting-dps-records/. Generally, courts within the Fifth Circuit allow plaintiffs at least one opportunity to cure any pleading deficiencies before dismissing a case under Rule 12(b)(6). *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

## CONCLUSION

For the foregoing reasons, the Court should deny City of Uvalde and Acting Chief Pargas's motion to dismiss. In the alternative, Plaintiffs respectfully request the opportunity to amend their Complaint.

**Dated:  July 31, 2023**

**Respectfully Submitted,**

*/s/Charles A. Bonner*
**CHARLES BONNER**
**LAW OFFICES OF BONNER & BONNER**
A.  CABRAL BONNER, ESQ.
475 Gate Five Rd., Suite 211
Sausalito, Ca 94965
Tel: (415) 331-3070

**EVANS LAW OFFICE P.P.L.C.**
JERRY EVANS
127 N. West Street
Uvalde, Texas 78801
Tel: (830) 900-5021
e-mail: devanslawoffice@gmail.com

**THE BONNER LAW FIRM, P.C**.
VICTOR BONNER
4820 Old Spanish Trail
Houston, Texas 77021
Tel: (832) 433-6565
e-mail: vicbonneresq@gmail.com

**Legal Center of Jose Angel Gutierrez, P.C.**
JOSE ANGEL GUTIERREZ, JUDGE RET.
429 W. 12th Street,
Dallas, Texas 75208
Tel: (214)941-1900
e-mail: joseangelgutierrez@yahoo.com

**ATTORNEYS FOR PLAINTIFFS**

## **<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned, hereby certify that on the 31st day of July, 2023, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and caused to be served upon all counsel of record via the CM/ECF system, pursuant to the Federal Rules of Civil Procedure.

<u>*/s/Charles A. Bonner*</u>
CHARLES BONNER