IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

FILED
SEP 29 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ________ DEPUTY CLERK

| | | |
|---|---|---|
| **CRYSTAL P. et al.,** **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIV NO. DR-23-CV-15-AM** |
| | § | |
| **CITY OF UVALDE et al.,** **Defendants.** | § | |

**ORDER**

On May 24, 2022, a lone teenage gunman opened fire at Robb Elementary School in Uvalde, Texas. Three minutes after arriving at the school, he entered two connected classrooms, and over a timespan of seventy-four minutes, murdered nineteen students and two teachers. State, city, county, and school district law enforcement officers responded to the scene within minutes, but no one entered the two classrooms for the full seventy-four minutes that followed. The massacre ended only when federal officers finally breached one of the classroom doors and killed the shooter within seconds.

On February 22, 2023, the Plaintiffs, who are a mix of parents, students, teachers, school personnel, and bystanders, filed this "class/mass action" against responding law enforcement officers, law enforcement agencies, and municipalities, bringing claims under 42 U.S.C. § 1983. The Plaintiffs allege that the Defendants, while acting under the color of state law, violated the Plaintiffs' Fourteenth Amendment substantive due process rights. The Plaintiffs are filing suit "individually, and on behalf of all other similarly situated students, student parents and/or guardians, teachers, and school support staff who were in attendance, or had children in attendance, at Defendant Uvalde Consolidated Independent School District's ("[U]CISD") Robb Elementary School ("Robb Elementary") on May 24, 2022, and who have sustained emotional and

psychological damages as a result of Defendants' conduct and omissions on that date." (ECF No. 15 at 4 (emphasis omitted).)[1]

Now pending before the Court are the following motions to dismiss pursuant to Rules 12(b)(1), 12(b)(5), and/or 12(b)(6) of the Federal Rules of Civil Procedure: (1) Motion to Dismiss by Uvalde County Sheriff Ruben Nolasco [ECF No. 30]; (2) Motion to Dismiss Plaintiffs' Amended Complaint by Uvalde Police Department Lieutenant Mariano Pargas and City of Uvalde [ECF No. 33]; (3) Motion to Dismiss by Uvalde Police Department Sergeant Eduardo Canales, Sergeant Daniel Coronado, Officer Louis Landry, Lieutenant Javier Martinez, Officer Justin Mendoza, and Officer Donald Page [ECF No. 34]; (4) Motion to Dismiss First Amended Complaint by Uvalde County Independent School District ("UCISD") Police Department ("PD") Officer Jesus "J.J." Suarez [ECF No. 35]; (5) Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim by UCISD and UCISD PD [ECF No. 42]; (6) Motion to Dismiss Pursuant to 12(b)(1) and 12(b)(6) by Texas Department of Public Safety ("DPS") and DPS Director Steven McCraw [ECF No. 47]; (7) Uvalde Police Department Lieutenant Mariano Pargas's Motion to Dismiss [ECF No. 64]; (8) Motion to Dismiss by UCISD PD Chief Pedro Arredondo [ECF No. 66]; and (9) Motion to Dismiss for Insufficient Service of Process Pursuant to Federal Rule of Civil Procedure12(b)(5) by DPS Captain Joel Betancourt, Regional Director Victor Escalon, Sergeant Juan Maldonado [ECF No. 83]. Defendant Mandy Gutierrez also filed a Motion to Dismiss Plaintiffs' Amended Class Action Complaint Pursuant to Rules 12(b)(1) and (6). (ECF No. 19.) However, the Plaintiffs and Gutierrez filed a Joint Stipulation of Dismissal, thus mooting the motion to dismiss. (*See* ECF No. 21.)

---

[1] This case has not yet been certified as a class or mass action.

Also before the Court is the Plaintiffs' Motion for Leave to File Response to Defendant Arredondo's Motion to Dismiss. (ECF No. 88.) Arredondo's Motion to Dismiss was filed on December 1, 2023, but the Plaintiffs did not file the Motion for Leave until July 26, 2024, faulting the attorney's inadvertence and busy schedule. Finding no good cause or excusable neglect to accept a response that was filed almost four months after the deadline, the Motion for Leave is denied. *See* Fed. R. Civ. P. 6(b).

After considering the remaining motions to dismiss and briefings, the Court finds that the Defendants are all entitled to dismissal of the claims against them.

## I. ALLEGED FACTS

Upon turning eighteen years old, Salvador Ramos purchased 1,740 rounds of ammunition, a Daniel Defense AR-15-style rifle, and a Smith and Wesson rifle. On May 24, 2022, just four days after turning eighteen, Ramos shot and injured his grandmother at her house in Uvalde, Texas. Carrying the guns and ammunition, he then drove his grandmother's vehicle towards Robb Elementary School, just a short distance away, where he lost control of the vehicle and crashed into a ditch.

At approximately 11:28 a.m., Ramos opened fire upon concerned onlookers who approached the vehicle. As they ran to safety, Ramos gathered his arsenal and traversed Robb Elementary School's five-foot-high perimeter fence. A third-grade teacher spotted Ramos, escorted her students to safety, and reported an active shooter through her school radio at 11:29 a.m. But because of a poor Wi-Fi signal, Mandy Gutierrez, the school's principal, was unable to broadcast the active shooter alert via text messaging. She also failed to utilize the campus's intercom system to initiate lockdown procedures.

Gutierrez, however, did call Defendant Pedro Arredondo, the chief of police of UCISD PD, who instructed Gutierrez to shut the school down. Gutierrez instructed the school's head custodian to ensure that all the doors were locked. Many teachers heard the gunfire and were able to usher their children into classrooms and closets, lock the doors, and assume lockdown positions away from windows and doors. Other classrooms began to lock down the classrooms as the shooting spread by word of mouth.

Unfortunately, the school's compliance with UCISD's safety protocols was deficient, and many doors did not lock or were difficult to lock. At approximately 11:33 a.m., Ramos proceeded through one of these unlocked doors at the west side of the school. He then entered an unlocked classroom (Room 111) that was connected to another classroom (Room 112) and announced to the children inside the room that it was "time to die." Using the Daniel Defense rifle, he began firing at teachers and fourth grade children. Gunfire also pierced the wall of an adjacent classroom (Room 109). Initial law enforcement responders arrived at the scene within three minutes, but seventy-four additional minutes passed before anyone breached the classrooms and killed Ramos. During those seventy-seven minutes, Ramos murdered nineteen children and two teachers and injured at least seventeen others.

Arredondo arrived at the school shortly after the shooting began. Consistent with nationally recognized—and locally implemented—active shooter policies, UCISD's policy required Arredondo, as the chief of police of the school district, to set up a command post and serve as the on-site commander. The policy also instructed officers to immediately neutralize the shooter and provide aid to victims, irrespective of the risk to law enforcement. But neither Arredondo nor anyone else did so. Instead of immediately breaching the classrooms, Arredondo communicated to others that the shooter was "barricaded," which in law enforcement jargon

indicates a non-active shooter. He also repeatedly instructed willing officers to hold off entering the classrooms and called for additional support and fire power.

While Ramos was inside the classrooms, *hundreds* of law enforcement officers from numerous state and federal agencies gathered around the classrooms and the school. Among these officers were the initial responders: (1) Defendant Mariano Pargas, the acting chief of the Uvalde Police Department; (2) Defendant Daniel Coronado, a sergeant of the Uvalde Police Department; (3) Defendant Juan Maldonado, a DPS sergeant; (4) Lieutenant Eduardo Canales, the commander of the Uvalde Police Department SWAT team who had an opportunity to shoot Ramos before he entered the school; and (5) Defendants Javier Martinez and Louis Landry, officers with the Uvalde Police Department. Other responding officers included: (1) Defendant Ruben Nolasco, the Uvalde County Sheriff, who delayed in relaying critical information about the identity of the shooter; (2) Defendants Johnny Field and Emmanuel Zamora, constables and instructors at the regional police academy; (3) Defendants Adrian Gonzalez and Jesus "J.J." Suarez, UCISD police officers; and (4) Defendants Donald Page and Justin Mendoza, law enforcement officers with the Uvalde Police Department.

None of the responding officers were quite sure who was in charge or how to proceed, and no one stepped up to take charge. The responding officers were also ill-equipped, lacking appropriate weapons, protective gear, and communications devices. As the officers scrambled to find appropriate gear, as well as a key to the classrooms, intermittent gunfire persisted inside Rooms 111 and 112.

Defendant DPS Captain Joel Betancourt, presumably following the directives of Defendants Steve McGraw, the overall director of DPS, and Victor Escalon, the regional director of DPS, instructed DPS officers to remain outside and establish a perimeter around the school.

After learning about the shooting at the school, family members and friends of students started to arrive. Suarez and Mendoza, who were guarding the perimeter, shoved, restrained, tackled, and tasered distraught family members and friends to keep them away from the school. Nolasco, whose department at the time did not have an active shooter policy, likewise obstructed parents from entering the school. The perimeter also prevented emergency services from nearing the school.

After a short pause in gunfire, Ramos began shooting again at 11:44 a.m. Still, no one attempted to enter the classrooms. At 12:09 p.m., as more and more officers amassed at the school with weapons and body armor, Arredondo continued to instruct officers not to breach the classroom, claiming "time is on our side right now."

At 12:10 p.m., a student in one of the classrooms with Ramos bravely called 911 and reported that numerous students were dead and at least eight were still alive. The student even offered to open the door for the officers waiting outside, but the operator instructed her to stay in place. After the conversation, the operator communicated the details of the call to Arredondo and stressed that the classrooms were "full of victims." However, Arredondo instructed a group of officers who were preparing to breach the classrooms to continue to wait.

At 12:21 p.m., after a thirty-seven minute break in shooting, Ramos began firing yet again. Still, no one attempted to enter the classrooms. At 12:48 p.m., U.S. Border Patrol Tactical Unit ("BORTAC"), a specialized unit of the United States Border Patrol, prepared to breach the door. Betancourt, however, instructed BORTAC to stand by. Disregarding the command, BORTAC breached the door at 12:50 p.m., and shot and killed Ramos within seconds.[2]

---

[2] In ruling on the motions, the Court takes the Plaintiffs' alleged facts as true. However, the Court notes that the Plaintiffs' allegations are sometimes inconsistent with allegations in similar cases, as well as the facts and timeline developed during an extensive federal investigation into the shooting.

## II. LEGAL BACKGROUND

The Plaintiffs then filed this § 1983 suit, alleging violations of their Fourteen Amendment substantive due process rights. Although none of the Plaintiffs, children, or teachers were inside Rooms 111 or 112 and all survived the massacre with no physical injuries, they assert that they have suffered tremendous emotional and psychological trauma and seek $20 billion in compensation, as well as declaratory relief and injunctive relief.[3] The Plaintiffs bring the claims against the responding law enforcement officers in their individual capacities (collectively the "Law Enforcement Defendants"),[4] as well as Arredondo, Pargas, Nolasco, Escalon, Gutierrez, and McGraw in their official capacities. They also seek to hold UCISD and the City of Uvalde (collectively the "Municipal Defendants") liable for their constitutional violations and for failing to properly train and/or supervise their employees under a *Monell* theory of liability.

Although they are not named in any particular count of the Complaint, the Plaintiffs name additional defendants, including: (1) Uvalde City Police Department ("UPD"); (2) UCISD PD; (3) DPS; and (4) 3000 Does, some of whom "were responsible for the training, supervision, control, assignment and discipline of the sworn and civilian personnel of UCISD and the City of Uvalde, as well as UCISD-PD, UPD, USD,[5] DPS and other local, state and federal law enforcement, including the U.S. Department of Homeland Security who responded to Robb Elementary on May 24, 2022." (ECF No. 15 at 18.)

To briefly summarize the allegations in the Amended Complaint, the Plaintiffs assert violations of their Fourteenth Amendment substantive due process rights under three separate

[3] A few of the Plaintiffs were students inside Room 109 but were uninjured.

[4] The Individual Law Enforcement Defendants include Arredondo, Pargas, Suarez, Coronado, Nolasco, Betancourt, Maldonado, Gonzalez, Canales, Martinez, Landry, Page, Escalon, and McCraw.

[5] The Plaintiffs do not define "UPD" but presumably are referring to the Uvalde County Sheriff's Department.

theories: (1) state created danger; (2) special custodial relationship; and (3) interference with the parent-child relationship. According to the Plaintiffs, the Law Enforcement Defendants violated their due process rights because they acted with deliberate indifference to the Plaintiffs' safety by creating a dangerous school environment—namely, by erecting a five-foot fence that was easily traversable, failing to fix broken locks, having sub-standard methods of communications during emergencies, failing to be prepared for an active shooter situation, and failing to follow nationally and locally recognized active shooter policy. Even though they were not inside the rooms with Ramos, the Plaintiffs also allege that that when the Law Enforcement Defendants surrounded the classrooms and made their presence known to Ramos, they enhanced the danger that the Plaintiffs were already facing. They also argue that the Law Enforcement Defendants, despite having a custodial relationship with the Plaintiffs, acted with deliberate indifference to their safety by failing to promptly neutralize Ramos and instead trapping them on the school's campus with no ability to care for themselves. Finally, they allege that the Law Enforcement Defendants violated their due process right to a parent-child relationship by physically restraining parents from entering the school premises to rescue their children.

As for the Municipal Defendants, the Plaintiffs allege that official policies of the Municipal Defendants or their final decisionmakers were the driving force behind the Law Enforcement Defendants' violations of their constitutional rights. They also allege that the Municipal Defendants failed to train their employees on responding to active shooter situations.

The Defendants all filed motions to dismiss. Defendants Betancourt, Escalon, and Maldonado filed a motion pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure, asking the Court to dismiss the claims against them because they still have not been properly served.

Defendant Suarez, in a separate Motion to Dismiss, also states that he is entitled to dismissal pursuant to Rule 12(b)(5) because he too has not been served.

The remaining Defendants, as well as Suarez, seek dismissal of the claims brought by the student parents under Rule 12(b)(1), arguing that the parents lack standing to bring their own claims because they did not suffer a concrete harm that is directly traceable to the Defendants' actions. Defendants DPS and McCraw, in his official capacity, also seek dismissal under Rule 12(b)(1), asserting that the claims against them are barred by Eleventh Amendment sovereign immunity.

Finally, the Defendants (excluding Betancourt, Escalon, and Maldonado) seek dismissal of any remaining claims under Rule 12(b)(6). In support, they argue that: (1) the Plaintiffs' allegations are conclusory; (2) the Plaintiffs' allegations lump the conduct of 3000+ defendants into one complaint without sufficiently identifying the specific conduct for which any defendant can be liable; (3) the Plaintiffs' claims are not cognizable under existing law; (4) any official capacity claims are redundant and must be dismissed; and (5) UCISD PD and UPD are nonjural entities who do not have the capacity to be sued. The Law Enforcement Defendants also assert they are entitled to qualified immunity because the Plaintiffs fail to allege a violation of a clearly established constitutional right.[6]

## III. ANALYSIS

### A. Rule 12(b)(1)

The Court will first begin with the Defendants' Rule 12(b)(1) arguments. Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter

---

[6] Some of the Defendants seek dismissal of state law tort claims, Fourth Amendment claims, and claims based on a failure to enforce criminal laws. Because the Plaintiffs do not allege such claims, the Court will not address these arguments.

jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996)). The "threshold question in every federal case" is "determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Therefore, "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In defending against a Rule 12(b)(1) motion, the party asserting jurisdiction bears the burden of proving that jurisdiction exists. *Id.* Courts assessing subject matter jurisdiction under Rule 12(b)(1) may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.*

**1. Standing**

The Defendants argue that the parents of the children at the school that day ("student parents") lack standing to bring their individual § 1983 claims because they did not suffer a cognizable harm. Before a federal court can consider the merits of a legal claim, "the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Arkansas*, 495 U.S.149, 154 (1990). Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const., art. III, § 2. No case or controversy exists when a party lacks standing to sue. *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016). "Standing in federal court is determined entirely by Article III and depends in no

degree on whether standing exists under state law." *Abraugh v. Altimus*, 26 F.4th 298, 303 (5th Cir. 2022) (citation modified).

Standing under Article III is evaluated on a claim-by-claim basis. *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021). To establish Article III standing, the party invoking federal jurisdiction bears the burden of showing (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," (3) which a favorable decision is likely to redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified). "An injury-in-fact constitutes 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 (5th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560). "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007)).

"In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). A litigant, however, may bring an action on behalf of a third party, provided three important criteria are met: (1) "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) "the litigant must have a close relation to the third party" and must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests," such as inaccessibility, mental

incompetence, or other disability. *Id.* at 410-11 (citations omitted); *Whitmore*, 495 U.S. at 163 (discussing standing in the context of next friend).

It is well established that a parent has Article III standing to act as next friend of their children, assuming the child suffered an injury in fact. "A 'next friend' does not himself become a party to the . . . action in which he participates, but simply pursues the cause on behalf of the [injured] person, who remains the real party in interest." *Whitmore,* 495 U.S. at 163. Minor children "are considered to be under a legal disability and are therefore unable to sue or be sued in their individual capacities; such persons are *required* to appear in court through a legal guardian, a 'next friend,' or a guardian ad litem." *Cf. Aus. Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005) (emphasis added). Parents, who have a "fundamental right to make decisions concerning the care, custody, and control" of their children, certainly have standing to act as next friends of their minor children, absent a conflict of interest. *Troxel v. Granville*, 530 U.S. 57, 72 (2000); *see also In re KC Greenhouse Patio Apartments, LP*, 445 S.W.3d 168, 174-76 (Tex. App. 2012).

With this in mind, the parents whose children were at the school during the shooting have Article III standing to bring claims as next friends on behalf of their children. Even if there was no physical injury to the child, "emotional harm satisfies the 'injury in fact' requirement of constitutional standing." *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 169 (5th Cir. 2016).

The student parents who unsuccessfully attempted to reach their children the day of the shooting also have Article III standing to pursue a due process claim based on interference with the parent-child relationship. The Fourteenth Amendment provides, "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under this amendment, a parent has a fundamental due process right to make decisions concerning

"companionship, care, custody, and management of his or her children . . . ." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Quillon v. Walcott*, 434 U.S. 246, 255 (1978). A parent also has a "cognizable liberty interest in preserving the life and physical safety of [a minor child] from deprivations caused by state action, a right that logically extends from his recognized liberty interest in the custody of his children and the maintenance and integrity of the family . . . ." *Est. of Bailey ex rel. Oare v. York County*, 768 F.2d 503, 509 n.7 (3d Cir. 1985). However, state interference with the parent-child relationship must be intentional. *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1190 (10th Cir. 1985). Because these student parents sufficiently allege an injury-in-fact, they have Article III standing.[7]

The student parents, however, do not have Article III standing to bring a claim based on a state created danger or a failure to protect. Even the student parents who were at the school were *outside* the Law Enforcement Defendants' perimeter and did not suffer any concrete harm from a constitutional violation caused by the State's purported failure to provide a safe environment or to protect those from harm within the perimeter. Rather, the alleged harm, at most, was indirect mental anguish from knowing their child was inside the perimeter. This type of harm is not fairly traceable to the alleged conduct of the Defendants and cannot constitute an injury in fact. Moreover, there is no hindrance to the children's "ability to protect [their] own interests," who all survived the massacre. *Powers,* 499 U.S. at 411. Although the children are minors and have no capacity to sue on their own, they can pursue their own claims with the representation of a guardian, committee, conservator, or next friend. Fed. R. Civ. P. 17(c). Therefore, the student

[7] The "student parents" also have prudential standing under § 1983 because, again, the purported harm was to the children *and* the parents.

parents' claims based on a state created danger or special relationship must be dismissed under Rule 12(b)(1).

Plaintiffs Sylvia U., Maria G.-R., and Vanessa G., the bus drivers who transported injured students to the hospital, also lack constitutional standing to bring claims based on a state created danger and special relationship, *as well as* a claim based on a parent-child relationship. They too were outside the perimeter of the school and were not subject to the barriers of the law enforcement officers. Moreover, they do not allege that they had a child in attendance that day at the school. Plaintiff Maria P., the grandmother of Plaintiff N.S., likewise lacks standing, for the same reasons. Therefore, their claims must be dismissed in their entirety under Rule 12(b)(1).

**2. Sovereign Immunity**

Next, Defendants Texas Department of Public Safety and Director McCraw, in his official capacity, argue that the Plaintiffs' claims are barred by Eleventh Amendment sovereign immunity. A suit against the Texas Department of Public Safety is a suit against the State of Texas itself. *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 581 (Tex. 2001). "The Eleventh Amendment is an explicit limitation o[n] the judicial power of the United States." *Missouri v. Fiske*, 290 U.S. 18, 25 (1933). "It deprives a federal court of power to decide certain claims against States that otherwise would be within the scope of Art. III's grant of jurisdiction." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119–20 (1984). "This bar extends not only to the state itself, but also to claims against 'state officials' in their official capacity when the state is the real party in interest." *Tawakkol v. Vasquez*, 87 F.4th 715, 718 (5th Cir. 2023).

There are only three circumstances in which an individual may sue a State: (1) "when Congress abrogates state sovereign immunity through the Fourteenth Amendment," *Russell v. Jones*, 49 F.4th 507, 512 (5th Cir. 2022), (2) "when the state itself consents to suit," *id.* (quoting

*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999)), or when (3) a plaintiff seeks an injunction "in federal court [to prevent] state executive officials from enforcing state laws that are contrary to federal law," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (citing *Ex parte Young*, 209 U. S. 123, 159–60 (1908)).

None of the three exceptions apply. *Cleveland v. Liberty Cnty. Sheriff's Dept.*, 626 F. App'x 540, 542 (5th Cir. 2015). "Thus, the Eleventh Amendment shields the department from suit in federal court." *Id.* Because DPS and McCraw, in his official capacity, are immune from suit, they are entitled to dismissal of the claims against them for want of jurisdiction.[8]

**B. Rule 12(b)(5)**

Defendants Betancourt, Escalon, Maldonado, and Suarez seek dismissal of the claims against them under Rule 12(b)(5) of the Federal Rules of Civil Procedure. Rule 12(b)(5) permits a party to file a motion to dismiss for "insufficient service of process." Fed. R. Civ. P. 12(b)(5). According to the Defendants, they have not been properly served with process to this day.

The Plaintiffs do not dispute that the Defendants have not been served and did not address Suarez's Rule 12(b)(5) arguments. They, however, claim that they diligently attempted to serve Betancourt, Escalon, and Maldonado numerous times without success and ask the Court to deny the motion and allow additional time for service.

Generally, "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). However, "if the plaintiff shows good cause for the failure, the court must extend

[8] Even if there was no immunity, "neither a State nor its officials acting in their official capacities are persons under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

the time for service for an appropriate period." *Id.* Good cause under Rule 4(m) requires "*at least* as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice." *Winters v. Teledyne Movible Offshore, Inc.*, 776 F.2d 1304, 1306 (5th Cir. 1985). "Additionally, some 'showing of good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance within the time specified is normally required.'" *Thrasher v. City of Amarillo*, 709 F.3d 509, 511 (5th Cir. 2013) (quoting *id.*).

Although dismissal under Rule 12(b)(5) and Rule 4(m) is without prejudice, where, as here, "the applicable statute of limitations likely bars future litigation,"[9] a district court's dismissal of claims under Rule 4(m) should be reviewed under the same heightened standard used to review a dismissal with prejudice." *Millan v. USAA Gen. Indem. Co.*, 546 F.3d 321, 326 (5th Cir. 2008). "[D]ismissal with prejudice is warranted only where 'a clear record of delay or contumacious conduct by the plaintiff' exists and a 'lesser sanction would not better serve the interests of justice.'" *Id.* (quoting *Gray v. Fid. Acceptance Corp.*, 634 F.2d 226, 227 (5th Cir. 1981)). Additionally, at least one of three aggravating factors must be present: "(1) delay caused by plaintiff himself and not his attorney; (2) actual prejudice to the defendant; or (3) delay caused by intentional conduct." *Price v. McGlathery*, 792 F.2d 472, 474 (5th Cir. 1986). The delay "must be longer than just a few months" and "be characterized by 'significant periods of total inactivity.'" *McNeal v. Papasan*, 842 F.2d 787, 791 (5th Cir. 1988) (quoting *John v. Louisiana*, 828 F.2d 1129, 1131 (5th Cir. 1987)).

---

[9] The statute of limitations for a § 1983 claim is borrowed from the forum state's personal injury statutes of limitations. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985). Texas's personal injury statute of limitations is two years. Tex. Civ. Prac. & Rem. Code § 16.003(a); *Piotrowski v. City of Houston*, 51 F.3d 512, 514 n.5 (5th Cir. 1995). The shooting at Robb Elementary School occurred over two years ago.

"[I]t is not a party's negligence—regardless of how careless, inconsiderate, or understandably exasperating—that makes conduct contumacious; instead, it is 'the stubborn resistance to authority' which justifies a dismissal with prejudice." *Id.* at 792 (quoting *John*, 828 F.2d at 1131–32). Dismissal is reserved for "egregious and sometimes outrageous delays" that threaten "the integrity of the judicial process, often to the prejudice of the defense, leaving the court no choice but to deny that plaintiff its benefits." *Rogers v. Kroger Co.*, 669 F.2d 317, 321 (5th Cir. 1982).

Dismissal is warranted here. The Plaintiffs filed suit on November 29, 2022, and filed an Amended Complaint adding the Defendants as parties on February 22, 2023. Over three years later, the Defendants still have not been served. Even after the Defendants filed the present motions to dismiss, there is no indication that the Plaintiffs have yet to reattempt service or file a motion for substitute service.

Even if the Plaintiffs initially acted in good faith in attempting to serve the Defendants, their actions quickly devolved into contumacious conduct. The Plaintiffs were warned on numerous occasions to serve the Defendants or face sanctions. Beginning on May 19, 2023, the Court issued a Rule 4(m) show cause order [ECF No. 24], to which the Plaintiffs submitted a nonresponsive reply as to why service had not been effected [ECF No. 27]. On June 20, 2023, the Court ordered the Plaintiffs to serve the Defendants within fourteen days and attend a status conference. (ECF No. 38.) The Plaintiffs still did not serve the Defendants by the deadline, *and* the Plaintiffs' counsel failed to attend the status conference. (ECF No. 39.) The Court then set the matter for a sanctions and contempt hearing on August 1, 2023. (ECF No. 41). The Plaintiffs' counsel appeared this time at the hearing [ECF No. 51], but the Plaintiffs still had not served the Defendants or sought substitute service. Counsel's additional delay of three years, with no effort

to seek substitute service, can only be characterized as "stubborn resistance to authority," *i.e.* intentional contumacious conduct.

The Plaintiffs have also proven that a lesser sanction would be ineffective. The Court has attempted numerous times to pressure the Plaintiffs to quickly effect service at the threat of sanctions and contempt, with no results. Accordingly, the Court will grant the Defendants' Rule 12(b)(5) motions to dismiss.

**C. Rule 12(b)(6)**

Finally, the Court will address the Defendants' Rule 12(b)(6) arguments. Rule 12(b)(6) allows a party to file a motion to dismiss based on a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (citation modified).

When determining whether a claim is properly stated, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotations omitted). However, the court cannot "accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quotations omitted). In ruling on a Rule

12(b)(6) motion to dismiss, courts generally should not go beyond the pleadings and "must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996); Fed R. Civ. P. 12(d).

The Law Enforcement Defendants rely on qualified immunity as a basis for dismissal. The doctrine of qualified immunity shields government officials from liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lincoln v. Turner*, 874 F.3d 833, 847 (5th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Id.* (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)). A plaintiff seeking to defeat qualified immunity must plead sufficient facts to show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts may look into either prong of the qualified immunity inquiry first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lincoln v. Barnes*, 855 F.3d 297, 301 (5th Cir. 2017) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This inquiry 'does not require a case directly on point, but existing precedent must have placed the statutory or

constitutional question beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

**1. Official Capacity**

Defendants Arredondo, Pargas, and Nolasco seek dismissal of the claims against them in their official capacities. "Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Accordingly, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Because the Plaintiffs have sued the real parties in interest—UCISD and City of Uvalde—any official capacity claims are redundant. The Court will therefore dismiss the official capacity claims against Arredondo, Pargas, and Nolasco.

**2. Law Enforcement Defendants**

Next, the Court will address the sufficiency of the Plaintiffs' § 1983 claims brought against the Law Enforcement Defendants. "To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v.*

*Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).[10] The parties do not dispute that the Law Enforcement Defendants were acting under color of state law—only whether the Plaintiffs adequately allege a violation of constitutional rights and whether that right was clearly established.

The Plaintiffs' claims are premised upon violations of the Due Process Clause of the Fourteenth Amendment. The Fourteenth Amendment provides, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression." *Brown v. Nationsbank Corp.*, 188 F.3d 579, 591 (5th Cir. 1999). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Due process guarantees "more than fair process" and covers "a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotations omitted).

The Due Process Clause protects "the people from the State" but is not a guarantor of protection from each other. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (2002). Accordingly, "a State's failure to protect an individual against private violence [generally] does not constitute a violation of the Due Process Clause." *Id.* at 197. Furthermore, the Due Process Clause does not generally confer an "affirmative right to governmental aid, even where

[10] "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. However, under a theory of bystander liability, an officer may be liable under § 1983 if "the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002)). The Court concludes that it is unnecessary to address whether bystander liability applies here. Considering the acts collectively and assuming each law enforcement officer knew of the acts of the others and acquiesced in their conduct, the Plaintiffs nonetheless fail to overcome the defense of qualified immunity.

such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

Acknowledging the general rule that a state actor has no duty to protect, the Plaintiffs rely on two exceptions to this general rule: (1) the special custodial relationship exception; and (2) the state created danger exception. The Plaintiffs also allege that the Law Enforcement Defendants violated their due process right to a parent-child relationship without governmental interference by constructing a barrier and preventing parents from rescuing and/or reuniting with their children.

***a. Special Relationship***

The special relationship exception to no duty to protect applies when the state, by a governmental order or the affirmative exercise of state power, "has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety." *Doe ex. Rel. Magee v. Covington Cnty. Sch. Dist*, 675 F.3d 849, 857 (5th Cir. 2012) (quoting *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (en banc)). When a special relationship is created, a State assumes some responsibility for an individual's safekeeping and general well-being. *DeShaney*, 489 U.S. at 199-200. When the State acts with deliberate indifference to the safety and wellbeing of those within its care, it violates the individual's due process rights. *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002).

The Plaintiffs fail to allege sufficient facts to show the existence of a custodial relationship between the children, teachers, and the Law Enforcement Defendants. As the Supreme Court explains,

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing,

> shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.

*Deshaney*, 489 U.S. at 200. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.*

The custodial requirement of a special relationship is a "difficult and more exacting standard than for a Fourth Amendment seizure." *Pierce v. Springfield Twp*, 562 F. App'x 431, 437 (6th Cir. 2014) (quotations omitted). Because of the stringent standard, the Fifth Circuit has recognized the exception in only three very limited circumstances, namely when the State (1) incarcerates a prisoner, (2) involuntarily commits someone to an institution, or (3) places a child in foster care. *Magee,* 675 F.3d at 856. The Fifth Circuit has repeatedly held that "the state does *not* create a special relationship with children attending public schools" because "[p]ublic schools do not take students into custody and hold them there against their will in the same way that a state takes prisoners, involuntarily committed mental health patients, and foster children into its custody." *Id.* at 857-58; *Doe v. Hillsborough Indep. Sch. Dist.*, 113 F.3d 1412, 1414-15 (5th Cir. 1997) (en banc); *see also Walton,* 44 F.3d at 1305 (holding no special relationship existed between the state and a deaf student at a full-time, residential public school for the deaf because these students "attended this school voluntarily with the option of leaving at will"); *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020) ("School attendance, even when compelled by truancy and compulsory attendance laws, is not similar in kind to incarceration or institutional confinement."). "Without a special relationship, a public school has no *constitutional* duty to ensure that its students are safe from private violence." *Magee*, 675 F.3d at 858; *see also*

*Johnson v. Dall. Indep. Sch. Dist.*, 38 F.3d 198, 202-03 (5th Cir. 1994) (finding no special relationship between a high school and a student shot and killed in the school hallway, during the school day, by a non-student who gained access to the school).[11] And certainly there is no constitutional duty to ensure that teachers are safe from private violence.

The Plaintiffs attempt to circumvent these cases by alleging that the Law Enforcement Defendants created a custodial relationship with the children and teachers by trapping them on the school's campus in a manner similar to incarceration or institutional confinement with no ability to care for themselves, and then acted with deliberate indifference to their safety by allowing Ramos to continue his rampage for a full seventy-seven minutes.

This argument fails for two reasons. First, the Law Enforcement Defendants' alleged actions are insufficient to show a custodial relationship. "[T]he mere exercise of 'control over an environment is alone insufficient' to bring an individual within *DeShaney's* custody exception." *Pierce*, 562 F. App'x at 437 (quoting *Carver v. City of Cincinnati*, 474 F.3d 283, 286 (6th Cir. 2007) (holding that officers' actions in securing a potential crime scene did not constitute custody)). Likewise, preventing a rescue effort does not create a custodial relationship. *Hale v. Bexar County*, 342 F. App'x 921 (5th Cir. 2009). Rather, the exception requires, at a minimum, "actual, physical restraint" by police. *Cutlip v. City of Toledo*, 488 F. App'x 107, 114 (6th Cir. 2012). Notably, none of the children or teachers were inside Rooms 111 or 112. Even so, any reading of the Plaintiffs' Complaint shows that the intent of the barrier was to restrain Ramos and ultimately free, not restrain, those inside the classrooms and on the campus. The Plaintiffs also

---

[11] In the context of a school shooting by a non-student, the Fifth Circuit explained that an injury arising from private violence "is attributable to the fortuity that an armed, violent *non-student* trespassed on campus. There can be no liability of state actors for this random criminal act unless the fourteenth amendment were to make the schools virtual guarantors of student safety—a rule never yet adopted even for those in society, such as prisoners or the mentally ill or handicapped, who are the beneficiaries of a 'special relationship' with the state." *Johnson*, 38 F.3d at 203 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

fail to allege that the officers were preventing the children or teachers from leaving any classroom or the school grounds, aside from making a conclusory assertion that the officers' armed presence trapped them inside the barricade.

Second, a special relationship must exist *before* a state has "a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *Magee*, 675 F.3d at 863 (quoting *McClendon*, 305 F.3d at 324). "[T]he same act that creates the special relationship [cannot] also violate the duty of care owed to the student." *See id.* at 862. Here, the act of surrounding the classrooms and barricading the school cannot simultaneously create the special relationship *and* violate the duty of care established by that relationship. The law enforcement officers, therefore, had no constitutional duty to ensure that the teachers and children were safe from private violence. *See Salas v. Carpenter*, 980 F.2d 299, 309 (5th Cir. 1992) ("Generally, the absence of a special relationship defeats any due process claim based upon a failure to provide protective services.").

Even if the Law Enforcement Defendants' actions created a special relationship, existing case law falls far short of clearly establishing the violation of the Plaintiffs' substantive due process rights under such a theory. The Fifth Circuit has *never* recognized a special relationship in this context, and in fact, a similar argument has been rejected by this circuit, as well as others. *See, e.g., Hale,* 342 F. App'x at 926-27 (preventing the rescue of people exposed to a chlorine gas leak did not create a special relationship between the state and the victims); *Salas*, 980 F.2d at 308 (finding no constitutional violation when a sheriff prevented city officials from aiding a hostage, used incompetent hostage negotiators, and failed to provide adequate equipment to handle the hostage situation); *Peterson*, 982 F.3d at 1330 (rejecting the argument that the presence of armed school-safety officers amounted to custody); *Tanner v. County of Lenawee*, 452 F.3d 472 (6th Cir.

2006) (dismissing the notion that setting up a perimeter around a house and cutting off potentially lifesaving rescue restrained liberty or prevented the plaintiff from acting on his own behalf). Therefore, the Individual Law Enforcement Defendants are entitled to qualified immunity and dismissal of this claim.

***b. State-Created Danger***

The Plaintiffs' reliance on a state-created danger theory of liability fares no better. The state-created danger exception to no duty to protect is a legal concept developed from dicta in *DeShaney* that holds state actors liable for harm committed by a private actor. For the exception to apply, a plaintiff, at a minimum, must show that "[1] the defendants used their authority to create a dangerous environment for the plaintiff and that [2] the defendants acted with deliberate indifference to the plight of the plaintiff." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537-38 (5th Cir. 2003). "To establish deliberate indifference for purposes of state-created danger, the plaintiff must show that '[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.'" *Magee,* 675 F.3d at 865 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001)). A claim may also exist when state actors "increase a person's vulnerability to private violence by interfering with protective services which otherwise would be available." *Salas*, 980 F.2d at 309 (citing *Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir. 1990)).

According to the Plaintiffs, the act of surrounding the classrooms and school essentially trapping the shooter in the classrooms increased the risk of harm to the children. But to the detriment of the Plaintiffs, neither the Supreme Court nor the Fifth Circuit has explicitly adopted the state-created danger exception. In *Sterling v. City of Jackson*, 159 F.4th 361 (5th Cir. 2025), a

Fifth Circuit panel briefly recognized the state-created danger doctrine as a viable theory for a substantive due process claim, where a city knowingly contaminated drinking water with lead and then encouraged residents to drink the water. However, the Fifth Circuit as a whole quickly retreated from this position by granting a petition for rehearing en banc and vacating the opinion. 159 F.4th 361 (5th Cir. 2025). In the recently released en banc opinion, the majority avoided any mention of the phrase "state-created danger" and simply held that under the specific facts of *Sterling*, there was no due process right to bodily integrity. No. 24-60370, 2026 WL 2617771 (5th Cir. Sept. 4, 2026). In other words, the Fifth Circuit still has not explicitly adopted or rejected a state-created danger theory of liability, despite an opportunity to do so.

Regardless of the fate of state-created danger within the Fifth Circuit, the law was not clearly established at the time of the shooting. Although the Fifth Circuit has loosely articulated the elements of a cause of action, it "has repeatedly noted its unavailability." *Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1002 (5th Cir. 2014) (collecting cases); *see also Fisher v. Moore*, 73 F.4th 367, 369 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024) ("This circuit has never adopted a state-created danger exception to the sweeping 'no duty to protect' rule."); *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 688 (5th Cir. 2017) (emphasizing that Fifth Circuit panels have repeatedly noted the unavailability of a state-created-danger exception); *Williams v. Williams*, No. 23-20376, 2024 WL 811526, at *1 (5th Cir. Feb. 27, 2024) ("The appellant recognizes that she cannot prevail under this court's longstanding jurisprudence whereunder we do not recognize 'state-created danger' as a theory of liability for a claimed constitutional violation. Appellant asks the court to use this case as a vehicle to adopt, for the first time, that theory. We decline the invitation."); *Robinson v. Webster County*, 825 F. App'x 192, 196 (5th Cir. 2020) (same). The Law Enforcement Defendants would thus be entitled to qualified

immunity and dismissal of these Fourteenth Amendment claims because "[a] *never*-established right cannot be a *clearly* established one." *Fisher*, 73 F.4th at 369 (discussing the state-created danger exception).[12]

*c. Parental Rights*

The Plaintiffs also vaguely allege a Fourteenth Amendment violation based on interference with the parent-child relationship. Although the Plaintiffs allege few facts in their Complaint to support this claim, they state in their response to the motions to dismiss, "By taking control of the crime scene yet failing to do anything to rescue or protect the student plaintiffs while, at the same time, forcibly holding back, pinning to the ground, pepper spraying, and tasing parents, the Law Enforcement Defendants violated the parents' and their children's constitutional right to family integrity." (ECF No. 49 at 10.)

Again, a parent has a fundamental right to make decisions concerning "companionship, care, custody, and management of his or her children." *Stanley*, 405 U.S. at 651; *Quillion*, 434 U.S. at 255. However, "the Due Process Clause does not condemn every conceivable state action that affects a fundamental right in any way." *McCurdy v. Dodd*, 352 F.3d 820, 827 (5th Cir. 2003). A parental right is constitutionally protected "only when the government directly acts to sever or otherwise affect his or her legal relationship with a child." *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986). For a § 1983 claim to be actionable, the "alleged unconstitutional state action must be specifically aimed at interfering with protected aspects of the parent-child relationship." *Tamez v. Manthey*, Civ. No. B-07-213, 2008 WL 11451445, at *5 (5th Cir. Sept. 18, 2008); *see also Chambers v. Sanders*, 63 F.4th 1092, 1098 (6th Cir. 2023); *Trujillo,* 768 F.2d at 1190

[12] The Plaintiffs argue that they should be allowed to conduct extensive discovery to effectively build a case for recognizing state-created danger. But the purpose of qualified immunity is to protect a state actor from having to undergo the burden of discovery when the constitutional right is not clearly established. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

(requiring an *intent* to interfere with the relationship). The [Supreme] Court has never held that the governmental action that affects the parental relationship only incidentally . . . is susceptible to challenge for a violation of due process." *Burgos*, 807 F.2d at 8; *see also Malagon de Fuentes v. Gonzalez*, 462 F.3d 498, 505–06 (5th Cir. 2006).

Assuming it is proper to consider new facts alleged in response to a motion to dismiss, the Plaintiffs' allegations fail to plausibly suggest that the intent in erecting a barrier around the classrooms and the school was to interfere with the parent-child relationship. A plain reading of the Complaint shows that the barrier was imposed to control an active crime scene. When an officer is "reacting to the specific situation before him, his actions [are] directed solely at the person at the center of the situation," *i.e.* Ramos, and not directed at the parent-child relationship. *Tamez*, 2008 WL 11451445, at *6.

Even if the Plaintiffs had a constitutionally protected right to be free from state interference with the parent-child relationship under the facts alleged, the Plaintiffs cannot point to a single decision expanding this right to a parent's attempt to interfere with law enforcement at the scene of an active shooter situation. Therefore, the Law Enforcement Defendants are entitled to qualified immunity.

**3. Municipal Liability**

UCISD and City of Uvalde likewise seek dismissal of any § 1983 claims against them pursuant to Rule 12(b)(6). The Plaintiffs allege that UCISD and City of Uvalde, through the deliberate indifference of their final policymakers, had a custom and practice of noncompliance with regulations and protocols to ensure the safety and protection of the students and staff in the event of an active shooter incident; and this deliberate indifference was the driving force of their

Fourteenth Amendment due process violations. They also allege that the Municipal Defendants should be held liable for failing to train and/or supervise the law enforcement officers.

The Plaintiffs' claims cannot survive Rule 12(b)(6) scrutiny. A municipality or other local government entity may be liable under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692); *Moore*, 233 F.3d at 874 (noting that a school district may be held liable under § 1983 "for constitutional violations committed pursuant to a governmental policy or custom"). To successfully state a § 1983 claim against a municipality, a plaintiff must plead facts that plausibly establish "a policy maker, an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom." *Ratliff v. Aransas County*, 948 F.3d 281, 285 (5th Cir. 2020) (*quoting Piotrowski*, 237 F.3d at 578).

In addressing municipal liability under § 1983, a court must separate two different issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [governmental entity] is responsible for that violation." *Collins*, 503 U.S. at 120. If there is no underlying constitutional violation, dismissal is proper under Rule 12(b)(6). *Rios v. City of Del Rio*, 444 F.3d 417, 427 (5th Cir. 2006).

Local governments are only responsible for their own unlawful acts and "are not vicariously liable for their employees' actions." *Connick*, 563 U.S. at 60. However, a municipality may be liable for failing to train its employees when a constitutional violation committed by the employee results directly from a municipal custom or policy. *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000). To state a claim for failure to train, a plaintiff must plead three things: (1) inadequate training of the individuals involved; (2) the inadequate training caused a violation

of the plaintiff's constitutional rights; and (3) the inadequate training "constituted deliberate indifference of municipal policymakers to the plaintiff's constitutional rights." *Bledsoe v. Willis*, 665 F. Supp. 3d 810, 824 (W.D. La. 2023) (citing *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)); *see also Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir. 1996). Importantly, governmental entities "cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Bustillos v. El Paso Cnty. Hosp. Distr.*, 891 F.3d 214, 222 (5th Cir. 2018) (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 511 (6th Cir. 2012)); *see also Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc).

As previously discussed, the Plaintiffs have not established a violation of any constitutional right by any of the Law Enforcement Defendants. They also allege insufficient facts to show that failing to implement certain safety measures at the school, such as installing a taller fence or ensuring that doors properly locked, amount to a constitutional violation, where there is no general duty to protect students from the criminal acts of third parties. Furthermore, to the extent that the Plaintiffs' claims are based on the Municipal Defendants' failure to train, a municipality cannot be deliberately indifferent to a policy that violates a constitutional right that is not clearly established. *Bustillos*, 891 F.3d at 222. In other words, even if the Plaintiffs' constitutional rights were violated, the Municipal Defendants cannot be held liable because these constitutional rights were not yet clearly established at the time of the shooting. Therefore, the Municipal Defendants are entitled to dismissal of the claims against them. *Id.*; *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that no case "authorizes the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm"); *Rios*, 44 F.3d at 425-26.

**4. Police Departments**

UCISD PD and City of Uvalde PD are also entitled to dismissal of the claims against them. A police department does not have the capacity to be sued unless it enjoys "a separate legal existence." *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991) (quotations omitted). "[U]nless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself." *Id.* at 313.

The Plaintiffs have not shown that the police departments have been granted jural authority. In such cases, courts generally construe allegations against police departments as allegations against the municipality itself. *See, e.g., Gordon v. Neughebauer*, No. 1:14-cv-0093-J, 2014 WL 5531734, at *5 (N.D. Tex. Oct. 31, 2014). In other words, they are duplicative of the claims against UCISD and the City of Uvalde. Therefore, the claims against UCISD PD and Uvalde PD must be dismissed as well.

**D. Leave to Amend**

The Plaintiffs ask for leave to amend their Complaint in the event the Court finds the Plaintiffs' pleadings are deficient. Federal Rule of Civil Procedure 15(a)(2) counsels that the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Generally, courts should give plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case under Rule 12(b)(6)." *Pierce v. Hearne Indep. Sch. Dist.*, 600 F. App'x 194, 200 (5th Cir. 2015). However, a court need not allow amendment when there is substantial reason to deny leave, such as when amendment would be futile or the plaintiffs have already alleged their best case. *Id.*; *see also Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Amending a complaint is futile when "the theory presented in the amendment lacks legal

foundation or because the theory has been adequately presented in a prior version of the complaint." *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 591 (5th Cir. 2016) (quotations omitted).

As the law stands in the Fifth Circuit, any additional amendments would be futile, where: (1) the Fifth Circuit has never officially adopted a due process claim based on a state-created danger theory; and (3) the Fifth Circuit has never before extended the "special relationship" exception to a school setting. *See Fisher*, 73 F.4th 367; *Doe v. Bridge City Indep. Sch. Dist.*, No. 20-40596, 2021 WL 4900296, at *2 (5th Cir. Oct. 20, 2021) (holding that amending to plead a custodial relationship between students and a school is futile under *DeShaney*). Likewise, the Fifth Circuit has never extended a child-parent interference claim to the context of an active school shooter response. Even if the Fifth Circuit were to recognize these theories under the facts alleged, the Defendants would nonetheless be entitled to dismissal, where the law falls far short of being clearly established. *Bustillos,* 891 F.3d at 222. Without a viable underlying clearly established constitutional claim, amending to allege additional facts is not warranted.

**E. Does 1 through 3000**

The claims against Does 1 through 3000 must also be dismissed. "A plaintiff should be given an opportunity through discovery to determine the identity of a defendant . . . ." *Hittle v. City of Garland*, 1 F.3d 1236, at *1 (5th Cir. 1993). But "if the plaintiff fails to name the defendant after a reasonable period of time, the claim is subject to dismissal for failure to prosecute." *Id.*; Fed. R. Civ. P. 41(b). Although the Court has discretion to dismiss a claim with or without prejudice, a dismissal with prejudice is permitted only "in the face of a clear record of delay or contumacious conduct by the plaintiff." *Colle v. Brazos County*, 981 F.2d 237, 243 (5th Cir. 1993) (quoting *Durham v. Fla. E. Coast Ry. Co.*, 385 F.2d 366, 368 (5th Cir. 1967)).

Dismissal with prejudice is warranted. The Plaintiffs have had a sufficient opportunity to determine the identity of at least some of the 3000 Does. The shooting occurred on May 24, 2022, over four years ago. Shortly after, the federal government conducted a well-publicized investigation into the shooting, providing details about not only the shooter and his victims, but also the responding law enforcement agents and agencies. Over three years after filing suit, the Plaintiffs still have not identified the Does.

Even if the Plaintiffs were allowed additional time to amend to name the Does, any such amendment would be futile. An amendment to substitute a named party for a "John Doe" does not relate back under Rule 15 of the Federal Rules of Civil Procedure. *See Jacobsen v. Osborne*, 133 F.3d 315 (5th Cir 1998). Therefore, any claims against the Does would likely be barred by § 1983's two-year statute of limitations period. *See Piotrowski*, 51 F.3d at 514 n.5. Even if there was a basis for tolling the limitations period, there is no merit to the claims against the Does, which are identical to the claims of the other Law Enforcement Defendants.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the motions to dismiss by the Law Enforcement Defendants and the Municipal Defendants [30, 33, 34, 35, 42, 47, 64, 66, 83] are **GRANTED**. Accordingly, it is **ORDERED** that:

(1) The student parent's individual claims based on a state created danger and custodial relationship are **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 12(b)(1) for want of jurisdiction;

(2) The claims of Plaintiffs Sylvia U., Maria G.-R, Vanessa G., and Maria P. are **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 12(b)(1) for want of jurisdiction;

(3) The claims against Defendants DPS and McCraw in his official capacity are **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 12(b)(1) for want of jurisdiction;

(4) The claims against Defendants Suarez, Betancourt, Escalon, and Maldonado are **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 12(b)(5) and Rule 4(m) for failure to timely effect service;

(5) The claims against Defendant Gutierrez are **DISMISSED WITHOUT PREJUDICE,** pursuant to the terms of the parties' stipulation of dismissal [ECF No. 21], and Defendant Gutierrez's motion to dismiss [ECF No. 19] is **DENIED AS MOOT**;

(6) The remaining claims against the Law Enforcement Defendants and the Municipal Defendants are **DISMISSED WITH PREJUDICE** pursuant to Rule 12(b)(6) for failure to state a claim;

(7) The Plaintiffs' motion for leave to file a response [ECF No. 88] is **DENIED**;

(8) The Plaintiffs' request for leave to file an amended complaint [ECF No. 22] is **DENIED**;

(9) The claims against Does 1-3000 are **DISMISSED WITH PREJUDICE**, pursuant to Rule 41(b) of the Federal Rules of Procedure, for failure to prosecute; and

10) Intervenor Gladys Castillon's Motion to Intervene [ECF No. 75], which was filed eighteen months after this case was initially filed, is **DENIED AS UNTIMELY AND AS MOOT**.

Because this Order disposes of all claims against all parties, it is further **ORDERED** that the Clerk of Court shall enter a clerk's judgment and terminate the present cause of action, as well as any additional pending motions.

SIGNED and ENTERED on this 29th day of September 2026.

ALIA MOSES
Chief United States District Judge